1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MONTANA

3              GREAT FALLS DIVISION

4

5  UNITED STATES OF AMERICA,    )

6            Plaintiff,    )

                        )  Criminal Docket

7     vs.              )  No. CR 19-57-GF-BMM

8  JOSHUA JAMES BIRDRATTLER,   )

9            Defendant.    )

      _____  )

10

11          Transcript of Motion Hearing

12

13       Missouri River Federal Courthouse
              125 Central Avenue West

14          Great Falls, MT 59404
            Tuesday, October 8, 2019

15        10:00 a.m. to 12:45 p.m.

16

17     BEFORE THE HONORABLE BRIAN MORRIS

18    UNITED STATES DISTRICT COURT JUDGE

19

20         Yvette Heinze, RPR, CSR
           United States Court Reporter

21     Missouri River Federal Courthouse
           125 Central Avenue West

22         Great Falls, MT 59404
       yvette_heinze@mtd.uscourts.gov

23          (406) 454-7805

24    Proceedings recorded by machine shorthand
  Transcript produced by computer-assisted transcription

25

1

**APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFF,
    THE UNITED STATES OF AMERICA:

3

4                   Cassady Adams
                    Assistant U.S. Attorney
                    OFICE OF THE U.S. ATTORNEY
5                   119 1st Avenue North, Suite 300
                    Great Falls, MT 59401

6
                    Lori A. Harper Suek
7                   Assistant US Attorney
                    US ATTORNEY'S OFFICE
8                   2601 Second Avenue North, Suite 3200
                    Billings MT, 59101

9

10  PRESENT ON BEHALF OF THE DEFENDANT:

11
                    Hank Branom
12                  FEDERAL DEFENDERS OF MONTANA
                    104 2nd Street South, Suite 301
13                  Great Falls, MT 59401

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

WITNESSES CALLED BY THE GOVERNMENT                          PAGE

  STACEY SMIEDALA
       DIRECT EXAMINATION BY MS. ADAMS                        6
       CROSS-EXAMINATION BY MR. BRANOM                        27
       REDIRECT EXAMINATION BY MS. ADAMS                      39
  STEVEN SNYDER
       DIRECT EXAMINATION BY MS. ADAMS                        40
       CROSS-EXAMINATION BY MR. BRANOM                        51
       REDIRECT EXAMINATION BY MS. ADAMS                      56
       EXAMINATION BY THE COURT                               56
       FURTHER EXAMINATION BY MS. ADAMS                       58
  STACEY SMIEDALA
       DIRECT EXAMINATION BY MS. ADAMS                        87
       CROSS-EXAMINATION BY MR. BRANOM                        90
  STEVEN SNYDER
       DIRECT EXAMINATION BY MS. ADAMS                        91
       CROSS-EXAMINATION BY MR. BRANOM                        92


WITNESSES CALLED BY THE DEFENDANT                           PAGE

  JOSHUA JAMES BIRDRATTLER
       DIRECT EXAMINATION BY MR. BRANOM                       61
       CROSS-EXAMINATION BY MS. ADAMS                         72

* * *

EXHIBITS

GOVERNMENT'S                                             ADMITTED

  Government's Exhibits 1 and 2                              5


DEFENDANT'S                                               ADMITTED
  Defendant's Exhibits 501, 502, 503, 504, and 505          5

PROCEEDINGS

1
2    (Open court.)
3    (Defendant present.)
4         THE COURT:  Please be seated.
5         Madam Clerk, please call the next case on the Court's
6    calendar.
7         THE CLERK:  This Court will now conduct a motion
8    hearing in Cause Number CR 19-57-GF-BMM, United States of
9    America versus Joshua James Birdrattler.
10        THE COURT:  Good morning, Ms. Adams.
11        MS. ADAMS:  Good morning, Your Honor.
12        THE COURT:  Good morning, Ms. Suek.
13        MS. SUEK:  Good morning, Your Honor.
14        THE COURT:  And who is with you, please?
15        MS. ADAMS:  This is Special Agent Steve Snyder with
16    the FBI.
17        THE COURT:  Welcome, Mr. Snyder.
18        Welcome, Mr. Branom.
19        MR. BRANOM:  Good morning, Your Honor.
20        THE COURT:  Mr. Birdrattler.
21        THE DEFENDANT:  Good morning.
22        THE COURT:  We're here on a motion to suppress
23    statements filed by Mr. Branom on behalf of Mr. Birdrattler.
24        I guess it's your burden, Ms. Adams.
25        MS. ADAMS:  That's correct, Your Honor.

 1          THE COURT:  Okay.  And how do you want to proceed?
 2   Do you have witnesses?
 3          MS. ADAMS:  We do, Your Honor.  And, first, I had a
 4   few administrative things for the beginning of the hearing.
 5          THE COURT:  All right.
 6          MS. ADAMS:  Mr. Branom filed a few exhibits, and I
 7   also filed two exhibits.  So at this time we have stipulated to
 8   the admissibility of all of the exhibits, and we're moving to
 9   admit Defendant's Exhibits 501 through 505 and United States's
10   Exhibits 1 and 2.
11          THE COURT:  501 through 505 and Plaintiff's 1 and 2?
12          MS. ADAMS:  Yes, Your Honor.
13          THE COURT:  Mr. Branom, any objection?
14          MR. BRANOM:  No, we have agreed to that, Your Honor.
15          THE COURT:  All right.  501 through 505 and 1 and 2
16   will be admitted.
17       (Government's Exhibits 1 and 2 admitted into evidence.)
18       (Defendant's Exhibits 501, 502, 503, 504, and 505 admitted
19       into evidence.)
20          THE COURT:  All right.  Anything else, Ms. Adams?
21          MS. ADAMS:  And just to clarify, in Mr. Branom's
22   motion, he was moving -- it just says, "We're moving to
23   suppress statements."  Hank and I -- Mr. Branom and I have
24   conferred, and the statements he's moving to suppress are
25   statements made by the defendant on April 3rd, 2019, not other

1    statements that were made in this case.

2              THE COURT:  All right.  I understand.

3              MS. ADAMS:  Other than that, we're ready, Your Honor.

4              THE COURT:  All right.  Why don't you call your first

5    witness, please.

6              MS. ADAMS:  The United States calls Special Agent

7    Stacey Smiedala.

8                      STACEY SMIEDALA,

9    called for examination by counsel for the government, after

10   having been first duly sworn to testify the truth, the whole

11   truth, and nothing but the truth, testified as follows:

12             THE COURT:  Good morning, sir.

13             THE WITNESS:  Good morning, sir.

14             THE COURT:  Please state your full name and spell

15   your last name.

16             THE WITNESS:  Stacey Smiedala, last name is spelled

17   S-M-I-E-D-A-L-A.

18             THE COURT:  Go ahead, Ms. Adams.

19                     DIRECT EXAMINATION

20   BY MS. ADAMS:

21   **Q.**   Good morning, Agent Smiedala.

22   **A.**   Good morning, Ms. Adams.

23   **Q.**   Where are you employed?

24   **A.**   I'm employed at the Helena resident agency of the FBI.

25   **Q.**   And what is your job with the FBI?

**A.**   I am a special agent as well as a polygraph examiner.

**Q.**   How long have you been a polygraph examiner?

**A.**   For, approximately, 16 years.

**Q.**   Can you describe what your job duties entail.

**A.**   I conduct polygraph examinations at the direction of the
FBI for applicant matters, witness security, employees, as well
as criminal matters.

**Q.**   Prior to being a polygraph examiner, did you do other law
enforcement jobs?

**A.**   I did.  I was employed with the United States Army prior
to the FBI as a special agent with the Criminal Investigation
Division.

**Q.**   And prior to becoming a polygraph examiner, were you also
an FBI agent?

**A.**   Yes, ma'am.

**Q.**   I'd like to talk about the case we're here for today.
Agent Smiedala, how did you become involved in this matter?

**A.**   I received a request as well as two phone calls from the
case agent, Special Agent Steve Snyder, regarding allegations
of a rape that occurred on the Browning Indian Reservation.

**Q.**   And in response to that request, what did you do?

**A.**   I coordinated with Special Agent Snyder to travel to the
Browning area to conduct a polygraph examination of the
defendant, Mr. Birdrattler.

**Q.**   And did that examination take place on April 3rd, 2019?

1   A.   Yes, ma'am.

2   Q.   I'd like to talk about that day, Agent Smiedala.

3   A.   Yes.

4   Q.   On April 3rd, 2019, where specifically did you go to

5   conduct a polygraph examination?

6   A.   Special Agent Snyder had set up with the defendant to test

7   in the Browning Federal Building, which is located on the

8   Browning Indian Reservation.

9   Q.   Had you been to that building before?

10  A.   Yes, I had been.

11  Q.   And can you describe, generally, what that building is and

12  if it has any other office spaces in it.

13  A.   Yes.  The building itself is -- has multiple offices in

14  the building.  They're mostly tribal offices.  The particular

15  office where I conducted the examination of the defendant is

16  known as a Child Advocacy Center.

17  Q.   Where specifically -- you said it was a Child Advocacy

18  Center.  Can you describe the place where you conducted an

19  interview.

20  A.   Yes.  The room itself was -- had a table, three chairs --

21  there was a window in the room, and I'm estimating -- or

22  approximating about 10 feet by 15 feet where the test was

23  conducted.

24  Q.   Do you recall if Special Agent Steve Snyder was also at

25  the federal building that day?

1   **A.**   He was.

2   **Q.**   Agent Smiedala, did you come to meet the defendant, Joshua

3   Birdrattler, on that day?

4   **A.**   I did.

5   **Q.**   How did you come to meet him?

6   **A.**   Special Agent Snyder escorted him back to the office I had

7   set up my equipment in and introduced me to the defendant.

8   **Q.**   Do you remember about what time you met him?

9   **A.**   It was approximately 1:25 p.m.

10   **Q.**   And do you remember, generally, what type of clothing he

11   was wearing?

12   **A.**   I don't.

13   **Q.**   Was he in street clothes?

14   **A.**   Yes, he was.

15   **Q.**   Prior to that day, had you met Mr. Birdrattler before?

16   **A.**   I had not.

17   **Q.**   Agent Smiedala, what were you wearing that day?

18   **A.**   I was wearing a suit.

19   **Q.**   Did you have a firearm on you?

20   **A.**   I did.  I wear a firearm on my ankle.

21   **Q.**   Was it visible?

22   **A.**   No, ma'am.

23   **Q.**   Once Agent Snyder introduced you to Mr. Birdrattler, where

24   did you and Mr. Birdrattler go from there?

25   **A.**   We went into the interview room that I had set up with the

1 | table and chairs as well as where my polygraph equipment was
2 | set up and began the polygraph process.
3 | **Q.** Before we continue, I should ask:  Do you see
4 | Mr. Birdrattler in the courtroom today?
5 | **A.** Yes, ma'am.  He's sitting to the right of Mr. Branom.
6 | MS. ADAMS:  Your Honor, if we could let the record
7 | reflect, Agent Smiedala has identified the defendant.
8 | THE COURT:  Record will reflect.
9 | BY MS. ADAMS:
10 | **Q.** So, agent Smiedala, you said Mr. Birdrattler came into the
11 | room?
12 | **A.** That's correct.
13 | **Q.** And how was your equipment set up in that room?
14 | **A.** The components to the polygraph instrument were sitting on
15 | the table as well as the laptop and the chair that the
16 | defendant would sit in if he took a test.
17 | **Q.** And when he first came in, did he sit in that particular
18 | chair where the polygraph components were?
19 | **A.** No, ma'am.  I have the examinee sit in another chair.
20 | It's more comfortable.
21 | **Q.** And where did you sit when you came in the room with him?
22 | **A.** I sat behind my laptop behind the desk in the room.
23 | **Q.** Was Mr. Birdrattler handcuffed or physically restrained at
24 | all on that day?
25 | **A.** No, he was not.

**Q.** And at any time that day did you actually put your polygraph components on Mr. Birdrattler's body?

**A.** I did not.

**Q.** I'd like to also ask another question about this room, Agent Smiedala. Do you know if the room was locked at any point that day when Mr. Birdrattler was in it?

**A.** No, it was not locked at any point.

**Q.** Agent Smiedala, about what time did you start your interview with Mr. Birdrattler on April 3rd, 2019?

**A.** It was about 1:25 p.m.

**Q.** And what was the first thing that you did at that time?

**A.** I, obviously, introduced myself and then explained to Mr. Birdrattler that I needed to complete two forms for him to participate in the polygraph process. So I began reading the first form, which was the polygraph consent form.

MS. ADAMS: And, Madam Clerk, if we could please have the Defendant's Exhibit 505.

(Displayed.)

BY MS. ADAMS:

**Q.** Agent Smiedala, do you recognize this form that's displayed on the screen?

**A.** Yes, ma'am. This is the Consent to Interview with Polygraph that I read to Mr. Birdrattler on April 3rd, 2019.

**Q.** Okay. And in the top right-hand corner, it says, "Time: 1:25 p.m." What does that tell us?

1  **A.**    The time that I started the form, when I began reading it

2  aloud to the defendant.

3  **Q.**    Did you have him read any part of it himself?

4  **A.**    I did.  I read the portion that's entitled, "Affiliation"

5  and "Your Rights" out loud, and then I ask the examinee to read

6  the Waiver and Consent form aloud to me.

7  **Q.**    Did he read that?

8  **A.**    Yes, he did.

9         MS. ADAMS:  And, Madam Clerk, if we could please

10  scroll down to the bottom.

11     (Displayed.)

12  BY MS. ADAMS:

13  **Q.**    Agent Smiedala, it says, "examinee signature," in the

14  bottom right-hand corner.  Who signed that?

15  **A.**    That is the defendant's signature.

16  **Q.**    And it says, "Examiner signature."  Who's signature is

17  that?

18  **A.**    That is my signature.

19         MS. ADAMS:  And, Madam Clerk, if we could please have

20  Exhibit 504.

21     (Displayed.)

22  BY MS. ADAMS:

23  **Q.**    Agent Smiedala, after you went over the consent form with

24  Mr. Birdrattler, which form did you go over next?

25  **A.**    I next completed the Advice of Rights form in the same

manner.  I read the Rights section out loud to the defendant

and asked him to read the Consent portion to me aloud.

**Q.**   And did he sign this form as well?

**A.**   Yes, ma'am, and so did I.

**Q.**   Why do you have people review these forms and sign them

prior to administering a polygraph exam?

**A.**   Well, there's a few reasons.  One, to ensure that they

understand the form and, if they have questions, they can ask

me.  He did not ask me any questions, but he read it.  I wanted

to ensure that he could read as well as write and understand

the process because it is a voluntary process to participate in

the polygraph.

**Q.**   Did Mr. Birdrattler appear to understand what you were

saying when you explained these forms to him?

**A.**   Yes.  And he told me he understood.

**Q.**   Did you have any reason to believe at that point that he

was not able to sign the forms voluntarily?

**A.**   None, whatsoever.

        MS. ADAMS:  We're done with those exhibits.  Thank

you very much.  If we could please have Government's Exhibit 1

now.

        (Displayed.)

BY MS. ADAMS:

**Q.**   Agent Smiedala, what did you do next after you reviewed

those forms with Mr. Birdrattler?

1  **A.**  Next, I began a form known as the "biographical sheet"
2  with the defendant.
3  **Q.**  Is that standard procedure for conducting a polygraph
4  examination?
5  **A.**  Yes, ma'am.
6  **Q.**  And why do you complete biographical sheets with people?
7  **A.**  Again, for a few different reasons, to certainly obtain
8  some somewhat personal information from them -- name, date of
9  birth, and the standard biographical information -- but as well
10 to get some information from them where I can make a
11 determination to see if they're, quote/unquote, kind of fit to
12 participate in the polygraph process.
13 **Q.**  We have on our screen Government's Exhibit 1.  Do you
14 recognize this form?
15 **A.**  Yes, ma'am.  This is the biographical sheet I completed
16 with the defendant.
17 **Q.**  And in the top portion it says, "Interview start time,
18 1:25 p.m."  Is that the time your interview started?
19 **A.**  Yes, that's the time I completed the initial consent form.
20 **Q.**  And when it says, "Interview end time," what does that
21 tell us?
22 **A.**  This is the time that the examinee, the defendant, walked
23 out of the interview.
24 **Q.**  So would that be 2:57 p.m.?
25 **A.**  Yes.

1          MS. ADAMS:  And if we could please scroll down to the
2  bottom part of that.
3       (Displayed.)
4  BY MS. ADAMS:
5  **Q.**   Agent Smiedala, do you complete this form
6  contemporaneously with individuals who are being interviewed?
7  **A.**   I do.
8  **Q.**   Did Mr. Birdrattler tell you about what his education
9  level is?
10 **A.**   He did.  He explained to me that he had a GED and that he
11 could read and write.  Those are the issues that I cover with
12 each examinee when they come in to take a test.
13 **Q.**   And did he describe his employment history to you?
14 **A.**   Yes.  He said he worked as a seasonal firefighter for
15 approximately 15 years.
16 **Q.**   Would that be -- is that the Chief Mountain Hotshots?
17 **A.**   Yes, ma'am.
18          MS. ADAMS:  If we could please have page 2.
19       (Displayed.)
20          THE COURT:  Madam Clerk, I'm not getting it on my
21 screen.
22       (Off-the-record discussion between the clerk and the judge
23       regarding the screens.)
24          MS. ADAMS:  Your Honor, we have an extra copy of the
25 exhibits too.

1    THE COURT:  That would be great.  Thanks.  If you

2 wouldn't mind.

3    MS. ADAMS:  May I approach?

4    THE COURT:  You may.

5    MR. BRANOM:  Thank you, Ms. Adams.

6    (Handing documents.)

7    THE COURT:  Go ahead, Ms. Adams.

8 BY MS. ADAMS:

9 **Q.**    Agent Smiedala, did Mr. Birdrattler describe if he had

10 traveled outside of the country?

11 **A.**    He did.  He said he had visited Mexico and Canada.

12 **Q.**    And do you ask individuals about their health as well when

13 you conduct a biographical sheet?

14 **A.**    I did.  And I asked the defendant -- I gave him a choice

15 of good, fair, or poor.  He chose "good" for his health that

16 particular day.

17 **Q.**    When you're going through this list of questions or sheet

18 with individuals in a polygraph exam, do you do it

19 chronologically as the sheet shows?

20 **A.**    I do.

21 **Q.**    Did he describe how much sleep he had the night before?

22 **A.**    Yes, six hours.

23 **Q.**    And did he say if he had taken any medications?

24 **A.**    He said he had taken no medications, prescription or

25 otherwise, prior to the exam.

1          MS. ADAMS:  And, Madam Clerk, if we could please

2    scroll down a little bit to the bottom.  Thank you.

3          (Displayed.)

4    BY MS. ADAMS:

5    **Q.**   Agent Smiedala, did you ask Mr. Birdrattler about whether

6    he had consumed any alcohol prior to taking the exam?

7    **A.**   I did.  He said he had four or five beers the previous

8    night.  The last beer he consumed at about 10:30 p.m.

9    **Q.**   Did you also ask him about whether he had taken a

10   polygraph exam before?

11   **A.**   I did.  He, the defendant, explained to me that he had

12   participated in a polygraph approximately 15 years ago in an

13   allegation regarding a man being killed and hit by a vehicle.

14   He did not know the results of the test, and he was not charged

15   at that time.

16   **Q.**   And are you aware of whether that was a polygraph -- like,

17   a federal agency or another law enforcement agency that's not a

18   federal agency?

19   **A.**   I don't know, and I did do some looking into it.  But

20   during that time, the records were not automated, so it would

21   be difficult to find the paper trail, although not impossible,

22   maybe down the line.

23          MS. ADAMS:  We're done with that exhibit.  Thank you

24   very much.

25          (Removed.)

1  BY MS. ADAMS:

2  **Q.**    Agent Smiedala, based on your training and experience and

3  your conversation with Mr. Birdrattler, did you determine

4  whether he was fit to partake in a polygraph exam?

5  **A.**    I did.  He was completely fit to participate in the

6  process that particular day.

7  **Q.**    And is there a particular phrase that you use to describe

8  this part of a polygraph exam before you actually put the

9  components on a person's body?

10  **A.**    Yes.  It's referred to as the pretest phase.

11  **Q.**    Okay.  And does the pretest phase begin as soon as you

12  start reviewing the consent forms with individuals?

13  **A.**    That's correct.

14  **Q.**    Agent Smiedala, after you went over this biographical

15  sheet, what did you do next?

16  **A.**    Then I began explaining to the defendant the polygraph

17  process.  And what I mean by that is -- excuse me -- the

18  specific format -- polygraph format that's going to be used.  I

19  show him each component and the general function of each

20  component.  I explain the physiology associated with polygraph

21  and how that process works; in other words, the things that I'm

22  going to say during the testing process, how he's going to sit

23  while we take the test, where the components are going to go on

24  his body.  And, generally, all of that is in an effort to

25  hopefully help a person relax a little bit because you expect

1   them to be a little nervous prior to the testing process, but

2   as well as just to gain some general knowledge regarding a

3   polygraph.

4   **Q**.    And are the procedures that you use, for example, in a

5   criminal polygraph exam like this one, are those procedures

6   similar to polygraph exam procedures you might use in other

7   context outside of Indian Country?

8   **A**    Yes, ma'am.

9   **Q**.    At some point during this pretest phase, did you also ask

10  Mr. Birdrattler about actual facts of the allegation?

11  **A**    I did.  Because part of that pretest phase is also to

12  review the questions or the potential subjects that I'm going

13  to test the person on.  In this particular case, part of that

14  is the allegations of rape or, you know, sexual abuse of the

15  victim of this matter.

16  **Q**.    Okay.  Can you describe how that conversation took place

17  with Mr. Birdrattler.

18  **A**.    Yes, ma'am.  Well, previously, once I finished the consent

19  forms, I asked Mr. Birdrattler if he was involved in any

20  capacity in forcing the victim -- in this case, Jacy

21  Blackman -- into any part of a sexual act or any type of a

22  sexual act.  He said he had not done anything to force her.

23          While I reviewed the questions later on in pretest

24  phase and discussed some of the questions that would involve

25  him forcing the victim to engage in a sexual act, he said that

1  there may have been a portion of their sexual activity that he

2  had forced her to become involved in.

3  **Q.**   What did you do in response to him making that disclosure?

4  **A.**   I asked him to generally tell me how that had occurred.

5  Then he basically told me that the oral sex/vaginal sex that he

6  had engaged in with the victim was consensual and the

7  relationship.  And that night things had begun consensually,

8  but that when the victim asked him to get behind her, he

9  interpreted that as a positional-type thing in the sexual

10  activity, and he decided to put his penis inside of her anus,

11  which she apparently did not want him to do.  And he felt that

12  he had probably forced her.

13  **Q.**   Did you attempt to initiate a recording at any point

14  during that disclosure?

15  **A.**   I did.  I started my recorder.

16  **Q.**   And why did you do that?

17  **A.**   Because once somebody had made an admission to the

18  allegations, at that point, I am going to begin what's called

19  the posttest phase and initiate the recorder immediately.

20  **Q.**   Agent Smiedala, why do you go from the pretest phase to

21  the posttest phase and skip the in-test phase whenever

22  someone's made an admission?

23  **A.**   Well, the reason the defendant was there was for me to

24  test and see if he had been involved in any level of force

25  regarding his sexual activity with the victim.  At that point,

1  he made an admission and said that a portion of that was forced
2  and not consensual.  So there's no reason I would test him at
3  that point.  So I began the recording.
4  **Q.**    And for clarification purposes, what is -- can you
5  describe what the posttest phase generally entails.
6  **A.**    It's just further questioning regarding the testing
7  process.  In this case, there was no test actually given, but
8  it's going to be further questioning.  And sometimes that even
9  means clarifying things after an initial bout of testing and
10 then maybe moving into more polygraph testing if need be.
11 **Q.**    And is the in-test phase -- is that where the components
12 are actually on a person's body?
13 **A.**    That's correct.
14 **Q.**    So can you describe the time period that this conversation
15 with Mr. Birdrattler took place and -- once he made the
16 admission?
17 **A.**    Yes.  I mean, certainly, after the pretest phase and --
18 because there was no in-test -- I thought I had started the
19 recorder, and I took a posttest statement from him for
20 approximately 10 to 15 minutes.  Once we had finished that
21 recording, I asked Special Agent Snyder to stand outside the
22 interview room with the defendant, and I checked the recording
23 to ensure it had actually recorded something, and my recorder
24 had malfunctioned.  So I asked Special Agent Snyder to bring
25 the defendant back into the room, which he did.  I explained to

1  the defendant that the recording devise had malfunctioned and
2  would he mind giving another statement regarding this matter.
3  He agreed to do that, and I took a second recording.
4  **Q.**   Did you tell Mr. Birdrattler that he was required to give
5  a second statement?
6  **A.**   No.
7  **Q.**   When Special Agent Snyder came back into the room with you
8  and Mr. Birdrattler, where did he sit?
9  **A.**   So at that time Special Agent Snyder stayed in the room
10 during the, I say, quote/unquote, second recording, and then
11 the recorder was functioning at that point.
12 **Q.**   Did Mr. Birdrattler sit down in the room when he came back
13 in?
14 **A.**   He did.
15 **Q.**   Where did he sit?
16 **A.**   I don't remember, but, obviously, about 4 to 6 feet away
17 from me, and Special Agent Snyder as well sat down.
18       MS. ADAMS:  At this time we'd like to publish
19 Exhibit 501, which we've previously admitted.
20       THE COURT:  Okay.  501, Madam Clerk.
21       (Exhibit 501 played.)
22       MS. ADAMS:  If we could please pause it for a second.
23       (Exhibit paused.)
24 BY MS. ADAMS:
25 **Q.**   Agent Smiedala, is this recording -- we just heard a

1  snippet of it -- is this the recording at issue in this case?

2  **A.**   Yes, it is.

3  **Q.**   And for clarification purposes, which interview was this

4  that you did with Mr. Birdrattler?  Was this the second

5  interview you did when you brought him back in?

6  **A.**   It was.  It was the only interview that actually recorded.

7           MS. ADAMS:  Thank you.

8           If we could please resume it.

9      (Exhibit 501 played.)

10  BY MS. ADAMS:

11  **Q.**   Agent Smiedala, I'd like to ask you a few questions about

12  the recording we just heard.

13  **A.**   Yes, ma'am.

14  **Q.**   So in the recording, towards the end of the recording, we

15  hear you ask Mr. Birdrattler about why he decided to tell the

16  truth, and he says something to the effect of "because you were

17  straight, frank with me, and told me how everything was going

18  to go, and if I didn't tell the truth, that it could be even

19  worse."

20           What did you understand that statement by him to

21  mean?

22  **A.**   I only understood it as if he decided -- or had decided to

23  take a polygraph and failed it, he would be lying to the FBI.

24  **Q.**   And can you describe what, if anything, he's referring to

25  in your conversation that you had had before the recording?

1  **A.**   I'm not sure what you mean by that.

2  **Q.**   Can you describe what he's referring to in terms of you
3  telling him how everything was going to go.

4  **A.**   Oh, how the instrumentation worked, as well as the
5  polygraph and that process.  I understood him to be explaining
6  that he had learned that process through me, and we had talked
7  about all of that, the components, and that I would know if he
8  was being truthful with me or not during that time period.

9  **Q.**   We also heard Mr. Birdrattler state that he didn't want to
10  be in trouble with anyone, and then you followed up by saying,
11  "No one told you you weren't going to be in trouble."  Why did
12  you say that?

13  **A.**   Well, I wanted to clarify the fact that that hadn't been
14  said.  No one told him he was not going to be in trouble or
15  promised him anything at all.  He came in there voluntarily to
16  take a test and, as well, gave a statement in the same fashion.

17  **Q.**   And we heard you ask Mr. Birdrattler several questions,
18  right around that same time in the recording, about whether his
19  statement was voluntary, whether it had been forced, or whether
20  he had been promised anything.

21          Why did you ask those questions to Mr. Birdrattler?

22  **A.**   Well, one, I want to ensure that we're doing things
23  legally and we're doing things in the right way.  But I also
24  want to make sure he still understands that what he's
25  participating in is a voluntary process and that I'm not

1  promising him anything to be engaged in that promise -- or that
2  process, and it's up to him to give me a truthful statement.
3  **Q.**   And did he appear to understand what you were saying when
4  you asked him those questions?
5  **A.**   Yes, I believe so.
6  **Q.**   Did he acknowledge that his statement was voluntary?
7  **A.**   He did.
8  **Q.**   Agent Smiedala, what was the approximate duration of this
9  entire interview with Mr. Birdrattler from the time you met him
10  till the time the interview concluded?
11  **A.**   It was about an hour and a half, to include that 10 or
12  15 minutes that I believed I was recording the first statement.
13  **Q.**   At any point during your interview with him on this day,
14  did you yell at him?
15  **A.**   No, ma'am.
16  **Q.**   Did you make any threats to him?
17  **A.**   I did not.
18  **Q.**   Did you make him any promises?
19  **A.**   I did not.
20  **Q.**   Did you ever tell him that he would not be charged?
21  **A.**   I did not.
22  **Q.**   Did you make any statements to him about which
23  jurisdiction would handle this case?
24  **A.**   I did not.
25  **Q.**   Was he ever physically restrained?

1  **A.**   He was not.

2  **Q.**   Did you ever touch him at all?

3  **A.**   I didn't.  I might have when I shook his hand coming into
4  the office.

5  **Q.**   Can you describe your tone of voice for the entire
6  interaction with Mr. Birdrattler, not just the recording but
7  the hour and a half interaction?

8  **A.**   Yes, ma'am.  I think the recording accurately reflects the
9  entire interview.  We had a decent rapport.  He was
10  well-behaved and reasonably polite.  So I think the recording
11  shows kind of the atmosphere during that time.

12  **Q.**   Similarly, how was his tone of voice?

13  **A.**   The same throughout the entire time.

14  **Q.**   What was your demeanor like?

15  **A.**   Just as I was on the recording.

16  **Q.**   And what was his demeanor like?

17  **A.**   Exactly the same.

18  **Q.**   Did he ever become emotional when he was speaking with
19  you?

20  **A.**   No, I don't think that he was emotional.  I mean, I did
21  see at times that he was a little nervous.  But, again, I
22  consider that pretty normal for that type of a circumstance.

23  **Q.**   At any point did Mr. Birdrattler tell you that he wanted
24  to stop the interview?

25  **A.**   No, he was completely cooperative the entire time.

1    Q.    And at the conclusion of the polygraph exam, did

2    Mr. Birdrattler leave the room?

3    A.    He did.

4    Q.    Okay.  Are you aware of whether he was arrested that day

5    on anything related to this case?

6    A.    No, he was not arrested that day.

7                MS. ADAMS:  If I may have a moment, Your Honor.

8                THE COURT:  You may.

9                MS. ADAMS:  (Reviewing.)

10               I don't have any further questions for this witness.

11   Thank you.

12               THE COURT:  Cross-examination, Mr. Branom.

13               MR. BRANOM:  Thank you, Your Honor.

14                           CROSS-EXAMINATION

15   BY MR. BRANOM:

16   Q.    Agent Smiedala, what training did you undergo to become an

17   FBI polygraph examiner?

18   A.    Yes, sir.  I attended the -- what was called at the time

19   the Department of Defense Polygraph Institute in 2003.

20   Q.    And have you had any follow-up training since 2003?

21   A.    Yes, sir.  I do an annual certification each year to

22   maintain my polygraph certification.

23   Q.    Who issues that certification?

24   A.    The FBI.

25   Q.    So is it an in-house FBI training?

**A.**   Sometimes, it is; other years we attend the American
Polygraph Association Certification, and it's a variety of
different types of training each year.

**Q.**   Now, let me direct your attention to April 3rd, 2019, and
your interaction with Mr. Birdrattler.  Did you -- when did you
first encounter him on that day?

**A.**   Right around 1:25 p.m. when Special Agent Snyder
introduced me.

**Q.**   So you didn't observe how Mr. Birdrattler got in the
building?

**A.**   I did not.

**Q.**   Okay.  And I believe you said that's the -- you described
it as the Browning Federal Building?

**A.**   Yes, sir.

**Q.**   Is that the one on Highway 2?

**A.**   I don't know that it's -- I think it is on Highway 2.
Yes, sir, I think it does come around there.

**Q.**   It's by the new Glacier Family Foods?

**A.**   That's correct, yes, sir.

**Q.**   And at least there are other federal offices in the
building; correct?

**A.**   Yes, there's a variety of tribal offices in the building.

**Q.**   Okay.  There's also the federal -- the US Probation Office
has an office in that building?

**A.**   I'm not privy to all of the offices that are there, their

1    names.  I know that there are a lot of tribal offices.  I

2    didn't know there were other federal offices there.

3    Q.   You didn't know there were other federal offices in the

4    federal building?

5    A.   No.  It's just called the federal building on the

6    reservation.

7    Q.   And that's the Blackfeet Reservation; correct?

8    A.   Yes, sir.

9    Q.   Okay.  And when Mr. Birdrattler was in that room with you,

10   your polygraph equipment was visible; correct.

11   A.   Yes, sir.

12   Q.   And what was that equipment?

13   A.   Specifically, the electrodermal activity plates, the

14   pneumograph tubes, as well as the blood pressure cuff and my

15   laptop computer.

16   Q.   At any time during this approximately hour and a half

17   meeting with Mr. Birdrattler, did he sit in the chair where

18   that equipment was?

19   A.   No, sir.

20   Q.   And there were only threes chair in the room; correct?

21   A.   Yes, sir, three, until the end.  I think we moved a chair

22   in when Special Agent Snyder came into the room.

23   Q.   Now, you did not record the preinterview or the pretest

24   portion; correct?

25   A.   That's correct.  I'm not allowed to.

1  **Q.**   Why are you not allowed to?

2  **A.**   It's FBI polygraph policy.

3  **Q.**   Do you seek clarification on that policy before each

4  interview?

5  **A.**   No, sir.

6  **Q.**   Okay.  So there's no supervisor you go to and, for

7  instance, say, "Hey, I'm interviewing a rape allegation on the

8  Blackfeet Reservation.  Should I record this"?

9  **A.**   No, sir.

10 **Q.**   It's standard practice.  No matter what, don't record it.

11 Is that fair?

12 **A.**   No, it's not standard practice.  It's just the policy

13 that's followed all of the time, 100 percent of the time.  We

14 don't record the pretest phase or in-test phase.

15 **Q.**   Okay.  Well -- I'm not going to play word games.  Thanks.

16      Now, do you know what is the rationale behind that

17 policy to not record that portion of your interaction with the

18 defendant?

19      And let me be clear, when I say, "Defendant," I only

20 want to hear answers about criminal cases.  I am not trying to

21 breach any kind of national security stuff.

22      So do you know why there is the policy to not record

23 a portion of your interview with a potential subject of a

24 criminal investigation?

25 **A.**   Sure.  I knew a portion of why.

1  **Q.**   Okay.

2  **A.**   I can't say I know everything.  But I do know that we

3  don't want to see those techniques and methodology given, say,

4  for instance, to a defendant and the attorney on discovery, and

5  then later on those things end up on the internet and can be

6  used for other examinees down the line to use those -- so to

7  speak, those test answers in future testing.

8  **Q.**   But if I asked you specifically what all you went over

9  with Mr. Birdrattler in the preinterview portion, you would

10 tell the truth, wouldn't you?

11 **A.**   Yes, sir.

12 **Q.**   Okay.  And how long did the preinterview portion last?  Do

13 you recall?

14 **A.**   I could only estimate.

15 **Q.**   Okay.

16 **A.**   But, I mean, obviously, the test started at about

17 1:25 p.m. with the consent form.  As a general rule, the

18 pretest phase is anywhere from 30 minutes to an hour.

19 **Q.**   And you brought up some of the forms.  Let me go over a

20 couple of those with you.

21         Madam Clerk, if you would show Defense 504.

22     (Displayed.)

23 BY MR. BRANOM:

24 **Q.**   Is it up on your screen?

25 **A.**   Yes, sir.

Case 9:17-cr-00051-DLM-JCL Document 239 Filed 02/19 Page 32 of 110

1  Q.   Okay.  Now, was that an actual piece of paper, or was it

2  on your computer that you went over that with Mr. Birdrattler?

3  A.   This is on my computer.

4            THE COURT:  Hold on, Mr. Branom.

5            MR. BRANOM:  Yes, Your Honor.

6            THE COURT:  Ms. Adams, do you have the other exhibits

7  too?

8            MS. ADAMS:  They should have all been --

9            THE COURT:  Oh, I'm sorry.  Hold on.

10           I apologize.  Go ahead, Mr. Branom.  502 or 504?

11           MR. BRANOM:  504.

12 BY MR. BRANOM:

13 Q.   And this is the -- 504 is the FD-395, Advice of Rights;

14 correct?

15 A.   Yes, sir.

16 Q.   Okay.  So this was on your computer?

17 A.   That's correct.

18 Q.   There wasn't an actual sheet of paper that Mr. Birdrattler

19 had in his hand?

20 A.   No, sir.

21 Q.   Then how did he sign it?

22 A.   So he signs it electronically by using a stylus to sign

23 the screen on my computer.

24 Q.   And I believe you testified -- but I want to make sure --

25 he read the -- you had him read the consent portion out loud?

1    A.    Yes, sir.

2    Q.    And then you similarly signed it with the stylus below

3    that?

4    A.    That's correct.

5              MR. BRANOM:   Now, Madam Clerk, if we could go to 505.

6         (Displayed.)

7    BY MR. BRANOM:

8    Q.    Was this also on the computer and not actually a piece of

9    paper?

10   A.    Yes, sir.

11   Q.    And you had Mr. Birdrattler read aloud the "Your Rights"

12   portion or was it -- well, which portion did you have

13   Mr. Birdrattler read?

14   A.    He read the waiver and consent portion aloud.

15   Q.    So the whole thing?

16   A.    Yes, sir.

17   Q.    All right.  And then did you, again, have him sign with

18   the stylus?

19   A.    I did.

20   Q.    Okay.  And then after that, do you go into what's

21   Government's Exhibit 1, the polygraph information form?

22   A.    Yes, sir, the biographical sheet.

23        (Displayed.)

24   BY MR. BRANOM:

25   Q.    Now, again, is this you filling it out on your computer?

**A.**   Yes, sir.  I'm doing that live-time as I'm speaking to
him.  I'm sitting behind my computer and filling in the
answers.

**Q.**   Okay is he ever given a chance to look at it and say, "Oh,
no, I think that's wrong" or correct anything?

**A.**   No.  We're only doing -- I'm asking him the question, and
he's giving me the answer, and I'm typing it into the
appropriate space.

**Q.**   At any time -- well, did you tell or discuss with
Mr. Birdrattler whether or not the results of any polygraph
would be admissible in court?

**A.**   No, sir.

**Q.**   Do you have any kind of estimate of how many prepolygraph
interviews you've done in Indian County cases in the District
of Montana?

**A.**   I don't.

**Q.**   Do you know, of those that you have done, can you give us
an estimate of how many actually proceed to a polygraph, as
opposed to this, where they don't?

**A.**   I would only be speculating, again, which I would be happy
to do, but I would say that probably anywhere from 60 to
80 percent of them go to a polygraph examination.  Technically,
this is a polygraph examination by FBI standards, but he was
not given a test.  There's a no-opinion result.  But I would
say anywhere from 60 to 80 percent take an examination, but

1    sometimes, as I said, that could be 30 to 40 percent of those

2    people give me information prior to -- or some information

3    prior to testing regarding the allegation.

4    Q.    But you don't -- you can't give us a number of how many

5    you think you have done total in like -- what was it?  -- the

6    15 years you have been doing this?

7    A.    I could give you an approximate number of tests done, but

8    it's not broken down into a way that I can say, "Okay, there

9    were this many that were pretest confessions; this many that

10   were not."

11   Q.    Well, do you have any idea how many interviews you have

12   done, again, in Indian Country, whether or not they went to an

13   actual exam or not?

14   A.    I don't.

15   Q.    All right.

16   A.    I mean, I don't.  Like I said, I could get those numbers

17   if you wanted me to or as accurately as I could get them.

18   Q.    And you've been a polygraph examiner for 16 years;

19   correct?

20   A.    Yes, sir, 16 in November.

21   Q.    I believe you testified, after going over Exhibit 1 -- or

22   the information contained in Exhibit 1, that you determined

23   that Mr. Birdrattler was fit to undergo the examination.  How

24   long did it take for you to make that determination, that he

25   was fit to undergo the examination?

**A.** I don't think there's a time period. I think it's once I've generally gotten through the pretest phase, the consent forms and the bio sheet, at that point I've got a pretty good idea whether or not there's any kind of an issue that would prohibit an interviewee from participating in an interview or polygraph test.

MR. BRANOM: I'm finished with Number 1 at this point, Madam Clerk. Thank you.

(Removed.)

BY MR. BRANOM:

**Q.** Once you determined that he's fit -- anybody, but in this instance, Mr. Birdrattler -- was fit to take the polygraph, you don't just jump right into it; correct?

**A.** No, sir. Part of the process that is done through each examiner around the nation is covering the components, the general polygraph process, the questions themselves, and the physiology associated with polygraph.

**Q.** But, again, in doing that, you don't -- you didn't tell Mr. Birdrattler, "No matter what happens here, this isn't coming in, in court"?

**A.** No, sir. I don't make that determination.

**Q.** Did you at any time during your meeting with Mr. Birdrattler tell him, "I'm going to recommend to the United States Attorney's Office they decline prosecution"?

**A.** No, sir.

1  Q.   Did you say anything, you know, to that effect to him?
2  A.   No, sir.
3  Q.   Did you mention to him anything about, you know, your
4  experience with women while you were in college?
5  A.   No, sir.
6  Q.   Now, I want to -- at some point you attempted to record
7  your meeting with Mr. Birdrattler.  What kind of recorder was
8  it?
9  A.   It's an internal recorder in the laptop.
10 Q.   How did you discover that it hadn't worked?
11 A.   Once Mr. Birdrattler had left the room, I went into the
12 recording function.  And although the bar that, I guess, shows
13 that a voice is speaking was jumping up and down, the recording
14 itself did not register.
15 Q.   So that recording would be going to the hard drive of your
16 laptop?
17 A.   No.  There was no recording being done.
18 Q.   Well, the second time, when it did work, is that what
19 happens?
20 A.   Yes, sir.
21 Q.   I'm just -- there's no thumb drive or anything.  It's
22 actually to the hard drive?
23 A.   That's correct.
24 Q.   And then at some point you transfer it to something else?
25 A.   Yes, sir.  It's burned to a CD.

1  **Q.**  I believe you testified when you discovered that it hadn't

2  recorded, Mr. Birdrattler was outside the room with Agent

3  Snyder; correct?

4  **A.**  Yes, sir.

5  **Q.**  And then you had Agent Snyder bring Mr. Birdrattler back

6  into the room?

7  **A.**  That's correct.

8  **Q.**  At that time, did you re-Mirandize Mr. Birdrattler?

9  **A.**  No, sir.

10  **Q.**  Did you go over form -- or Exhibit 505 with him at that

11  time?

12  **A.**  I'm sorry.  What was 505, again?

13       (Displayed.)

14  BY MR. BRANOM:

15  **Q.**  The FD-328.

16  **A.**  No, sir.  It wasn't required by law.

17  **Q.**  Well, respectfully, isn't that up to the judge?

18  **A.**  Yes, sir.

19  **Q.**  Did you say to Mr. Birdrattler, "I need you to come back

20  in"?  What was your verbiage to get him back in the room?

21  **A.**  I don't remember what the exact verbiage was.  I think

22  that the beginning of the recording probably documents that

23  better than I could remember it.

24              MR. BRANOM:  May I have just a moment, Your Honor?

25              THE COURT:  You may.

1        (Off-the-record discussion between Mr. Branom and the

2        defendant.)

3            MR. BRANOM:  Nothing further, Your Honor.

4            THE COURT:  Redirect, Ms. Adams.

5                    REDIRECT EXAMINATION

6  BY MS. ADAMS:

7  **Q.**  Agent Smiedala, in your position, do you make the

8  Polygraph Unit policy?

9  **A.**  I do not.

10  **Q.**  If there was a change in policy, such as a change in which

11  part of the polygraph test is allowed to be recorded, would you

12  be notified of that change?

13  **A.**  No, and I don't think anybody would ask me.

14  **Q.**  Agent Smiedala, we're here for a criminal case today.  But

15  to clarify, is the same technique that's used in the pretest

16  phase and in-test phase, is that same technique also used in

17  national security investigations or employee investigations and

18  background checks?

19  **A.**  Yes, ma'am.  They are almost exact, except for the wording

20  of some of the questions, clearly.

21            MS. ADAMS:  Thank you.  I have no further questions.

22            THE COURT:  Is the witness excused?

23            MS. ADAMS:  We would like him to remain, Your Honor,

24  in case we need to recall him for rebuttal.

25            THE COURT:  You may step down for now.  Thank you,

1    Mr. Smiedala.

2              THE WITNESS:  Thank you, sir.

3              THE COURT:  Do you have another witness, Ms. Adams?

4              MS. ADAMS:  Yes.  The United States calls Special

5    Agent Steve Snyder.

6                        STEVEN SNYDER,

7    called for examination by counsel for the government, after

8    having been first duly sworn to testify the truth, the whole

9    truth, and nothing but the truth, testified as follows:

10             THE COURT:  Good morning, sir.

11             THE WITNESS:  Good morning, Your Honor.

12             THE COURT:  Please state your full name and spell

13   your last name.

14             THE WITNESS:  My name Steven Snyder, S-N-Y-D-E-R.

15             THE COURT:  Go ahead, Ms. Adams.

16                      DIRECT EXAMINATION

17   BY MS. ADAMS:

18   Q.   Agent Snyder, where are you employed?

19   A.   I'm employed with the FBI at the Shelby Resident Agency.

20   Q.   How long have you worked for the FBI?

21   A.   11 years.

22   Q.   Okay.  And what are your job duties with the FBI?

23   A.   I am a special agent with the FBI.

24   Q.   Are you the case agent for the case that we're here for in

25   court today?

1  **A.**   I am.

2  **Q.**   I'd like to talk about February 16th, 2018.  Did you come

3  into contact with Mr. Joshua Birdrattler on this date?

4  **A.**   I did.

5  **Q.**   Can you explain the circumstances of how you came into

6  contact with him?

7  **A.**   I had been contacted by the Blackfeet Tribal Police in

8  regard to an allegation of a rape.  And the rape victim -- or

9  the person that alleged the rape had happened had indicated

10 that Mr. Blackman was the one that -- or excuse me --

11 Mr. Birdrattler was the one that had conducted the rape.

12 **Q.**   So on February 16th, 2018, where did you come into contact

13 with Mr. Birdrattler?

14 **A.**   I contacted him at his mother's residence.

15 **Q.**   Was that in the morning time?

16 **A.**   It was in the early -- very early morning hours.

17 **Q.**   And at that time, can you just very briefly describe the

18 topics that you discussed with Mr. Birdrattler.

19 **A.**   We asked Mr. Birdrattler what had happened that evening,

20 kind of starting from earlier that evening up to the point that

21 we were meeting with him.  He told us that he had picked up the

22 victim in this instance and had driven her back to the

23 residence that we were at, which he described as his mother's

24 residence, at which point she wanted to stay with him, and he

25 told her that basically she couldn't stay with him and that she

1 | had to leave, and that she left.

2 |     We further told him that she had alleged he raped
3 | her, at which point he stated that he had had consensual oral,
4 | vaginal, and anal sex with her.

5 | **Q.**  Did you discuss --

6 |     THE COURT:  Ms. Adams, let me just clarify a point.

7 |     Did you say 2018?

8 |     MS. ADAMS:  Yes, Your Honor.

9 |     THE COURT:  Okay.  Go ahead.

10 | BY MS. ADAMS:

11 | **Q.**  Agent Snyder, did you ask Mr. Birdrattler whether he would
12 | participate in a -- be willing to participate in a polygraph
13 | exam on this date?

14 | **A.**  Yes, ma'am.

15 | **Q.**  Did you tell him that he was required to participate in a
16 | polygraph exam?

17 | **A.**  No, ma'am.

18 | **Q.**  Okay.  And on that date did you make any threats or
19 | promises to him concerning the polygraph exam?

20 | **A.**  No, I did not.

21 | **Q.**  Did he express a willingness to take a polygraph exam?

22 | **A.**  He did.

23 | **Q.**  Agent Snyder, I'd like to go to February 28th, 2019.  Did
24 | you come into contact or have contact with Mr. Birdrattler on
25 | this date?

1 **A.** I did.

2 **Q.** And why was that?

3 **A.** It was to confirm with him his willingness to continue to
4 take a polygraph examination.

5 **Q.** And was this contact in person?

6 **A.** No, it was over the telephone.

7 **Q.** Okay. Did you call him?

8 **A.** Yes, I did.

9 **Q.** And why did you call him on this particular day to ask if
10 he was still willing to take a polygraph exam?

11 **A.** I had been in contact with Special Agent Smiedala, and
12 that was one of the days that would most work with coordinating
13 everyone's schedule.

14 **Q.** And the date would be the date April 3rd, 2019?

15 **A.** Correct.

16 **Q.** Okay. And can you describe your conversation with
17 Mr. Birdrattler on this date, February 28th, 2019.

18 **A.** I asked Mr. Birdrattler if he would still be willing to
19 take a polygraph and that his polygraph would be completely
20 voluntary. He didn't have to take one. And he agreed.

21 **Q.** Did he appear to understand what you were saying?

22 **A.** Yes.

23 **Q.** Did he have any questions for you about whether the
24 outcome of your investigation might depend on his polygraph?

25 **A.** I can't remember.

1  **Q.**  So I'd like to go to April 3rd, 2019, the date we were

2  discussing with Agent Smiedala.  Were you present at the

3  federal building in Browning on this day?

4  **A.**  I was.

5  **Q.**  Okay.  And through your job duties and work as an FBI

6  agent at the Shelby Resident Agency, do you go to that

7  building, the federal building in Browning?

8  **A.**  I do.

9  **Q.**  And what kinds of things do you go there for?

10  **A.**  Typically, we go there to interview -- do forensic

11  interviews of children and adolescents.  Specifically, we have

12  a Child Advocacy Center in that building.

13  **Q.**  What is a Child Advocacy Center?

14  **A.**  A Child Advocacy Center is a place where we can conduct

15  forensic interviews of children and young adolescents.

16  **Q.**  For the record, what's a forensic interview?

17  **A.**  A forensic interview is an interview that's conducted of a

18  minor or a young person in a way that will not influence what

19  they say.  It's a clinical interview.

20  **Q.**  Can you describe how the Child Advocacy Center is set up?

21  **A.**  The Child Advocacy Center has a room that is wired and has

22  a -- it's wired for sound, and it's wired for audio.  And then

23  directly outside of that room is a small table, and it has

24  things that would be appealing or that would be something that

25  would help children calm themselves.  So it has toys, coloring

1  books, things of that nature.  And the actual interview room

2  itself is similarly appointed.

3  Q.   To clarify, was the interview record -- entirety on this

4  date recorded in the manner that would --

5        Was the interview recorded in its entirety on this

6  day, the way it would be recorded for a child victim?

7  A.   No, it was not.

8  Q.   Okay.  This federal building in Browning, are there other

9  offices in this building?

10  A.   There are.

11  Q.   Can you describe what type of offices there are?

12  A.   There are various administrative offices for the Bureau of

13  Indian Affairs.  The US Probation Office is located in there.

14  There are a couple of offices for Bureau of Indian Affairs or

15  BIA investigators.  And, of course, there's the Child Advocacy

16  Center.

17  Q.   Is there a separate jail building on the Blackfeet Indian

18  Reservation?

19  A.   There is, yes.

20  Q.   Is that jail located at this building?

21  A.   No.

22  Q.   Okay.  What were you wearing on April 3rd, 2019?

23  A.   I was wearing a pair of blue jeans and a -- just basic --

24  a basic pullover shirt.

25  Q.   And did you come to interact with Mr. Birdrattler on this

1  day?

2  **A.**    I did.

3  **Q.**    Okay.  How did you first come to encounter him on that

4  day?

5  **A.**    I came to the front desk reception area, and I escorted

6  him back to Child Advocacy Center.

7  **Q.**    And are you aware of how he got to the federal building

8  that day?

9  **A.**    My understanding is that he drove himself there.

10  **Q.**    Did you introduce Mr. Birdrattler to Special Agent

11  Smiedala?

12  **A.**    I did.

13  **Q.**    Once you made that introduction to Special Agent Smiedala,

14  where did Mr. Birdrattler and Agent Smiedala go?

15  **A.**    So they went into the actual Child Advocacy Center

16  interviewing room, and I stayed out in the reception area.

17  **Q.**    Okay.  About how close to the door to the interview room

18  were you?

19  **A.**    Within 5 to 10 feet, approximately.

20  **Q.**    Do you know if the door was closed all the way?

21  **A.**    It was closed.

22  **Q.**    Okay.  Now, once Mr. Birdrattler and Agent Smiedala went

23  into the room, what did you do?

24  **A.**    I stayed in the reception area.

25  **Q.**    Were you able to hear any of the conversation between

1  Agent Smiedala and Mr. Birdrattler?

2  **A.**   Very little of it.  I could hear very indistinct -- very

3  little.  The walls are very thin.

4  **Q.**   Can you describe, generally, what you remember hearing?

5  **A.**   What little I could remember and what little I could hear,

6  it sounded like a very generic interview about facts and

7  circumstances of the night of the event and a very basic

8  explanation of the polygraph equipment.

9  **Q.**   Do you remember what you heard verbatim?

10 **A.**   No, I don't.

11 **Q.**   Did you ever hear Agent Smiedala raise his voice at

12 Mr. Birdrattler?

13 **A.**   No.

14 **Q.**   Did you ever hear him threaten Mr. Birdrattler?

15 **A.**   No.

16 **Q.**   From what you do remember hearing, do you remember him

17 making any promises to Mr. Birdrattler?

18 **A.**   No, ma'am.

19 **Q.**   At some point did Mr. Birdrattler come out of the

20 interview room?

21 **A.**   He did.

22 **Q.**   Did Agent Smiedala walk out with him?

23 **A.**   I can't remember.

24 **Q.**   So what happened after Mr. Birdrattler walked out?

25 **A.**   Mr. Birdrattler walked out, and at some point Special

1  Agent Smiedala informed me that the recorder hadn't recorded
2  and that we were going to ask Mr. Birdrattler to do another
3  interview -- or another recording, another statement recording.
4  **Q.**  Okay.  And do you remember where Mr. Birdrattler was
5  standing when Agent Smiedala came out and told you that?
6  **A.**  To the best of my recollection, he was standing with me in
7  that reception area.
8  **Q.**  Did Agent Smiedala tell Mr. Birdrattler that he was
9  required to come back in?
10 **A.**  I do not remember him saying anything to that effect.
11 **Q.**  Did you hear the recording that we played in court today,
12 Agent Snyder?
13 **A.**  I did.
14 **Q.**  And does that -- let me back up a little bit.
15         Did you go back into the interview room with
16 Mr. Birdrattler?
17 **A.**  I did.
18 **Q.**  And Agent Smiedala?
19 **A.**  Correct.  Yes, ma'am.
20 **Q.**  When you went back in, generally, where did you sit?
21 **A.**  I sat on -- in a chair near the wall, near the far wall of
22 the interview room.
23 **Q.**  And where did Mr. Birdrattler sit?
24 **A.**  From my memory, Mr. Birdrattler sat across from Special
25 Agent Smiedala.

1  **Q.**  Did he sit in the chair with the components?

2  **A.**  He did not.

3  **Q.**  Did Agent Smiedala sit in a chair as well?

4  **A.**  Yes, he did.

5  **Q.**  What happened when you went into the interview room with

6  Mr. Birdrattler and Agent Smiedala?

7  **A.**  Special Agent Smiedala had explained that his recording

8  device had malfunctioned and that he was going to do another

9  recorded statement with Mr. Birdrattler.

10  **Q.**  And did that recorded statement take place at that time?

11  **A.**  It did.

12  **Q.**  And did you hear the recording that we played in court

13  today?

14  **A.**  I did.

15  **Q.**  And does that recording accurately represent the

16  conversation that you and Agent Smiedala and Mr. Birdrattler

17  had at that time?

18  **A.**  It does.

19  **Q.**  What happened after the end of this interview?  Did

20  Mr. Birdrattler leave the room?

21  **A.**  He did.  I basically escorted him out of the building.

22  And to the best of my knowledge, he left.

23  **Q.**  At any point during any of your interactions with

24  Mr. Birdrattler, throughout this investigation of this case,

25  did you make him any promises?

1  **A.**   I did not.

2  **Q.**   Okay.  From your observations on April 3rd, 2019, was

3  Mr. Birdrattler ever restrained by you or Agent Smiedala?

4  **A.**   No, ma'am.

5  **Q.**   Can you describe your tone of voice during your

6  interactions with Mr. Birdrattler throughout your investigation

7  in this matter?

8  **A.**   Similar to now, just a normal tone of voice, normal

9  cadence.

10 **Q.**   On April 3rd, 2019, can you describe his tone of voice

11 throughout all of your interactions with him?

12 **A.**   Normal, maybe a bit nervous, but nothing out of the

13 ordinary.

14 **Q.**   And from what you could hear from sitting outside the

15 Child Advocacy Center while Mr. Birdrattler was in the room

16 with Agent Smiedala, can you describe his tone of voice?

17 **A.**   From what I could hear -- which was muffled, I couldn't

18 hear much -- it sounded very normal.

19 **Q.**   Can you please describe your demeanor throughout all of

20 your interactions with Mr. Birdrattler?

21 **A.**   Just normal demeanor, as you and I are talking right now.

22 **Q.**   Can you describe his demeanor on -- specifically on

23 April 3rd, 2019?

24 **A.**   Normal demeanor.  Perhaps a little bit nervous but

25 nothing -- nothing out of the ordinary.

1  **Q.**  At any point on April 3rd, 2019, did Mr. Birdrattler

2  appear to not understand what was going on?

3  **A.**  No.

4  **Q.**  Okay.

5       MS. ADAMS:  I have no further questions for this

6  witness.  Thank you.

7       THE COURT:  Cross-examination, Mr. Branom.

8                    CROSS-EXAMINATION

9  BY MR. BRANOM:

10 **Q.**  Agent Snyder, you are the case agent on this case;

11 correct?

12 **A.**  Yes, sir, I am.

13 **Q.**  And the alleged offense happened on February 15th or 16th

14 of 2018?

15 **A.**  Yes, it did.

16 **Q.**  And your first contact with Mr. Birdrattler, I believe you

17 testified, was on February 16th, of 2018?

18 **A.**  Correct.

19 **Q.**  And that was at his mother's house?

20 **A.**  Yes, it was.

21 **Q.**  Who else was with you during that encounter?

22 **A.**  Special Agent James Eagle Eye and a tribal police officer.

23 **Q.**  Was the tribal police officer in uniform?

24 **A.**  He was, yes.

25 **Q.**  And did he have a firearm in plain view?

1  **A.**    I believe he did.  It was very cold that night, so he may

2  have been wearing a jacket that may have been covering it.  I

3  can't remember specifically.

4  **Q.**    But he was in his police uniform?

5  **A.**    Correct.

6  **Q.**    Did you identify yourself to Mr. Birdrattler as an FBI

7  agent?

8  **A.**    Yes, sir, I did.

9  **Q.**    And did you show your credentials?

10 **A.**    I can't remember if I specifically showed him my

11 credentials, but normally I do.

12 **Q.**    And what about Agent Eagle Eye?  How was he dressed?

13 **A.**    He was dressed similar to me.  It was very cold that

14 night.  So we were wearing --

15 **Q.**    Plain clothes?

16 **A.**    Yes, yes.

17 **Q.**    Okay.  And at that time Mr. Birdrattler told you that his

18 consensual -- or that his sexual relations with the complaining

19 witness was consensual?

20 **A.**    Correct.  Yes, he did.

21 **Q.**    And was it on February 16th of 2018 that he first agreed

22 to take a polygraph?

23 **A.**    Yes, sir.

24 **Q.**    And then his meeting with Agent Smiedala to accomplish

25 that occurs, roughly, 14 months later?

1  **A.**   Yes, sir.

2  **Q.**   Now, when did you first -- well, was there some point in

3  February of 2019, when you contacted Mr. Birdrattler to

4  actually schedule the interview?

5  **A.**   I'm sorry.  Can you repeat that again?

6  **Q.**   Did you have contact with Mr. Birdrattler sometime in

7  February of 2019, to arrange the meeting with Agent Smiedala?

8  **A.**   Yes, sir.

9  **Q.**   Do you recall when that was?

10  **A.**   Yeah, the exact date, I'd have to look it up in my case

11  file.  Would you like the exact date?

12  **Q.**   Yes, please.

13  **A.**   (Reviewing.)

14       Correct.  Yeah, on February 28, 2019, I contacted

15  Mr. Birdrattler at his telephone.

16  **Q.**   Now, at some point between February 21st -- oh, that's --

17  all right.

18       And then did you give him instructions on where to go

19  and where the meeting was going to be and stuff like that?

20  **A.**   Yes, sir.

21  **Q.**   Okay.  Now, this child advocacy room where the interview

22  happened, were there -- on April 3rd of this year, were there

23  any toys out in the room?

24  **A.**   The reception area had toys and coloring books in it.  The

25  actual interview room did not.  We had taken the toys out.

1   Q.   So there was -- all right.

2        And you escorted Mr. Birdrattler back to that room?

3   A.   Yes, sir.

4   Q.   And that room is equipped with recording equipment that

5   can -- well, you said it was equipped with recording equipment.

6   Let me go into that a little bit.

7        Do you know if it's audio recording equipment?

8   A.   There is audio recording equipment in the room.

9   Q.   Is there video recording equipment in the room?

10  A.   There is.

11  Q.   Okay.  But neither one of those were used on April -- or

12  I'm sorry -- yeah, April 3rd of this year with Mr. Birdrattler;

13  correct?

14  A.   Correct.

15  Q.   In sum, as you sit here and testify today, how long would

16  you say your dealings with Mr. Birdrattler have been?  An hour?

17  A couple hours?  20 minutes?  You know, can you give me an

18  estimate?

19  A.   In the course of the entire investigation to date?

20  Q.   Yes, sir.

21  A.   I would -- it would be a complete estimate, but I would

22  say a few hours.

23  Q.   Now, I want to go to where -- you know, the discovery that

24  the initial attempt to record hadn't worked.  At that point was

25  Mr. Birdrattler out of the interview room?

A.   I'm sorry.  When the device was not --

Q.   When it was discovered that it hadn't worked?

A.   I can't remember, specifically.

Q.   Was Mr. Birdrattler still in your presence?  Again, when it was discovered the first attempt to record had malfunctioned.

A.   Again, I cannot remember specifically where Mr. Birdrattler was at when Special Agent Smiedala realized that the device had not recorded.

Q.   And do you have a specific recollection of what Agent Smiedala said to Mr. Birdrattler to get the two of you back into the interview room?

A.   I can't remember what was specifically said.

        MR. BRANOM:  I don't have anything further, Your Honor.  Thank you.

        THE COURT:  Redirect, Ms. Adams.

        Hold on, Ms. Adams.  One moment.

    (Off-the-record discussion between Mr. Branom and the defendant.)

        MR. BRANOM:  Briefly, Your Honor.

BY MR. BRANOM:

Q.   Was there a prior polygraph scheduled sometime before April 3rd of 2019?

A.   I believe there was.  And for a reason that I cannot remember, it did not happen.

1  **Q.**   And then when you -- you scheduled this -- the April 3rd

2  one that did occur, did you schedule that in person with

3  Mr. Birdrattler, or was it on the phone?  Or do you recall?

4  **A.**   To my recollection, it was over the phone.

5          MR. BRANOM:  Nothing further now, Your Honor.  Thank

6  you.

7          THE COURT:  Redirect, Ms. Adams.

8                    REDIRECT EXAMINATION

9  BY MS. ADAMS:

10  **Q.**   Agent Snyder on any of your interactions with

11  Mr. Birdrattler, including the logistical arrangements that you

12  made about the polygraph exam, did you ever tell him that he

13  had to take a polygraph exam?

14  **A.**   I did not.

15          MS. ADAMS:  No further questions.

16          THE COURT:  I have a question, Ms. Adams, for the

17  witness.

18                       EXAMINATION

19  BY THE COURT:

20  **Q.**   Mr. Snyder, you testified that you contacted -- or you

21  made contact with the defendant on February 16th of 2018, when

22  Blackfeet Law Enforcement contacted you; is that correct?

23  **A.**   Yes, sir, Your Honor.

24  **Q.**   You went to the defendant's mother's house?

25  **A.**   Yes, Your Honor.

**Q.**    What happened in your investigation between February 16th

of 2018 and your phone call on February 28th of 2019?

**A.**    Between that time, we collected DNA from Mr. Birdrattler,

which was collected at his residence.  I then secured that

DNA --

**Q.**    When did you collect that?

**A.**    That night.

**Q.**    February 16th?

**A.**    Yes, Your Honor.

**Q.**    Okay.

**A.**    From there, I took that back, and I entered it into

evidence at our evidence control facility in Billings, Montana.

And then from there, I requested that it be sent to the -- to

our evidence -- our laboratory in Quantico, Virginia, to be

analyzed.

        We also had the DNA that we had collected from

Ms. Blackman's sexual assault kit.  We also had that sent to

Quantico for examination.

        I also had another interaction with Mr. Birdrattler,

in which he told me about the picking up Carlissa Norunner, who

he said -- he didn't remember in his initial interview, but he

told me that he had picked her up that night and that she had

been with him and with our victim while he drove her around so

that she could sell bread.

        And then I did my coordinations with Special

1  Agent Smiedala for the polygraph examination.

2  **Q.**   With regard to the DNA, Mr. Birdrattler had admitted to

3  you that he had sexual contact with the victim?

4  **A.**   Yes, sir.

5  **Q.**   So no surprise that the DNA would come back positive?

6  **A.**   No, Your Honor.

7  **Q.**   All right.  Anything else you did between February 16th of

8  2019 and February 20th of 2019 on the case?

9  **A.**   Contacted Mr. Birdrattler, just to coordinate the

10  polygraph examination.

11           THE COURT:  Thank you.

12           Any follow-up?

13           MS. ADAMS:  A couple.

14                    FURTHER EXAMINATION

15  BY MS. ADAMS:

16  **Q.**   Agent Snyder, can you describe your caseload, generally,

17  on the Blackfeet Reservation as an FBI agent?

18  **A.**   I typically carry anywhere from 35 to 40 cases, all

19  simultaneously.

20  **Q.**   And what kind of cases are those?

21  **A.**   Sexual assault, violent assault, mostly.  And they're --

22  basically, the majority of my cases are sexual assault.

23  **Q.**   Does it sometimes take up to a year, if not longer, to

24  investigate a sex assault case?

25  **A.**   Absolutely.

1  **Q.**  Why is that?

2  **A.**  Getting the DNA results back from Quantico can sometimes

3  take up to a year to eight months to get those results back.

4  **Q.**  And why would you -- why would you still want to get DNA

5  results back even if someone made an admission to having sex?

6  **A.**  It could corroborate their statements.

7  **Q.**  Does it also potentially corroborate the victim's

8  statement?

9  **A.**  That's true.

10  **Q.**  Is it sometimes difficult to contact witnesses in your

11  profession?

12  **A.**  Yes, it is.

13  **Q.**  Can you explain why that is?

14  **A.**  A lot of people on the Blackfeet Indian Reservation don't

15  have a permanent residence.  Sometimes they don't even have a

16  working telephone number.  So you have to do a fair amount of

17  investigation just to find that person and talk to them.

18  **Q.**  Why was it important to find Carlissa Norunner during this

19  time in your investigation?

20  **A.**  It could corroborate Mr. Birdrattler's statements.

21  **Q.**  Thank you.  No further questions.

22          THE COURT:  Is the witness excused?

23          MS. ADAMS:  He may step down, Your Honor, but we

24  would also like him to remain.

25          THE COURT:  You may step down, Mr. Snyder.  Thank

1  you.

2          Ms. Adams, any other witnesses?

3          MS. ADAMS:  I do not plan to call any additional

4  witnesses, Your Honor.  We do have Special Agent Brad Beyer

5  here from the FBI, and he is the representative who can speak

6  about Polygraph Unit recording policies, if the Court has any

7  questions about that.  Our criminal chief, Joe Thaggard, is

8  also here in the courtroom, as is Ms. Suek.  But for the time

9  being, I have no additional witnesses.

10          THE COURT:  All right.  Thank you.

11          Mr. Branom, any witnesses?

12          MR. BRANOM:  Yes, Your Honor.  Call Mr. Birdrattler.

13          THE COURT:  Okay.

14                   JOSHUA JAMES BIRDRATTLER,

15  called for examination by counsel for the defense, after having

16  been first duly sworn to testify the truth, the whole truth,

17  and nothing but the truth, testified as follows:

18          THE COURT:  Sir, would you please state your full

19  name and spell your last name.

20          THE DEFENDANT:  Joshua James Birdrattler.  My last

21  name is spelled B-I-R-D-R-A-T-T-L-E-R.

22          THE COURT:  Go ahead, Mr. Branom.

23          MR. BRANOM:  Thank you, Your Honor.

24  ///

25  ///

DIRECT EXAMINATION

BY MR. BRANOM:

**Q.** Josh, you understand you are the defendant in this case?

**A.** Yes, I do.

**Q.** Where are you from?

THE COURT: Hold on, Mr. Branom.

Would you pull the microphone closer. Thank you, sir.

Go ahead, Mr. Branom.

BY MR. BRANOM:

**Q.** Where are you from, Josh?

**A.** I am from Browning, Montana.

**Q.** Did you grow up there?

**A.** Yes, I did.

**Q.** Tell the Court about your educational background.

**A.** I -- well, starting out of -- I got a GED, I guess, when -- like, when I was in the 11th grade. But prior to growing up, I had a problem with reading and spelling and speech to where I was -- where I stuttered quite a bit, and I couldn't pronounce words all that well, and I proceeded with special classes to help me with my reading and speech and spelling.

**Q.** What have you done for employment?

**A.** I work -- well, I worked for the State of Montana Race Horse Committee when I was probably 16 till I was 18, and I

1  worked for -- and, now, presently work for the Chief Mountain

2  Hotshots, as their communications officer/squad boss for

3  Squad 3.

4  **Q.**   And how long have you been doing that?

5  **A.**   I have been doing that for the past 15 seasons now that I

6  am a permanent employee.

7  **Q.**   Let me direct your attention to this April 3rd meeting

8  with Agent Smiedala and Agent Snyder.  How did you come to meet

9  with them on that day?

10 **A.**   Agent Snyder contacted me.  I believe the first time he

11 contacted me was in December, and he scheduled a polygraph test

12 for January.  I believe it was the 15th, somewhere around

13 there.  And he contacted me to cancel that one.

14         Then he showed up to my mother -- Penny Birdrattler's

15 house in person and knocked on her door, which I answered.  I

16 was the only one there at the house at that time -- to tell me

17 he was going to reschedule the polygraph test at -- and that he

18 would be in contact, which he contacted me on the phone to let

19 me know that it would be on April 3rd.

20 **Q.**   What had you done the night of April 2nd?

21 **A.**   April 2nd, I went out, and we had a -- actually, did

22 league bowling.  So we went out, and we were drinking at the

23 local bowling alley till about the -- you know, we got done

24 bowling approximately -- it was pretty -- it was pretty late.

25         MR. BRANOM:  Madam Clerk, if you could put up

1  Exhibit 1, the second page, please.

2      (Displayed.)

3  BY MR. BRANOM:

4  Q.   All right.  Do you see on there where it talks about

5  alcohol use within the past 24 hours?

6  A.   Yes, I do.

7  Q.   Is that what you told Agent Smiedala?

8  A.   Yeah, that is what I had told him.

9  Q.   Was that accurate?

10 A.   Not exactly.

11 Q.   Well, what exactly would be accurate?

12 A.   I -- well, I -- we were drinking at the local bowling

13 alley there because we had a league night, and we continued to

14 the Glacier Peaks Casino, and we -- and we finished the night

15 there.  So, I mean, it would probably be at least -- I'd say at

16 least 15 beers.

17 Q.   Why didn't you tell Agent Smiedala that number?

18 A.   I was nervous and scared at the time.  I thought if I told

19 him that I was -- that I was intoxicated the night before that

20 he would think different of me, I guess.

21 Q.   Okay.  How did you get to the building where this meeting

22 happened on April 3rd?

23 A.   I drove myself from my place of work.

24 Q.   Okay.  And how did you get into the building?

25 A.   I walked into the building, and the security guard at the

1  front, I told him why I was there.  And he had me sit down and
2  told me that Agent Snyder would be out to escort me back.
3  Q.   What was the security guard wearing?
4  A.   He was wearing a security blue long-sleeved shirt with
5  a -- with the black slack pants with the design down the side
6  and a firearm on the side.
7  Q.   What was your understanding of what was going to happen
8  that day?
9  A.   My understanding that I was just going to go in and be --
10  take the polygraph test of -- as -- you know, just a test about
11  then.
12  Q.   What was your understanding as to whether or not you had
13  any choice whether or not to do this?
14  A.   Well, at the time they told me that, you know, I was able
15  to take a polygraph test and that -- that it would clear my
16  name as -- you know, is what I was told.  And it was like I
17  didn't have a -- a choice that -- that's the way I understood
18  it.
19  Q.   What was that understanding based on?
20  A.   It was under -- well, on -- my understanding was -- you
21  know, I mean, I had the FBI standing in front of me and the
22  cops, and I figured that it was -- you know, like it would --
23  it was like a mandatory kind of thing, I guess.
24          MR. BRANOM:  Okay.  Madam Clerk, if you could put
25  up -- let's start with 504, please.

 1          (Displayed.)

 2   BY MR. BRANOM:

 3   Q.   Do you remember -- well, let me ask you:  Did

 4   Agent Smiedala go over this form with you?

 5   A.   To my recollection, it was just a -- part of the procedure

 6   of the policy test that he presented as something that I had to

 7   sign.

 8   Q.   Okay.  Is that --

 9          If you'd scroll up just a bit, Madam Clerk.

10          (Complying.)

11   BY MR. BRANOM:

12   Q.   Is that your signature?

13   A.   Yes, that is.

14   Q.   Now, did you read any portion of this form out loud?

15   A.   No, I didn't.

16   Q.   How was it presented to you?

17   A.   I -- it was presented in front of -- to my recollection it

18   was a paper form.

19   Q.   And did you sign a piece of paper?

20   A.   Yes, I did.

21          MR. BRANOM:  Madam Clerk, if we could go to 505.

22          (Displayed.)

23   BY MR. BRANOM:

24   Q.   Do you recall Agent Smiedala going over this form with

25   you?

**A.**   I remember -- I just remember the -- the parts of him
saying that I need some -- these pieces of paper to sign to
proceed in the polygraph test.

          MR. BRANOM:  Okay.  Madam Clerk, if you could scroll
up.

     (Displayed.)

BY MR. BRANOM:

**Q.**   Is that your signature?

**A.**   Yes, it is.

**Q.**   Did you read any part of this form out loud?

**A.**   No, I didn't.

**Q.**   Did you read it at all?

**A.**   No.

**Q.**   Let me ask you -- we'll have the clerk go back to the
previous one, 504.

     (Displayed.)

BY MR. BRANOM:

**Q.**   Did you read that one at all?

**A.**   No.

**Q.**   Did you ask any questions of Agent Smiedala about either
one of these forms?

**A.**   No.  He just -- he just advised me that I needed to sign
these for -- to proceed in the polygraph test which I was there
to take.

**Q.**   Okay.  Thank you, Madam Clerk.

1           Was the polygraph equipment there in the room?

2 **A.**   Yes, it was.

3 **Q.**   Okay.  And during the time when it's just you and

4 Agent Smiedala in the room, where did you sit?

5 **A.**   I sat in the chair with the -- with the polygraph

6 equipment on it, with the arm cuff on my left side and the

7 other wires hanging off the right side.  And there was a pad at

8 my feet.  It was a black chair right next to the desk.

9 **Q.**   Okay.  Where was Agent Smiedala during the meeting?

10 **A.**   He was sitting within arm's reach, two, maybe three feet

11 in front of me.

12 **Q.**   Now, were these devices ever actually placed on your body?

13 **A.**   No, they weren't.

14 **Q.**   All right.  What happened during your encounter, again,

15 just when it's you and Mr. Smiedala?

16 **A.**   Well, I figured I was there to take the polygraph test,

17 and that he went through what each instrument was on the

18 polygraph test, which I was sitting on, and I had a -- one that

19 was at my feet, and he explained which all of them did and

20 which part of the body they would be hooked to.  And then he

21 proceeded to, like -- I thought we was going to be -- I thought

22 I was going to be hooked up to the machine then to start the

23 polygraph test, and then he just started asking me questions

24 like he was interrogating me kind of.  It wasn't like he wanted

25 me to tell what was going on.  It was more of an interrogation

1  to me.  And I started getting, you know, like, flustered, I
2  guess, in my speech and everything was -- I started getting
3  scared.  You know, it wasn't like I was just there to take a
4  polygraph test.

5  **Q.**  Then what happened?

6  **A.**  And then he proceeded to ask me questions.  I told him,
7  you know, what had happened.  And as we got to the part as
8  where it went to the -- the time, you know, of -- about
9  stopping and stuff, and I told him that, you know, I -- I
10 proceeded to stop, and he was the one that said it wasn't --
11 the time period, he was the one that said it wasn't -- "It
12 wasn't more like 15 seconds to a minute?"  And then I was like,
13 "No."  I told him the time that it -- you know, I stopped
14 pretty much like when she said.

15         And then he was like, "Well, you know, if you lie to
16 me, you know, I can -- I can get more time tacked on to you."
17 And, to me, I took that as a threat and it start -- it got me
18 scared and kind of emotional at the time.

19 **Q.**  Did he ever relay to you any personal experiences?

20 **A.**  Yes, he did.  He talked about a time -- he kind of related
21 back to when -- he said, "Oh, well, when I was in college, you
22 know, I remember when -- when this was -- when girls, you know"
23 -- he had an experience -- kind of some experience like this,
24 and then he was -- then he proceeded to say that it was --
25 "Back in my time it was doggy style," is what he said.

**Q.**   At any time during your meeting where it's just you and Agent Smiedala in the room, what was your understanding of your ability to leave the room?

**A.**   That I couldn't.

**Q.**   Why not?

**A.**   Because the door behind me was shut, and Agent Snyder was standing on the other side of it.

**Q.**   Did Agent Smiedala say anything to you about any -- about how the case would go from there?

**A.**   Yes, he did.

**Q.**   What did he tell you?

**A.**   He told me that -- well, I asked him, you know -- I was like, "Well, what do you -- what did think about it?"

          And he said, "Well, my position on this, I wouldn't -- that I'm going to go to the US Assistant Attorney and tell her that there is no reason to proceed in this case. And, if anything, it would be up to the tribal police to take it over."

**Q.**   Okay.  At some point, then, do you leave the room?

**A.**   Yes, I do.  I walk outside, and he tells me to stand by the little waiting room.

**Q.**   Who is "he"?

**A.**   Agent Smiedala.

**Q.**   Okay.

**A.**   Tells me to stand outside in the waiting room there, to

1  not go anywhere, that he needed to talk to Agent Snyder.  And
2  that's when they both proceeded into the room.
3  Q.   Okay.  Then what happened after that?
4  A.   And then they both came out, and he advised me that it --
5  that the tape recorder didn't record and that I would need to
6  do it again.
7  Q.   What was your understanding, at that point, if you had any
8  ability to not do it again?
9  A.   To my understanding, it was that I had to do it again.
10  Q.   Was there anybody else around, besides Agent Smiedala and
11  Agent Snyder, at that point?
12  A.   No, there wasn't.  I know when I first walked in, there
13  was a lady sitting in a desk down the hallway from where we
14  was, but that was, you know, 15 to 20 feet away.
15  Q.   Okay.  Let me make sure you're understanding.  When you
16  were instructed to go back into the room, were the only people
17  around Agent Snyder and Agent Smiedala?
18  A.   Yes.
19  Q.   Okay.  Now, you were here when the recording got played;
20  right?
21  A.   Yes.
22  Q.   You listened to it?
23  A.   Yes.
24  Q.   In the end, you were asked whether or not you were treated
25  fairly.  Do you recall that part of the recording?

1  **A.**   Yes, I do.

2  **Q.**   Why did you give the answer that you did?

3  **A.**   Well, because -- because I didn't want anything for them

4  to come back at me with -- with like how we started off to

5  threaten me with -- to me, I was scared, and I didn't want to,

6  you know, tell them "no."

7  **Q.**   And you were also questioned about, you know, were you

8  made any promises.  In response to that question, why did you

9  answer in the manner that you did?

10  **A.**   I guess the same answer there.  I was scared, and I

11  didn't -- I didn't want them to, you know, come at me as --

12  just pretty much scared --

13  **Q.**   And what --

14  **A.**   -- and confused.

15  **Q.**   What led to you being scared?

16  **A.**   Well, the way he was talking to me in the room, and he

17  was, you know, threatening me with more -- giving me more time

18  and, like, telling me things as of "I could get you 5 to 10

19  more years for lying to me."  You know, I mean, I -- that's --

20  I was afraid at the time.

21  **Q.**   Did you have any understanding of whether or not the

22  entire meeting was going to be recorded?

23  **A.**   Well, as I walked in, I thought the whole -- the whole

24  conversation would be recorded because in -- prior, when I

25  talked to Agent Snyder, he recorded from the beginning to the

1  end of everything.  I thought the whole thing was going to be
2  recorded, and you could see the speakers and the video camera
3  on the ceiling.
4        MR. BRANOM:  I have no further questions at this
5  point, Your Honor.
6        THE COURT:  Ms. Adams.
7                    CROSS-EXAMINATION
8  BY MS. ADAMS:
9  Q.    Good morning, Mr. Birdrattler.
10 A.    Good morning.
11 Q.    So you testified you have a GED; is that correct?
12 A.    Yes, I do.
13 Q.    Okay.  And that when you were in school, you had a problem
14 with reading, spelling, and speech?
15 A.    Yes, I do.
16 Q.    Okay.  And you took special classes for it?
17 A.    Yes.
18 Q.    Did those classes help?
19 A.    With the talk and speech -- with the speech part of it.
20 Q.    Okay.
21 A.    I just never could really read, I guess.
22 Q.    And your current job, you said you were working for the
23 State of Montana on a committee.  What was that that you
24 testified to?
25 A.    The Montana Race Horse Committee.

1  **Q.**  Okay.

2  **A.**  It was just like for the starting gates and saddling the

3  horses.

4  **Q.**  Okay.  And now you currently work as a squad boss and

5  communication officer for the Chief Mountain Hotshots?

6  **A.**  Yes, I do.

7  **Q.**  What do you have to do as part of that job?

8  **A.**  Well, as the squad boss, I'm in charge of six other

9  individuals, for their well-being and making decisions for

10  fire.  And for communications, I take care of the radio cloning

11  and frequencies for our radios.

12  **Q.**  Do you sometimes have to do paperwork as part of that job?

13  **A.**  Not really.

14  **Q.**  You don't do paperwork as part of your job as a

15  communication officer?

16  **A.**  No.  It's -- we usually tie in with the communications

17  unit.  On the fire, I handle my radios.  They hook a cloning

18  cable to my radio and clone my radio.  I go over and clone the

19  rest of our radios, using our cloning cable.

20  **Q.**  And you recall having contact with Agent Snyder in

21  February of 2018, February 16th, in the early morning hours; is

22  that correct?

23  **A.**  Yes.

24  **Q.**  Okay.  And did he ask you about the allegation that was

25  made in this case?

1  **A.**   Yes.

2  **Q.**   Okay.  And at that time did he ask you if you would be
3  willing to take a polygraph exam?

4  **A.**   Yes.

5  **Q.**   And you indicated that you would?

6  **A.**   Yes.

7  **Q.**   He didn't tell you that you had to take one, though;
8  correct?

9  **A.**   No.

10  **Q.**   Okay.  And it sounds like you had a few contacts with
11  Agent Snyder while you were scheduling this polygraph exam; is
12  that correct?

13  **A.**   Yes.

14  **Q.**   Okay.  And at no time did Agent Snyder tell you, you were
15  required to take a polygraph exam?

16  **A.**   Well, on one time he told -- it was pretty much -- like,
17  after he canceled the first one, the second one was -- it kind
18  of sounded like it was mandatory.

19  **Q.**   He didn't tell you it was mandatory, did he?

20  **A.**   No, but he -- when he came to me, he told me that that one
21  was canceled, that we will be doing another one.  So I took
22  that as...

23  **Q.**   You took him telling you that they would schedule another
24  polygraph exam to being that it was mandatory; is that correct?

25  **A.**   Yes.

1  **Q.**  Okay.  And do you remember a phone call with him on

2  February 28th of 2019?

3  **A.**  Yes, I do.

4  **Q.**  Okay.  And he told you that the polygraph exam is

5  voluntary; is that correct?

6  **A.**  No.  He did not say that, those words.

7  **Q.**  Did he tell you that you're required to take it as part of

8  the investigation?

9  **A.**  Yes.  Or, well, you know, it was kind of in that general

10  wording, I guess.

11  **Q.**  You guess?

12  **A.**  Yes.

13  **Q.**  But you don't remember what he said exactly on that day,

14  do you?

15  **A.**  No, I don't.

16  **Q.**  And you had taken a polygraph exam before; is that

17  correct, sir?

18  **A.**  Yes, I did.

19  **Q.**  Okay.  Tell me about that.  What was the circumstance of

20  that?

21  **A.**  Well, there was a gentleman ran over in Browning.  And at

22  the time my girlfriend owned a green four-door -- or a double

23  cab, Ford pickup, and they said that that was the description

24  of the pickup that ran over the gentleman, which ran over his

25  legs.  The gentleman is still living today.

Q.  Where did you go to take that polygraph exam?

A.  I went into the federal building, Blackfeet Federal Building on route -- on Highway 2 in Browning.

Q.  That's the same building that you had the polygraph exam for this case?

A.  Yes, but not the same room.

Q.  Okay.  Did you meet with a FBI agent polygraph examiner in that case?

A.  You know, I don't recall if he was an FBI agent or just a Bureau of Investigations officer.  I don't know.

Q.  Did you meet with somebody who does polygraph exams?

A.  Yes.

Q.  Okay.  And did you agree to do a polygraph exam on that occasion?

A.  Yes, I did.

Q.  Okay.  And did the agent go through a list of questions with you in terms of the Advice of Rights form and the Consent form, like you went through in this case?

A.  No, he didn't.

Q.  Okay.  And in that case, did you actually have the components hooked up to your body?

A.  Yes, I did.

Q.  Did the agent ask you questions about his investigation in that case?

A.  Yes, he did.

1  **Q.**  And at the end of that interview, did you leave on your
2  own, or were you arrested?
3  **A.**  I left on my own.
4  **Q.**  Okay.  So it's fair to say you are familiar with what a
5  polygraph exam is; is that correct?
6  **A.**  No.
7  **Q.**  Well, you've taken one before; right?
8  **A.**  Yes, I did.
9  **Q.**  Okay.  So I want to talk about April 2nd -- excuse me --
10  April 3rd, 2019 -- or April 2nd.  Let's back up there.
11      So you testified that you had about 15 beers at the
12  bowling alley, is that right?
13  **A.**  Yes.
14  **Q.**  And about what time did you stop drinking that night?
15  **A.**  Approximately about 2:30, 3:00.
16  **Q.**  Was that the first time that you consumed alcohol,
17  Mr. Birdrattler?
18  **A.**  No.
19  **Q.**  People's bodies respond to alcohol differently; is that
20  fair to say?
21  **A.**  I wouldn't know -- I wouldn't know the difference in
22  everybody's body.
23  **Q.**  Okay.  But had you had more than one beer on an occasion
24  on another time?
25  **A.**  I'm kind of an average drinker, so I -- it's -- no, I

1  haven't.

2  **Q.**  You've never had more than one beer on one occasion?

3  **A.**  No.

4  **Q.**  This was the first time you had more than one beer; is

5  that correct?

6  **A.**  No, that's not -- it's -- I have had -- I usually don't

7  just have one beer.

8  **Q.**  What's a normal amount that you would drink on, like, a

9  Friday or Saturday night?

10 **A.**  Probably 15 to 20, if not more.

11 **Q.**  So, for you, 15 beers would be a normal night out?

12 **A.**  Huh?

13 **Q.**  For you, sir, 15 beers would be a normal night out?  That

14 wouldn't be unusual for you to drink 15 beers in one night?

15 **A.**  No.

16 **Q.**  And then you went home from the bowling alley?

17 **A.**  I had a friend drop me off at my mom's, Pennie's.

18 **Q.**  Did you go to sleep after that?

19 **A.**  Yes, I did.

20 **Q.**  Do you remember what time you woke up the next day?

21 **A.**  About 7:00, 7:30.  I had to leave to get to work by 8:00.

22 **Q.**  So you went to work that day?

23 **A.**  Yes, I did.

24 **Q.**  Okay.  What did you do at work that day?

25 **A.**  We were getting ready to start our yearly -- to bring the

1  crew back for the orientation.

2  **Q.**  And what kind of -- what does that entail?  Tell me a

3  little bit more about what that means.

4  **A.**  We were getting material ready, getting saws ready,

5  getting our fire shelters ready for the upcoming week

6  for our -- to bring our crew back to do our 80 hours of

7  critical training.

8  **Q.**  Were you actually working with saws that day, moving saws

9  around?

10  **A.**  No, that would be the other -- what the other squad boss

11  that deals with that.  He's considered our saw boss.  I was

12  just working with the radios.

13  **Q.**  And did you work up until the time it was time to go to go

14  be interviewed at the federal building?

15  **A.**  Yes, I did.  But we took lunch at noon, and we came back

16  at 1:00.

17  **Q.**  What did you have to eat for lunch?

18  **A.**  I didn't have anything.  I was...

19  **Q.**  Okay.  And how did you get to the federal building on

20  April 3rd, 2019?

21  **A.**  I drove.

22  **Q.**  Did you get pulled over?

23  **A.**  No, I didn't.

24  **Q.**  And then you walked into the federal building from your

25  car; is that correct?

1  A.   Yes.

2  Q.   Did you park outside in the parking lot?

3  A.   Yes, I did.

4  Q.   And you testified about a security guard at the front desk

5  at the federal building.  Was that security guard involved in

6  asking you any questions about this case?

7  A.   No, he wasn't.

8  Q.   Okay.  I believe you testified, "They told me that it

9  would clear my name."

10        Who is "they"?

11 A.   Agent Snyder.  And that was when he was in the presence of

12 Agent Eagle Eye and the officer, Francis LaPlant, from

13 Browning.  They were the only two that -- they were the only

14 three that come inside my mother's house.  The rest of the

15 officers were downstairs, out by the parking lot.

16 Q.   But they never told you, you didn't have a choice; is that

17 correct?

18 A.   I don't recall.

19        MS. ADAMS:  Okay.  And, Madam Clerk, if we could

20 please have Exhibit 505.

21      (Displayed.)

22 BY MS. ADAMS:

23 Q.   Mr. Birdrattler, this is the form that you testified

24 Agent Smiedala -- one of the forms Agent Smiedala went over

25 with you; is that correct?

1  **A.**   It was one of the forms he had me sign.

2  **Q.**   Okay.  And you testified that he had you -- or he asked

3  you to read the bottom of the form, but you couldn't read it?

4  **A.**   He didn't ask me to read any form.  He just had me sign.

5  **Q.**   And the top part, your testimony is that he -- did he read

6  the top part to you, your rights?

7  **A.**   No, he didn't.

8  **Q.**   So he didn't tell you, you have the right to refuse to

9  take a polygraph test?

10 **A.**   No.  As I recall, he just had me sign it.

11 **Q.**   And he didn't tell you that if you agree to take the

12 polygraph test, you have the right to stop the test at anytime?

13 **A.**   No.

14 **Q.**   Okay.  And he didn't tell you if you agree to take the

15 polygraph test, you have the right to refuse to answer any of

16 the individual questions?

17 **A.**   No.

18 **Q.**   And you agreed to sign a form without being able to read

19 it; is that correct?

20 **A.**   Well, I was in talking to the FBI, and I figured if -- you

21 know, I was scared at the time, and they -- he told me that

22 this -- these forms were to proceed with the polygraph test,

23 which I was there for.  So I signed them because that's what I

24 was there for.

25 **Q.**   You signed the form without knowing -- without reading it;

1    correct?

2  **A.**    Yes.

3  **Q.**    And this wasn't the first time you talked to law

4    enforcement, was it, Mr. Birdrattler?  You talked to a

5    polygraph examiner before for the other case; right?

6  **A.**    Yes.

7  **Q.**    And you have been arrested on a few occasions before;

8    correct?

9  **A.**    Yes, I have.

10           MS. ADAMS:  If we could please have the next exhibit.

11       (Displayed.)

12           THE CLERK:  504?

13           MS. ADAMS:  Yes, please.

14       (Displayed.)

15  BY MS. ADAMS:

16  **Q.**    Mr. Birdrattler --

17           MS. ADAMS:  If we could please scroll down to the

18    bottom.

19       (Complying.)

20  BY MS. ADAMS:

21  **Q.**    -- is that your signature on the bottom, sir?

22  **A.**    Yes, it is.

23  **Q.**    So you did sign this form; correct, sir?

24  **A.**    Yes, I did.

25  **Q.**    Okay.  And the top part of this form says, "I have read

1   the statement of my rights, and I understand what my rights
2   are.  At this time I'm willing to answer questions without a
3   lawyer present."
4           And you signed that?
5   A.   Well, I signed it, but it was one of the two pieces of
6   paper that he presented in front of me that he wanted me to
7   sign for the polygraph test.
8   Q.   I think you testified about Agent Smiedala talking about a
9   personal experience he had in college; is that correct?
10  A.   Yes.
11  Q.   And you testified, as well, about Agent Smiedala saying
12  that he would talk to the prosecutor; is that correct?
13  A.   I testified that he said he would talk to the US Assistant
14  Attorney in Helena and tell them that he has no -- that he
15  thinks there is no further reason to pursue this and that it
16  would be left up to the BIA, the Browning Police Department.
17  Q.   Agent Smiedala never told you that charges wouldn't be
18  filed, though; correct?
19  A.   No, he didn't.
20  Q.   Now, I'd like to talk about this recording,
21  Mr. Birdrattler.  We heard the recording in court.  And at the
22  end of the recording, you acknowledge that nobody told you, you
23  wouldn't be in trouble.  Is that correct?
24  A.   Can you repeat the question?
25  Q.   Sure.

1              So the recording that we heard in court today, that
2    day, you told the FBI agent that nobody told you, you wouldn't
3    be in any trouble?
4    A.    I don't really get what you are saying.
5    Q.    Did you tell Agent Smiedala, "No, I don't want to be in
6    trouble with anybody"?  Do you remember saying that?
7    A.    Yes.
8    Q.    Okay.  And then Agent Smiedala responded, "But nobody told
9    you, you weren't going to be in trouble."  Right?
10   A.    He did, but I -- I mean, yeah, he did.
11   Q.    And you told him, "Yeah, nobody said anything like that."
12   Correct?
13   A.    He told me -- yeah, that's what I said.  I mean, I was
14   scared at the time so -- I mean, I didn't really understand
15   what he was saying, I guess you could say.
16   Q.    Well, you responded to him, "Yeah, nobody said anything
17   like that," in response to his question.  Is that correct, sir?
18   A.    Yes, I did.  But I didn't understand the question at the
19   time.
20   Q.    And Agent Smiedala said, "Have you told the full
21   100 percent truth today?"  And you responded, "Yes, I have."
22              Did you understand that question?
23   A.    I did, but it wasn't the -- it wasn't the truth.  I mean,
24   it was what he kind of led me into and -- yeah.
25   Q.    Agent Smiedala never told you what to say; correct?

1  **A.**  Yes, he did.

2  **Q.**  Agent Smiedala said, "Did you give me a voluntary

3  statement today?"  And you said, "Yes, I have."

4       Is that correct?

5  **A.**  That is correct.  But, I mean, as of what he was telling

6  me prior and into the -- when he was questioning me, I didn't

7  want to get him mad, I guess, is what you would say.

8  **Q.**  And he said, "Did I force you in any way to give a

9  statement?"  And you responded, "No."

10      Is that correct?

11 **A.**  Yes.

12 **Q.**  And he said, "Did I promise you anything to give me a

13 truthful statement?"  And then you responded, "No."

14      Do you remember that?

15 **A.**  Yes.

16 **Q.**  And then he asked if he treated you fairly.

17      Do you remember that?

18 **A.**  Yes.

19 **Q.**  And you responded, "Yes"?

20 **A.**  Yes.

21 **Q.**  Agent Smiedala never yelled at you, did he,

22 Mr. Birdrattler?

23 **A.**  I wouldn't call it yelling.

24 **Q.**  Well, he talked to you; right?

25 **A.**  Yes.

1   **Q.**   He never put his hands on you?

2   **A.**   Not that I recall.

3   **Q.**   He never put you in handcuffs?

4   **A.**   No.

5   **Q.**   Okay.  And so you said that you were scared on this day;

6   is that correct, sir?

7   **A.**   Yes, I was.

8   **Q.**   Okay.  Were you also nervous?

9   **A.**   Yes, I was.

10   **Q.**   Are you nervous in court today?

11   **A.**   Yes.

12   **Q.**   Is that just part of speaking with judges and attorneys

13   and law enforcement?  Does that make people nervous?

14   **A.**   I would -- yes.

15         MS. ADAMS:  I have no further questions for this

16   witness.

17         THE COURT:  Redirect, Mr. Branom?

18         MR. BRANOM:  No, Your Honor.

19         THE COURT:  Is the witness excused?

20         MR. BRANOM:  Yes, Your Honor.

21         THE COURT:  You may step down, sir.

22         Mr. Branom, do you have any other witnesses?

23         MR. BRANOM:  No, Your Honor.

24         THE COURT:  Ms. Adams, any rebuttal?

25         MS. ADAMS:  Yes.  We would recall Special Agent

1  Stacey Smiedala.

2                    STACEY SMIEDALA,

3  called again for examination by counsel for the government,

4  after previously having been first duly sworn to testify the

5  truth, the whole truth, and nothing but the truth, testified as

6  follows:

7           THE COURT:  Ms. Adams, let me be clear.  I heard the

8  recording.  I know what was said on that.

9           Mr. Smiedala, you are still under oath.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Go ahead, Ms. Adams.

12                   DIRECT EXAMINATION

13 BY MS. ADAMS:

14 **Q.**   Agent Smiedala, when you reviewed the two consent forms

15 with Mr. Birdrattler, the FD-328 and the FD-325, that's

16 Exhibits 505 and 504, were the exhibits on a computer, or were

17 they on a piece of paper?

18     (Displayed.)

19          THE WITNESS:  No, they were on a computer.  And you

20 can actually see by the diagonal signing of his name there on

21 both occasions.  Again, my training and experience of having

22 thousands of people sign these forms, it shows you that he's

23 right-handed and that he's signing a screen that's standing

24 straight up.

25 ///

BY MS. ADAMS:

**Q.**   And these consent forms, are they on computers for individuals who do polygraph exams in all contexts?

**A.**   Yes, ma'am.  There are no written forms anymore, not with consents.

**Q.**   At some point did the FBI transition into using computers?

**A.**   Yes.

**Q.**   These forms?

Okay.  And when you reviewed the rights section of both of these forms with Mr. Birdrattler, did you -- how did you review them with him?

**A.**   I read them aloud to him.

**Q.**   Why did you read them aloud to him as opposed to having him read it?

**A.**   Well, because I'm going to have him read the consent portion, which is what I had him do.  I wanted him to be -- a participant-type thing, again, all in an effort to ensure that he can read and that he's there voluntarily and he understands all of the things that are on the form.

**Q.**   And how are you able to determine that he can read?

**A.**   When he read the consent portion out loud to me.

**Q.**   Now, would -- if a person can't read very well, would that necessarily prevent them from taking a polygraph exam?

**A.**   No, ma'am.  There's been times when I read that portion. Or, if they have difficulty with a word, I would help them with

1  that.  I don't remember if he had any difficulty with any of
2  the words, but he read the entire portion of both forms, the
3  consent portions out loud to me.

4  **Q.**  At any point during your interaction with Mr. Birdrattler
5  on April 3rd, 2019, did you tell him that this was something he
6  had to do?

7  **A.**  No, I did not.

8  **Q.**  Do you remember making any statements to him about more
9  charges for lying to a federal agent?

10 **A.**  No, ma'am, I did not.

11 **Q.**  Do you remember if you used any personal experiences
12 during your conversation with him?

13 **A.**  I don't remember giving him any personal examples of
14 anything like that.

15 **Q.**  Okay.  And do you remember whether you made any statements
16 about talking to the prosecutor or recommending that the case
17 be handled by the tribe?

18 **A.**  Absolutely not.

19 **Q.**  Is it common for people to be nervous when they come in to
20 meet with you?

21 **A.**  Yes, it's completely normal.

22 **Q.**  And when you came out to request that he come back in to
23 do another recorded statement because your recorder
24 malfunctioned, did you tell him that he had to come back in or
25 he was required to come back in?

1  **A.**   No, I did not.  I asked him to come back in and give a

2  second statement.  And I explained to him that the recorder had

3  malfunctioned and would he be willing to do that, and he agreed

4  to do that.

5  **Q.**   Okay.

6          MS. ADAMS:  I have no further questions.

7          THE COURT:  Mr. Branom.

8          MR. BRANOM:  Thank you, Your Honor.

9                      CROSS-EXAMINATION

10 BY MR. BRANOM:

11 **Q.**   When you discussed Exhibits 504 and 505 with

12 Mr. Birdrattler, that was near the beginning of your meeting

13 with him; correct?

14 **A.**   Yes, sir, the very beginning.

15 **Q.**   And that portion of the meeting, that wasn't recorded, was

16 it?

17 **A.**   No, sir.

18 **Q.**   And is it your understanding that the FBI policy prohibits

19 a recording of advising someone of their rights?

20 **A.**   For the polygraph purposes, yes, I'm not allowed to record

21 anything during that pretest phase.

22 **Q.**   What about 504, which appears to me just to be the Miranda

23 waiver?  You're prohibited from recording that as well?

24 **A.**   Again, I'm prohibited from recording anything during the

25 pretest phase.

1  **Q.**  Including a Miranda waiver?

2  **A.**  Yes, primarily because if I recorded that and I turn the

3  recorder off and then I turn it on, that would also cause some

4  difficulty.

5  **Q.**  How so?

6  **A.**  Well, I think we'd probably be discussing different issues

7  here in the courtroom when I turn the recorder on and off.

8          MR. BRANOM:  No further questions, Your Honor.

9          THE COURT:  Redirect.

10          MS. ADAMS:  No further questions.

11          THE COURT:  Is the witness excused?

12          MS. ADAMS:  Yes.

13          THE COURT:  You may step down.  Thank you, sir.

14          Anyone else, Ms. Adams?

15          MS. ADAMS:  Briefly, Special Agent Steve Snyder.

16                  STEVEN SNYDER,

17  called again for examination by counsel for the government,

18  after having been previously first duly sworn to testify the

19  truth, the whole truth, and nothing but the truth, testified as

20  follows:

21          THE COURT:  You are still under oath, sir.

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Go ahead, Ms. Adams.

24                  DIRECT EXAMINATION

25  BY MS. ADAMS:

1  Q.   Agent Snyder, when you were sitting outside the Child
2  Advocacy Center while Agent Smiedala was inside, do you recall
3  hearing Agent Smiedala asking or making any statements about
4  lying to a federal agent and adding on charges for lying to a
5  federal agent?
6  A.   No, I don't.
7         MS. ADAMS:  No further questions.
8         THE COURT:  Cross.
9                    CROSS-EXAMINATION
10  BY MR. BRANOM:
11  Q.   While you were outside the child room and Agent Smiedala
12  and Mr. Birdrattler were in the room, you couldn't clearly hear
13  everything that was being discussed, could you?
14  A.   No, I couldn't.
15         MR. BRANOM:  No further questions.
16         THE COURT:  Redirect.
17         MS. ADAMS:  No.
18         THE COURT:  Is the witness excused?
19         MS. ADAMS:  Yes.
20         THE COURT:  You may step down, sir.  Thank you.
21         Anyone else, Ms. Adams?
22         MS. ADAMS:  No further witnesses, unless the Court
23  has questions from the Mr. Beyer from the FBI Polygraph Unit,
24  or any of our office management who is present in the courtroom
25  today.

1      THE COURT:  All right.  Who is going to answer

2   questions for the US Attorney's Office today?

3      MR. THAGGARD:  I can do that, Your Honor.  I may need

4   some assistance from Ms. Suek on one subject matter, but...

5      THE COURT:  All right.  Mr. Thaggard, why don't you

6   come to counsel table and make an appearance, please.

7      Make an appearance, please.

8      MR. THAGGARD:  Yes, I am, Your Honor.  Your Honor, I

9   did review at least --

10      THE COURT:  No, I asked you to make an appearance.

11      MR. THAGGARD:  I'm sorry, Your Honor.  I was having

12   trouble hearing you.  And I will go ahead and appear.  My name

13   is Joe Thaggard.  I'm the criminal chief for the United States

14   Attorney's Office.

15      THE COURT:  All right.  I have three questions for

16   you.

17      Do you find it ironic that we've spent almost two and

18   a half hours now debating about the events of April of 2019 for

19   an interview that took about an hour and 15 minutes that we

20   could have just listened to the recording of and clarified any

21   ambiguities or debate or doubts about what happened?

22      MR. THAGGARD:  Your Honor, if we were not dealing

23   with a polygraph technique, my answer would be "yes."

24      THE COURT:  Okay.  So that gets to my second

25   question.  I have reviewed numerous cases involving

1  Mr. Smiedala and the polygraph examinations, beginning with the

2  *United States v Red Star, United States v Deputee, United*

3  *States v Woodenlegs, United States v Medicine Horse, United*

4  *States v Alvarez, United States v Windy Boy, United States v*

5  *Davis, United States v Graham.*  And it's my recollection in

6  each of those cases -- and then we also have another case --

7  let me back up for a second.  I'm sorry.  I forgot something.

8  We have another case, *United States v --*

9              What is it, Mr. Branom?

10             MR. BRANOM:  *Damon*, Your Honor.

11             THE COURT:  -- *Damon*, in which I requested the

12  government to produce some documentation.

13             Are you aware of that, sir?

14             MR. THAGGARD:  I am, Your Honor.

15             THE COURT:  Okay.  And the government did provide

16  those documents.  Would there be any objection to discussing

17  some of those documents in this proceeding?

18             MR. THAGGARD:  I have no objection, Your Honor.

19             THE COURT:  Mr. Branom, any objection from you?

20             MR. BRANOM:  No, Your Honor.

21             THE COURT:  Okay.  So in reviewing the cases that

22  I've discussed and in Mr. -- is it *"Damon"*?

23             MR. BRANOM:  *Damon*, yes, Your Honor.

24             THE COURT:  In each of those cases, as I recall, what

25  happened was the person showed up for the polygraph examination

1  and was introduced to Mr. Smiedala, and there was a -- what I
2  think is referred to as the preinterview portion.  At some
3  point during those preinterview -- well, let me back up.
4          In each of those cases, there was a previous
5  interview in which the subject of the investigation denied
6  involvement.
7          Is that fair to say?
8          MR. THAGGARD:  I think that's generally my
9  understanding of the sort of pattern that we see with these
10 cases, Judge.
11         THE COURT:  And then the subject shows up for the
12 interview, and there's a preinterview phase that's not
13 recorded.  And at some point during the preinterview phase, the
14 subject of the investigation makes admissions to incriminating
15 information.  And at that point a second agent, who is outside
16 the interview room, comes in and sits in on what's called a
17 summary recording.
18         Is that fair to say?
19         MR. THAGGARD:  I think that's generally my
20 understanding, Your Honor.  I think in some of those instances,
21 it sounds like a second agent may not have come in for the
22 summary recording.  Perhaps I'm wrong about that, but there's
23 certainly a summary recording.
24         THE COURT:  All right.  I will have to go back and
25 review these cases.  I thought in each instance the second

1   agent came into the room with Mr. Smiedala and a summary

2   recording of was made.

3         MR. THAGGARD:   Certainly.   And, Your Honor, I'm not

4   contesting what the Court is saying.   I'm simply saying I'm not

5   intimately familiar with --

6         THE COURT:   Okay.   I understand.   And before I make

7   a -- I'm not going to suggest otherwise.   I will have to go

8   back and review those cases.

9         But today I was surprised that Mr. Smiedala testified

10  that he began the recording -- or attempted to begin the

11  recording in this case as soon as Mr. Birdrattler made an

12  admission because at that point there's no need for the

13  polygraph exam and so he could start recording.   And he only

14  brought in the second agent after he discovered his recording

15  had failed.   That seems different than every other case we've

16  had regarding the application of this policy about recording,

17  that the post-polygraph phase potentially could be recorded.

18  But this is the first time I've heard that as soon as the

19  defendant makes an admission a recording can begin.

20        Are you aware of that?   Did you hear that today?

21        MR. THAGGARD:   I did hear that today, Your Honor.

22        THE COURT:   I'm trying to square that with what I

23  have been told in the past about FBI policy regarding polygraph

24  recording.

25        MR. THAGGARD:   Sure.   And, Your Honor, my

1  understanding of the policy -- and I'm not an expert on the FBI
2  policy -- but my understanding of the policy is that, in fact,
3  once a defendant has made a significant admission, I would say
4  "confession," that at that point there's really no need to
5  proceed with the actual examination, hooking him up to the
6  equipment of the polygraph, and that they can proceed with the
7  recording at that point.  So that's my understanding of it,
8  Your Honor.

9      THE COURT:  Where is that -- is that written down
10  someplace?  I didn't see it in any of the documents.

11      MR. THAGGARD:  To my knowledge, Your Honor, it's not
12  written down.  Again, what sort of internal documents there may
13  be in the FBI concerning that, I'm not aware of.  But in my
14  experience and some of the cases that I've done -- I will
15  concede those were a number of years ago -- I believe that I
16  saw a similar sort of pattern.

17      THE COURT:  All right.  My third question:  I read
18  off the list of cases here:  *Red Star* was 2006; *Deputee was*
19  *2007; Woodenleg*s, 2010; *Medicine Horse*, 2011; *Alvarez*, 2012;
20  *Windy Boy*, 2013; *Davis*, 2012; *Graham*, 2013.  So these were
21  coming up every -- at least once a year or close to it for a
22  long period of time.

23      MR. THAGGARD:  I understand.

24      THE COURT:  Back in 2014, we had a dispute about this
25  practice, and there was a discussion among the judges of this

1   district and the US Attorney's Office.  And, eventually, we

2   were told that there had been a change in policy, that from now

3   on the FBI would record interviews on investigations in Indian

4   Country.  That was in 2014, at some point, I believe.

5          And we did not have -- I don't recall, having

6   reviewed the record, having any other cases since that time

7   that involved the use of the scheduled polygraph and then the

8   confession being elicited and the recorded statements of the

9   summary afterwards, until *Damon* in 2019.

10         So what happened?

11         MR. THAGGARD:  Well, Judge, what I can tell you is

12  this:  In terms of the policy, by way of background, I became

13  the criminal chief in January of 2014, so sort of in this

14  entire time period that you're discussing.  We knew that a

15  policy was coming along.  And, in fact, it came down in May of

16  2014.  You have been provided with a copy of that policy.

17         There was a discussion right about the time that that

18  policy came out.  I had been contacted by Agent Smiedala.  And

19  I am not certain whether or not I had a conversation with him

20  and a supervisor, but I certainly had a conversation with him.

21  And at that point the discussion focused on the fact that there

22  was going to be this recording policy and how it would

23  implicate polygraphs and sort of the broader use of polygraphs

24  and the technique and some pretty significant concerns in the

25  national security area, counterespionage, and, frankly,

1  polygraphing FBI employees and the need to maintain, frankly, a
2  pretty high level of security and secrecy concerning this
3  technique.

4          And at that point we had the conversation at the
5  managerial level within the United States Attorney's Office,
6  and we agreed, you know, from our perspective that this policy
7  did not apply to polygraphs.  And that's been the policy all
8  along.

9          Now, I understand and I read in the Damon transcript
10 the Court had brought up a prior instance where you believed
11 that somebody from the United States Attorney's Office had
12 represented to the contrary to you.  I have no doubt that at
13 some point there was representation made that we were recording
14 Indian Country interviews.  And that is true.  However, it is
15 also true that, from the genesis of this policy, that it has
16 been our position and our understanding that polygraphs are not
17 recorded.

18          THE COURT:  Well, wait a second.  The whole point
19 that -- I understood the policy was changed, and this was at a
20 meeting of chief judges of the United States of all of the
21 districts, and Director Comey announced they were going to
22 record interviews in Indian Country.  And he informed our chief
23 judge that Montana had been the impetus for that change.  And
24 the reason -- the concern here was this use of these
25 polygraphs.

1     So how can you stand there and tell me that the
2  policy -- "We decided to start recording, but it never
3  encompassed polygraphs, which was the impetus for the recording
4  in the first place"?
5           MR. THAGGARD:  Well, Your Honor, the policy -- and
6  you've got it -- specifically talks, in subparagraph 2(e),
7  under the Public Safety and National Security Exception, about
8  recording not being required in certain instances, including
9  questions concerning intelligence sources or methods.
10          THE COURT:  What does Mr. Birdrattler's case have to
11  do with national security?
12          MR. THAGGARD:  Well, his case has nothing to do with
13  it, but the technique employed has everything to do with it.
14          THE COURT:  And whose choice was it to use this
15  technique in Indian Country cases?
16          MR. THAGGARD:  Well, that was the FBI's, and the
17  US Attorney has chosen to go forward in these sorts of cases.
18          THE COURT:  And can you tell me any case in the Ninth
19  Circuit in which polygraph results have been admissible in
20  court?
21          MR. THAGGARD:  I am not aware of any, Your Honor.
22          THE COURT:  So what's the point of interrogating a
23  witness using a technique that you know not to be admissible,
24  other than as an element of coercion?
25          MR. THAGGARD:  Well, Your Honor, I would -- I would

1   respectfully disagree with the characterization of it as
2   coercive.  I do know that we've used polygraphs in the past to
3   clear people who have been accused of crimes, and we made that
4   offer directly from the United States Attorney's Office.  You
5   know, "Come in and let's see what a polygraph says."  And so it
6   certainly can be used to clear somebody.  I think it's a
7   reliable technique.  I think that a balance has been struck by
8   the summary recording at the conclusion of either an actual
9   completed polygraph exam or, as happened, where there's a
10  confession.

11          And is it the best possible evidence?  No.  But in
12  light of the need to preserve the technique, I think that it's
13  a reasonable one.

14          THE COURT:  I understand the need to preserve the
15  technique.  I've heard the explanation before, numerous times.
16  But having that weapon in your arsenal, knowing that it's
17  needed for national security purposes, knowing that it's needed
18  for background checks and interviews of FBI personnel and other
19  national personnel, and you make a choice to use it in criminal
20  investigations -- domestic criminal investigations with no
21  national security implications whatsoever.

22          MR. THAGGARD:  And we have and --

23          THE COURT:  There was such urgency here that this
24  case sat for a year waiting for DNA -- I'm not quite sure
25  why -- before we got around to contacting Mr. Birdrattler about

1  scheduling the polygraph.

2          MR. THAGGARD:  And there was a delay, but there is,
3  unfortunately, a delay in getting forensic evidence.  Forensic
4  evidence can be helpful.

5          THE COURT:  When did the DNA results come in?  I
6  didn't have any testimony to that effect, except it takes a
7  long time sometimes.  There's nothing in the record about what
8  day that came in.

9          MR. THAGGARD:  And I can't tell you what they are
10 other than from experience that they take a while, Your Honor.
11 And we did choose to employ the technique.  I think that it was
12 appropriate and --

13         THE COURT:  So, Mr. Thaggard, why was there a
14 five-year gap between -- well, have you employed it in the past
15 five years?

16         MR. THAGGARD:  Pardon?

17         THE COURT:  Have you used the polygraph exams in
18 investigations between 2014, when I thought and my colleagues
19 thought you stopped, and the Damon case in 2019 and this case?

20         MR. THAGGARD:  And if I could consult with Ms. Suek
21 about that for just a moment, Your Honor, I think I know the
22 answer.

23      (Off-the-record discussion between Mr. Thaggard and
24      Ms. Suek.)

25         MR. THAGGARD:  Judge, thank you.

1      Ms. Suek informs me that Mr. Weldon had had a couple
2   of cases last winter where we had done polygraph.  One involved
3   an infant death.

4      And the other thing I would point out is that
5   Agent Smiedala was out of the state for a period of time there.
6   He was working at headquarters back in Washington, and so it
7   was a matter of having to bring people in to do polygraphs.
8   And so that's fairly inconvenient at times, and so they simply
9   weren't being used as often.

10      I think I can represent to the Court that there was
11  nothing nefarious about this.  This does not represent a change
12  in policy.  The policy is what I've described.

13      THE COURT:  So what was the change in policy in
14  2014 --

15      MR. THAGGARD:  Well, the change in policy--

16      THE COURT:  -- when this new policy was announced?

17      MR. THAGGARD:  Sure.  When the policy was
18  implemented, we went to a nationwide system of recording
19  custodial interviews, which was a departure in many instances
20  from what traditionally had been done, as the Court knows,
21  where there was simply notes of interviews taken and then 302
22  were generated from those.  This was an attempt to have a
23  uniform nationwide policy, and it was not geared entirely
24  toward Indian Country.  It was part of the larger Smart On
25  Crime effort of the Obama administration that touched on all

1  sorts of criminal justice and that's --

2      THE COURT:  Let me focus you again on the policy for

3  a second.  I'm assuming you're talking about the exceptions

4  here.  It would be Roman Numeral II, Part B, on page 3.

5      Do you have that document, sir?

6      MR. THAGGARD:  I do, Your Honor.

7      THE COURT:  The Public Safety and National Security

8  Exception, is that what you are pointing to or relying on here?

9      MR. THAGGARD:  I am relying on that and the residual

10  exception, which is paragraph -- subparagraph D, Your Honor.

11      THE COURT:  So let's talk about paragraph B for a

12  moment.

13      MR. THAGGARD:  Sure.

14      THE COURT:  *New York v Quarles*, there was a robbery

15  suspect arrested in a crowded supermarket in New York City.

16      MR. THAGGARD:  That's correct.

17      THE COURT:  He had hidden his gun somewhere.  And so

18  the agents were concerned about a member of the public or

19  someone coming across the gun and who knows what would happened

20  there.  So there was a public safety concern.

21      MR. THAGGARD:  That's right.  I recall the case.

22      THE COURT:  All right.  Anything similar in this

23  case?

24      MR. THAGGARD:  In this case, no.

25      THE COURT:  Then we have the national security,

1  related to the intelligence or questioning concerning the

2  intelligence sources or methods to public disclosure which

3  could cause damage to national security.

4        How does that apply?

5        MR. THAGGARD:  I think the questioning itself and the

6  nature of it implicates the technique, the method, Your Honor.

7        THE COURT:  The method.  All right.

8        So it's your choice to use polygraphs in these

9  interviews that shields you from the recording requirement.

10       MR. THAGGARD:  I believe it -- I believe it does.  I

11 don't think it's simply a shielding, but I think it's an

12 appropriate, discretionary decision not to use the recording.

13 That's correct, Your Honor.

14       THE COURT:  All right.  Anything else you want to

15 add, Mr. Thaggard?

16       MR. THAGGARD:  No, Your Honor.  I have -- I think I

17 have expressed what the US Attorney's position is on this.  I

18 appreciate being heard.

19       THE COURT:  All right.  Thank you, sir.

20       Mr. Branom, briefly.

21       MR. BRANOM:  If I could see my notes, I will attempt

22 to argue.

23       Judge, just a few things.  And I think what

24 distinguishes Mr. Birdrattler is the "you need to come back."

25 And Agent Snyder testified he doesn't specifically recall what

1 the wording was to get Mr. Birdrattler back.

2 THE COURT:  This is an hour-and-15-minute interview.

3 Did they really overcome his will in an hour and 15 minutes?

4 MR. BRANOM:  We don't know.  The one thing -- as

5 you've just talked to Mr. Thaggard about, the one thing that

6 would let us know, the government chose not to provide the

7 Court.

8 THE COURT:  Are you familiar with the Ninth Circuit

9 decision in *Haswood*?

10 MR. BRANOM:  Yes, Your Honor.

11 THE COURT:  How do you distinguish it from your

12 claim?

13 MR. BRANOM:  Well, one, in *Haswood*, the polygraph

14 exam actually happened, and we haven't said --

15 THE COURT:  The district court determined that the

16 FBI policy didn't prevent the recording.

17 MR. BRANOM:  That's correct, Your Honor.  I remember

18 in Damon the government argued, even if they don't follow the

19 policy, that doesn't mean, you know, it's involuntary or it's

20 unconstitutionally obtained.  But I think the flip side is

21 true.  Even if they did follow the policy, it's up to you

22 whether or not it was involuntary.

23 I think it raises -- from the defense perspective, my

24 suspicion is you are right.  An hour and 15 minutes, an hour

25 and a half, and all of a sudden people flip their story in what

1   is represented to the Court to be a very benign set of
2   questions about what's going to happen in the polygraph.  And I
3   see no reason, no rationale, that they can't at least record
4   the Miranda warning.
5         And I think -- Mr. Birdrattler says it was on paper.
6   Mr. Smiedala says it was on the screen.  That shows how nervous
7   Mr. Birdrattler was.  I think it probably was on the screen,
8   but he's so out of his wits --
9         THE COURT:  So, Mr. Branom, if that's the case, we've
10  got conflicting stories between Mr. Smiedala and
11  Mr. Birdrattler about what happened during the prepolygraph
12  portion.  Why wouldn't a cautionary instruction to the jury be
13  sufficient to cure any alleged constitutional violation?
14        MR. BRANOM:  Well, I don't know that it would be
15  sufficient.  I certainly would accept one, but I think it's --
16  the government has the burden of proving the voluntariness of
17  the statement.  They had a tool at their disposal that would
18  resolve the question, and they chose not to use it.
19        THE COURT:  Have you read Judge Molloy's order in the
20  *Graham* case?
21        MR. BRANOM:  I have, Your Honor.
22        THE COURT:  Do you take issue with any of it?
23        MR. BRANOM:  Well, we thought it should have been
24  suppressed.  So, again, that's my preferred.  But I think I
25  cited *Graham*, if not in this one, certainly I think I did in

1  *Damon*.  So I can't -- I'm not going to speak out of both sides

2  of my mouth here.  I appreciate the Graham ruling.

3  THE COURT:  All right.  Anything else, Mr. Branom?

4  MR. BRANOM:  No, Your Honor.  Thank you.

5  THE COURT:  Let me just clarify.  Is there anything

6  in particular you'd point to that you think was unduly coercive

7  or just the totality of the circumstances?

8  MR. BRANOM:  Generally, the totality, but I think the

9  "you've got to come back" is where it crossed the line.

10  THE COURT:  Meaning when Mr. Smiedala asked

11  Mr. Birdrattler to come back for a second recording?

12  MR. BRANOM:  Yes.

13  THE COURT:  That's the point.  Okay.  I understand.

14  All right.  Anything else, sir?

15  MR. BRANOM:  No, Your Honor.  Thank you.

16  THE COURT:  Thank you.

17  All right.  Ms. Adams, anything you wish to add?

18  MS. ADAMS:  Just regarding the Court's questioning to

19  Mr. Branom about the cautionary instruction, we would object to

20  that, Your Honor, based on the testimony the Court has heard

21  from the agents, as well as the affidavit that was provided to

22  the Court in the Damon case.  This wasn't Agent Smiedala's

23  choice to not record under these circumstances.

24  THE COURT:  But that's -- no.  It's not his choice

25  because of the FBI policy.  But it was the choice of the FBI to

1  use the investigative technique.  Correct?

2          There are stories all over about these cases.  I

3  mean, there's a story where the investigators hooked a person

4  up to a copier machine and told him it was a polygraph machine.

5  Every time they said a lie, they'd hit a button, and it would

6  pump out a piece of paper that said "lie" on it.  And the

7  person -- "Oh, my gosh.  This machine is magic."

8          It's your choice to use the technique.  Right?

9          MS. ADAMS:  It's an investigative technique.

10          THE COURT:  Okay.

11          MS. ADAMS:  But for the purpose of making the record

12  today, we would object to that.

13          THE COURT:  All right.  I understand.  Thank you,

14  Ms. Adams.

15          Anything else today, Counsel?

16          MR. BRANOM:  No, Your Honor.

17          THE COURT:  All right.  I'll take this under

18  advisement.  I will get an order out in this case and *Damon* as

19  soon as possible.  Thank you.

20      (The proceedings concluded at 12:42 p.m.)

21

22                      --o0o--

23

24

25

REPORTER'S CERTIFICATE

1

2      I, Yvette Heinze, a Registered Professional

3  Reporter and Certified Shorthand Reporter, certify that the

4  foregoing transcript is a true and correct record of the

5  proceedings given at the time and place hereinbefore mentioned;

6  that the proceedings were reported by me in machine shorthand

7  and thereafter reduced to typewriting using computer-assisted

8  transcription; that after being reduced to typewriting, a

9  certified copy of this transcript will be filed electronically

10  with the Court.

11      I further certify that I am not attorney for, nor employed

12  by, nor related to any of the parties or attorneys to this

13  action, nor financially interested in this action.

14      IN WITNESS WHEREOF, I have set my hand at Great Falls,

15  Montana, this 23rd day of October, 2019.

16

17                              /s/ Yvette Heinze

18                              _____
                                Yvette Heinze
19                              United States Court Reporter

20

21

22

23

24

25