IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA JAMES BIRDRATTLER,<br><br>Defendant. | Cause No. CR-19-57-GF-BMM<br><br>ORDER |

A Grand Jury indicted Defendant Joshua James Birdrattler ("Birdrattler") on one count of Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 1153(a) and 2241(a)(1). (Doc. 1.) Birdrattler filed a Motion to Suppress Statements on September 16, 2019. (Doc. 18.) The Government opposes the motion. (Doc. 27.) The Court held a hearing on Birdrattler's motion on October 8, 2019. (Doc. 33.)

**BACKGROUND**

Jane Doe reported that Birdrattler had sexually assaulted her sometime between the late-night hours of February 15, 2018, and the early-morning hours of February 16, 2018. (Doc. 27 at 2.) Doe received immediate medical care at the Indian Health Services Building in Browning, Montana. (Doc. 20 at 1.) Medical professionals conducted a sexual assault examination. (Doc. 20 at 1.) The anal swab test results positively identified Birdrattler's DNA. (Doc. 20 at 1.)

Birdrattler told law enforcement officers during initial interviews that he and Doe had engaged in consensual sexual activity. Birdrattler did not admit to any nonconsensual sexual activity. Special Agent Steven Snyder ("SA Snyder") contacted Birdrattler by telephone on February 28, 2019. (Doc. 19-1 at 1.) SA Snyder confirmed that Birdrattler would be willing to participate voluntarily in a polygraph examination. (*Id.*) Birdrattler arrived at the federal building in Browning, Montana, for his scheduled polygraph examination on April 3, 2019. (Doc. 19 at 2.) SA Snyder led Birdrattler to the interview room and introduced Birdrattler to Special Agent Stacey Smiedala ("SA Smiedala").

SA Snyder left the interview room, leaving SA Smiedala and Birdrattler alone. SA Smiedala presented an Advice of Rights Form and a Consent to Interview with Polygraph Form to Birdrattler. (Docs. 19-2 & 19-3.) SA Smiedala testified that he read portions of the forms out loud to Birdrattler and that Birdrattler read portions of the forms out loud to SA Smiedala. (Doc. 35 at 11-13.)

Birdrattler did not recall reading portions of the forms out loud to SA Smiedala and testified that he believed he had to sign the forms. (*Id.* at 65-66.) Birdrattler and SA Smiedala signed the forms through electronic signatures on the screen of Smiedala's computer at 1:25 p.m. and 1:26 p.m, respectively. (Docs. 19-2 & 19-3.)

SA Smiedala conducted what he described as a pre-polygraph interview with Birdrattler. (Doc. 20 at 2.) Birdrattler admitted for the first time during this pre-polygraph interview that he had engaged in nonconsensual sexual activity with Jane Doe. SA Smiedala testified that FBI policy prohibits him from recording any portion of a polygraph examination, including the pre-polygraph interview. (Doc. 35 at 29-30.)

At the end of the pre-polygraph interview during which Birdrattler admitted for the first time to having nonconsensual sexual activity with Jane Doe, Birdrattler agreed to provide a recorded summary of the statements that he had made. (Doc. 20 at 2.) SA Smiedala testified that he turned on his recording device and that Birdrattler made a statement. (Doc. 35 at 20.) SA Smiedala subsequently discovered that the recorder had not operated properly when Birdrattler made his statement. (Doc. 20 at 2.) SA Smiedala requested that SA Snyder enter the interview room. (Doc. 35 at 21-22.)

Birdrattler agreed to provide the statement again. (*Id.* at 22.) SA Smiedala and SA Snyder recorded Birdrattler's statement. (*Id.*) Birdrattler admitted in the

audio recording to having nonconsensual anal sex with Jane Doe. (Doc. 21, Def. Ex. 501.) Birdrattler also stated that SA Smiedala treated him fairly, that Birdrattler had not been forced to make the statement, and that SA Smiedala had not made any promises in return for Birdrattler's statement. (*Id.*) The interview ended at 2:57 p.m. Birdrattler left the office without having taken a polygraph examination. (Doc. 20 at 2.)

Birdrattler now requests that the Court suppress the statements that he made on April 3, 2019. (Doc. 19 at 3.) Birdrattler argues that the statements had not been voluntary and that no way exists to know what SA Smiedala did during the pre-polygraph interview because SA Smiedala failed to record it. (Doc. 19 at 6.). (*Id.*) Birdrattler argues that admission of only the recorded portion of the discussion will violate his due process rights. (Doc. 19 at 7.)

## DISCUSSION

Involuntary statements violate a defendant's right to due process. *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993). Physical and psychological pressure may lead to an involuntary confession. *Miller*, 984 F.2d at 1030. The government has the burden to prove by a preponderance of the evidence the voluntariness of a defendant's confession. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). A statement is voluntary if it is "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989). A court looks

4

to the totality of the circumstances when analyzing the admissibility of a defendant's statements. *Withrow v. Willams*, 507 U.S. 680, 689 (1993).

Courts consider whether the government obtained a confession by physical or psychological coercion or by improper inducement so as to overbear the suspect's will. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Courts evaluate various factors in determining whether a person had provided a statement voluntarily: the suspect's age and intelligence; whether law enforcement advised the suspect of his constitutional rights; how long law enforcement detained the suspect; whether the questioning was prolonged and repeated; and whether law enforcement used physical punishment such as the deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

Law enforcement officers may confront suspects with evidence, appeal to defendants' emotions, and even provide false or misleading information. *See, e.g.*, *Fracier v. Cupp*, 394 U.S. 731, 737-39 (1969); *Ortiz v. Uribe*, 671 F.3d 863, 870-72 (9th Cir. 2011); *United States v. Moreno-Flores*, 33 F.3d 1164, 1168-70 (9th Cir. 1994). A confession proves voluntary as long as it remains the "product of the suspect's own balancing of competing considerations." *Miller*, 984 F.2d at 1031.

The Ninth Circuit in *United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003), considered the voluntariness of a suspect's confession to an FBI agent after

5

having undergone an unrecorded polygraph examination. The suspect in *Haswood* agreed to take a polygraph examination and signed the standard FBI Advice of Rights Form and Consent to Polygraph Form at the beginning of the examination. *Haswood*, 350 F.3d at 1026. The FBI agent administered the polygraph examination.

After the examination, the FBI agent showed a newspaper article to Haswood about a different child abuse case. The suspect in the other case initially had lied to the FBI agent. *Id.* A court ultimately sentenced the suspect in the other case for both child abuse and having made false statements. Haswood subsequently admitted to having touched the victim on three occasions. The FBI agent and Haswood went over Haswood's statement. The FBI agent asked Haswood to write a statement as soon as they both "felt comfortable." *Id.* The FBI agent did not record any portion of the interaction. Haswood moved to suppress the statements. *Id.* at 1027.

The FBI agent testified that FBI policy prohibited him from recording the polygraph examination. *Id.* at 1028. The district court disagreed after having examined the FBI Policy Manual. The district court concluded that the policy did not affirmatively prohibit an agent from recording a polygraph examination. The district court suppressed Haswood's statements due to the coercive nature of showing Haswood the newspaper article. *Id.*

The Ninth Circuit reversed. *Id.* at 1029. The Ninth Circuit concluded that, even if it accepted the district court's underlying findings and inferences about what occurred during the unrecorded polygraph examination, the record still lacked any evidence of coercion. *Id.; see also United States v. Red Star*, 2007 WL 2051235 (9th Cir. 2007). The Ninth Circuit summarized the facts as follows:

> [A]n FBI agent drove Haswood to the examination, where another agent subjected him to a daylong interrogation. During this time, Haswood denied having molested the young girl. Once the agent concluded the polygraph examination, he accused Haswood of being untruthful during the exam. The agent then presented Haswood with a newspaper article that illustrated the possible consequences of lying. Haswood verbally confessed. [The FBI agent] subsequently influenced which words Haswood used in his written confession.

*Haswood*, 350 F.3d at 1029. Nothing in the record suggested that the FBI Agent's failure to record the interview had influenced Haswood's admission. *Id.* at 1028-29. The Ninth Circuit specifically noted that the "use of polygraph results is a reasonable means of police questioning." *Id.* at 1028.

Based on the record, the Court is unable to conclude th at Birdrattler's statements to SA Smiedala were involuntary. The Court considered the following factors in arriving at this conclusion: Birdrattler's age and intelligence; whether SA Smiedala advised Birdrattler of his constitutional rights; how long SA Smiedala detained Birdrattler; whether the questioning had been prolonged and repeated; and

whether SA Smiedala used physical punishment such as the deprivation of food or sleep. *See Haswood*, 350 F.3d at 1027.

Birdrattler obtained his GED when he was n the eleventh grade and was an adult at the time of the interview. (Doc. 35 at 61.) Conflicting testimony exists regarding whether SA Smiedala advised Birdrattler of his rights. Birdrattler undisputedly signed the Advice of Rights Form and the Consent to Interview with Polygraph Form. (Docs. 19-2 & 19-3.) The interview began around 1:25 p.m. when Birdrattler signed the standard FBI polygraph examination forms. (Docs. 19-2 & 19-3.) The interview ended at 2:57 p.m. The questioning lasted for less than two hours. This duration cannot be described as prolonged and repeated. *Cf. Haswood*, 350 F.3d at 1029. Nothing in the record suggests that SA Smiedala used any sort of physical punishment. The evidence does not demonstrate that the FBI obtained Birdrattler's confession by means of physical or psychological coercion or by improper inducement so as to overbear Birdrattler's will. *See Leon Guerrero*, 847 F.2d at 1366.

Similar to *Haswood*, the record contains insufficient facts to establish that Birdrattler's statement had been involuntary. Obviously the record does not contain potential contested facts due to the failure to record all except the summary statement. SA Smiedala's failure to record the pre-polygraph interview, however, absent any other evidence of coercion, does not demonstrate that SA Smiedala

8

obtained Birdrattler's confession by physical or psychological coercion or by improper inducement so as to overbear Birdrattler's will. *Haswood*, 350 F.3d at 1029.

The reliability of Birdrattler's voluntary statement remains suspect, however, due to the fact that SA Smiedala did not record the pre-polygraph interview and then recorded only a summary confession statement. This scenario left SA Smiedala in a position potentially to shape Birdrattler's recorded interview statements during the unrecorded pre-polygraph interview. SA Smiedala's interview procedure, as used here and in numerous similar cases, generally will not result in involuntary or coerced statements. *See Haswood*, 350 F. 3d at 1028-029. SA Smiedala's interview procedure instead allows the Government to shape its presentation of the defendant's statements at trial. *See United States v. Graham*, CR 13-37-DWM, Doc. 128 at 13. SA Smiedala's interview procedure affects the reliability and fairness of presenting the recorded "summary" statements to the jury. *Id.*

Courts have identified significant concerns regarding partial recordings. *See State v. Barnett*, 789 A.2d 629 (N.H. 2001); *State v. Scales*, 518 N.W.2d 587 (Minn. 1994); *Stephan v. State*, 711 P.2d 1156 (Alaska 1985). The New Hampshire Supreme Court in *Barnett* determined that a taped recording of an interrogation that occurred after law enforcement had provided *Miranda* rights would be

admissible only if it represented a complete recording of the interrogation. *Barnett*, 789 A.2d at 632. The court noted that the danger of allowing a recorded confession into evidence. The defendant's statements, in his or her own voice, have "a persuasive power unrivaled by contradictory testimonial evidence." *Barnett*, 789 A.2d at 632-33.

The Alaska Supreme Court in *Stephan* examined a situation in which law enforcement only partially recorded the interrogations of two defendants. *Stephan*, 711 P.2d at 1158. The court excluded the partial recordings based on law enforcement's "arbitrary failure" to record the entire conversation that directly affected the defendant's ability to present his defense. *Stephan*, 711 P.2d at 1164. The Minnesota Supreme Court in *Scales* required that law enforcement should record all custodial interrogations when feasible. *Scales*, 518 N.W.2d at 592. The court recognized that a "recording requirement . . . discourages unfair and psychologically coercive police tactics and thus results in more professional law enforcement." *Scales*, 518 N.W.2d at 591.

Montana law, although not specifically applicable here, requires law enforcement officers to record custodial interviews in their entirety, subject to a few exceptions. Mont. Code Ann. § 46-4-408. "The recording must contain a peace officer advising the person being interviewed of the person's Miranda rights, a recording of the interview, and a conclusion of the interview." *Id.* The Montana

Supreme Court "views with distrust" a law enforcement officer's failure to record a non-custodial interview if the interview took place in a controlled situation absent exigent circumstances. *See State v. Deines*, 208 P.3d 857, 860-863 (Mont. 2009) (discussing cases).

The Montana Supreme Court has applied this "views with distrust" notion in a variety of contexts. These contexts include the following scenarios: a law enforcement officer's failure to record *Miranda* warnings advising a suspect of his rights, *State v. Grey*, 907 P.2d 951, 956 (Mont. 1995); failure to videotape the results of a thermal imaging scan used to support a search warrant application for a suspected marijuana grow operation, *State v. Siegal*, 934 P.2d 176, 192-93 (Mont. 1997), *overruled on other grounds by State v. Kuneff*, 970 P.2d 556 (Mont. 1998); failure to record an interview with child sexual abuse victims, *State v. Weaver*, 964 P.2d 713, 723 (Mont. 1998); and failure to record a citizen informant's statements in the controlled environment of a station house, *State v. Worrall*, 976 P.2d 968, 978 (Mont. 1999). The Montana Supreme Court has questioned the veracity of statements even more when the investigating officer makes a conscious decision not to videotape or audiotape interviews or to preserve any other kind of record of the interviews. *Weaver*, 964 P.2d at 723.

The Court further recognizes that the Ninth Circuit generally prohibits the admissibility of a polygraph examination at trial. *United States v. Bowen*, 857 F.2d

1337, 1341 (9th Cir. 1988). Polygraph evidence presents an "overwhelming potential for prejudice" because of its "questionable reliability and its misleading appearance of accuracy." *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir. 1989).

SA Smiedala repeatedly has obtained confessions during unrecorded polygraph interviews. SA Smiedala has employed nearly identical interview procedures to obtain confessions in numerous other Montana cases. *See, e.g.*, *United States v. Damon*, CR 19-45-GF-BMM; *United States v. Graham*, CR 13-37-M-DWM; *United States v. Deputee*, CR 07-64-BLG-RFC; *United States v. Davis*, CR 13-28-GF-DLC. SA Smiedala interviewed the defendant in *Deputee* for an hour and a half during a pre-polygraph interview, obtained a confession from the defendant, and then recorded the last five minutes of the interview as a "summary of statements made." (*Deputee*, CR 07-64-BLG-RFC, Doc. 57.) SA Smiedala used similar interview techniques in *Damon*, *Graham*, and *Davis*. SA Smiedala did not perform a polygraph test in *Damon*, *Graham*, or *Davis*. SA Smiedala did not perform a polygraph test here. SA Smiedala testified that FBI policy prohibits him from recording polygraph examinations, including pre-polygraph interviews. (Doc. 35 at 29-30.) The Government maintains that SA Smiedala's interview procedures comply with the FBI's policy regarding polygraph examinations.

The Court directed the Government to submit documentation regarding the FBI Policy and the policy of the United States Attorney's Office on the recording of interviews in the related case *Damon*. The United States Department of Justice issued a memorandum outlining its policy that creates a presumption in favor of recording custodial statements of individuals. (No. 19-45 Doc. 50-1.) The memorandum provides limited exceptions to the presumption, including for public safety and national security. (*Id.* at 3.) The public safety exception typically involves a scenario where a defendant's actions, such as discarding a weapon in a crowded supermarket, present an immediate safety concern to the general public or the arresting officer. *New York v. Quarles*, 467 U.S. 649, 655-56 (1984); *see also United States v. Williams*, 842 F.3d 1143, 1149-50 (9th Cir. 21016) (declining to extend public safety exception to questioning of a defendant in custody of his gang affiliations).

The United States submitted the District of Montana 2019 Indian Country Law Enforcement Initiative Operational Plan ("Operational Plan"). The Operational Plan creates guidelines for the investigation of crimes in Indian Country. The Operational Plan explicitly references and adopts the "presumption in favor of electronically recording custodial interviews, with certain exceptions, and encourages agents and prosecutors to consider taping outside of custodial interrogations." (No. 19-45 Doc. 50-3.)

The United States also submitted a declaration from Josefina Regula, the Acting Unit Chief of the Polygraph Unit of the FBI. (No. 19-45 Doc. 50-3.) According to Regula's declaration, "noncustodial polygraph examinations may not be audiotaped or videotaped without the approval of both the Unit Chief of the Polygraph Unit and the Special Agent in Charge of the FBI Field Office where the examination occurs." (No. 19-45 Doc. 50-3 at 2.) Regula justified the need for the policy based on her characterization of the polygraph exam as a "sensitive investigative technique." (No. 19-45 Doc. 50-3 at 2.)

The FBI's use of a polygraph examination appears to serve primarily as a coercive tactic and a justification to avoid having to record interviews. There appears to be little intention by the FBI actually to administer the polygraph examination in these interviews. The fact that any results from a polygraph examination almost certainly would be inadmissible as evidence to establish the truth of any statement supports this conclusion. *See Bowen*, 857 F.3d at 1341.

The Court also remains skeptical that few cases that arise in Indian Country present "public safety" or "national security" concerns that otherwise would justify the failure to record these interviews. (No. 19-45 Doc. 50-1); *see also Quarles*, 467 U.S. at 655-56. The FBI investigated alleged crimes of sexual abuse in both *Birdrattler* and *Damon*. The documents submitted by the Government and testimony provided by its witnesses attempt to cast the pre-test phase as both a

14

routine, information gathering interview and a "protected investigative tool." (No. 19-45 Doc. 50-3.) It cannot be both.

The Government controls the interrogation process. Courts have offered cautionary instructions to ensure the fair presentation of evidence in similar situations. *See, e.g.*, *United States v. Azure*, 1999 WL 33218402 at *2 (D.S.D. 1999); *Massachusetts v. DiGiambattista*, 813 N.E.2d 516 (Mass. 2004). The Massachusetts Supreme Court in *DiGiambattista* reasoned that a specific cautionary instruction may be appropriate where "there are grounds for questioning the reliability of certain types of evidence that the jury might misconstrue as particularly reliable." *DiGiambattista*, 813 N.E.2d at 533. The court noted that a fact finder can evaluate an interrogation's precise contents and any alleged coercive influences only from a complete recording of the entire interrogation. *Id.* at 532. A cautionary instruction would be appropriate in situations where a partial recording exists. The court specifically noted that the existence of only a partial recording often may be attributed to the strategic decisions of the interrogating officer. *Id.* at 533.

The Ninth Circuit has recognized that a district court may "support any disbelief it has" of a witness's testimony by "noting the lack of a recording." *United States v. Wright*, 625 F.3d 583, 604 n.10 (9th Cir. 2010), *superseded by statute on other grounds as stated in United States v. Brown*, 785 F.3d 1337, 1351

(9th Cir. 2010). The FBI's failure to record interviews when possible may support the fact finder's inference that the agent did not portray accurately the interrogation's circumstances. *Id.* (citing *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988)). The district court also may consider the FBI's adopted policy of not recording interviews preceding a polygraph examination. *Id.*

The totality of the circumstances likely will support a cautionary instruction in this case. *DiGiambattista*, 813 N.E.2d at 533. SA Smiedala had available to him the technology to record the pre-polygraph interview, but he chose not to record it. Should the Government play the recorded portion of the interview or present testimony about the unrecorded portion of the interview at trial, the Court will instruct the jury to weigh that evidence with great caution. The Court further will instruct the jury that if they find the FBI could have recorded the interview—but chose not to record—the jury should "view with distrust" the recording and the testimony. *Deines*, 208 P.3d at 860-863.

The Court again notes its concern with the interview procedures used in this case, in *Damon*, and in others. The use of an unrecorded pre-polygraph interview as a coercive tactic and justification for the failure to record the interview conflicts with the policy issued by the United States Department of Justice and the District of Montana's Operational Plan on recording interviews in Indian Country. The Court appreciates the potential national security concerns that could arise from the

16

recording of FBI polygraph examinations. (No. 19-45 Doc. 50-1.) The interview of suspects in investigations for crimes committed in Indian Country, however, typically do not involve alleged terrorism or threats to public safety of the type identified in *Quarles*. The cases cited in this order prove the point. *United States v. Damon*, CR 19-45-GF-BMM; *United States v. Graham*, CR 13-37-M-DWM; *United States v. Deputee*, CR 07-64-BLG-RFC; *United States v. Davis*, CR 13-28-GF-DLC.

The Government has chosen to use the tool of a threatened polygraph examination to attempt to extract confessions from defendants. The Government cannot choose to use this "sensitive investigative technique" in cases that lack apparent national security or public safety concerns and avoid scrutiny. (No. 19-45 Doc. 50-3 at 2.) This scrutiny includes questions regarding the need for the use of this practice in these types of cases. Some may argue that the ends justify the means as evidenced by the statements obtained. In a free and democratic society, however, how we discover the truth matters as much as the truth that we discover. "For jurors to see as well as hear the events surrounding an alleged confession or incriminating statement is a forward step in the search for truth." *Hendricks v. Swenson*, 456 F.2d 503, 507 (8th Cir. 1972).

# ORDER

Accordingly, **IT IS ORDERED** that Birdrattler's Motion to Suppress (Doc. 18) is **DENIED**.

DATED this 12th day of November, 2019.

*Brian Morris*
Brian Morris
United States District Court Judge