IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

   -vs-                            Criminal Docket
                                    No. 19-45-GF-BMM

MYCHAL THOMAS DAMON, and
JOSHUA JAMES BIRDRATTLER,         Criminal Docket
                                    No. 19-57-GF-BMM

       Defendant.

_____

TRANSCRIPT OF MOTION HEARING PROCEEDINGS

Heard in the Charles Pray Courtroom
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, Montana
December 16, 2019
2:05 p.m.


BEFORE THE HONORABLE BRIAN MORRIS


UNITED STATES DISTRICT JUDGE




TINA C. BRILZ, RPR, FCRR
Freelance Court Reporter
BRILZ COURT REPORTING, INC.
4956 Smallwood Court
Helena, Montana  59601



Proceedings recorded by mechanical stenography, transcript
produced by computer.

<u>A P P E A R A N C E S</u> :


<u>PRESENT ON BEHALF OF THE PLAINTIFF, THE UNITED
STATES OF AMERICA</u>:

        MS. LORI A. HARPER SUEK and
        MR. TIMOTHY A. TATARKA
        Assistants U.S. Attorney
        OFFICE OF THE U.S. ATTORNEY
        James F. Battin Federal Courthouse
        2601 2nd Avenue North, Suite 3200
        Billings, Montana  59101

           and

        MS. CASSADY A. ADAMS
        Assistant U.S. Attorney
        U.S. ATTORNEY'S OFFICE - GREAT FALLS
        119 First Avenue North, Suite 300
        P.O. Box 3447
        Great Falls, Montana  59403


<u>PRESENT ON BEHALF OF THE DEFENDANTS, MYCHAL THOMAS
DAMON and JOSHUA JAMES BIRDRATTLER</u>:

        MR. R. HENRY "HANK" BRANOM, JUNIOR
        Assistant Federal Defender
        FEDERAL DEFENDERS OF MONTANA
        GREAT FALLS BRANCH
        104 Second Street South
          Suite 301
        Great Falls, Montana  59403-3547

1  The following proceedings were had:

2

3          THE COURT:  Please be seated.

4      Madam Clerk, please call the first case on the court's

5  calendar.

6          CLERK OF COURT:  This court will now conduct motion

7  hearings in Cause Numbers CR-19-45-GF-BMM, United States of

8  America versus Mychal Thomas Damon; and CR-19-57-GF-BMM, United

9  States of America versus Joshua James Birdrattler.

10          THE COURT:  Good afternoon, Ms. Adams.

11          MS. ADAMS:  Good afternoon, Your Honor.

12          THE COURT:  Looks like you brought in the A team

13  here.

14          MS. ADAMS:  We have our billet chief, Tim Tatarka,

15  and Deputy Chief Lori Suek with me at counsel.

16          MS. SUEK:  Good afternoon, Your Honor.

17          THE COURT:  The A-plus team.  I don't want to deflate

18  the grades.

19      Good afternoon, Mr. Branom.

20          MR. BRANOM:  Good afternoon.

21          THE COURT:  Good afternoon, Mr. Damon; good

22  afternoon, Mr. Birdrattler.

23          DEFENDANT BIRDRATTLER:  Good afternoon, Your Honor.

24          THE COURT:  We're here on a motion in limine filed by

25  the government related to an earlier order I issued in October

1  of this year regarding -- or I'm sorry -- yeah.  In October.

2  Regarding the polygraph evidence and the motion to suppress.

3       Ms. Adams, who's going to argue for the government?

4            MS. ADAMS:  Mr. Tatarka will, Your Honor.

5            THE COURT:  Before we get started, one of the items

6  that became an issue here was I directed the government to file

7  documentation of the policy that prohibits recording.  And I

8  got a copy -- three documents were filed.  Number one was a

9  government -- the FBI's general policy regarding recording that

10 contains presumptions of various kinds.  And there was three

11 circumstances, I believe, or two circumstances when that

12 presumption of recording doesn't apply; one of those is the

13 public safety exception in New York versus Quarles, which I

14 don't believe applies here.  And the other one was an issue

15 involving national security -- or terrorism.  And I don't think

16 either of those are implicated here.

17      And then, the second document was layout of the

18 operational arrangements of the federal prosecutors and their

19 interaction with the tribal authorities in the State of Montana

20 -- District of Montana, excuse me.

21      And finally, a declaration by an FBI agent.

22      But nowhere did you actually produce the policy.  So I'm

23 still wondering whether there is such a policy.

24            MR. TATARKA:  And --

25            THE COURT:  Why don't you go to the podium.  If

1  you're going to argue, Mr. Tatarka, why don't you go to the

2  podium.

3          MR. BRANOM:  And Judge, before we get too far into

4  this, you are holding a hearing in both these cases.  I've

5  discussed it with Mr. Damon and Mr. Birdrattler.  And they

6  consent to having the hearing combined.

7          THE COURT:  Thank you, Mr. Branom.

8      Do you represent both of them?

9          MR. BRANOM:  Yes, Your Honor.

10          THE COURT:  Okay.

11      And Mr. Damon and Mr. Birdrattler, you understand you have

12  separate cases.  The same issue is presented in each of your

13  cases.  And we're going to talk about the legal issues that

14  each case presents and then talk about how the facts of each of

15  your cases apply to those legal questions.  Do you understand?

16          MR. DAMON:  Yes, Your Honor.

17          MR. BIRDRATTLER:  Yes, Your Honor.

18          THE COURT:  All right.  Good.

19      Thank you.

20      Go ahead, Mr. Tatarka.

21          MR. TATARKA:  So to answer the court's question

22  directly, the United States has given the court the policies

23  that it has with respect to -- with respect to the recording of

24  interviews, both generally and with respect to Indian Country.

25          There's one important clarification that I want to make

1 with respect to the court's -- the way the court has outlined

2 -- outlined that policy.

3     And I want to clarify that my purpose here is not to

4 relitigate the court's prior order.  But I do want to make sure

5 that I'm laying the stuff out correctly.

6     The policies that the court noted, and the policies that

7 we gave you, with respect to the presumption of recording, is

8 the presumption of recording custodial interviews.

9     So, the court is correct that there is a presumption for

10 custodial interviews that they will be recorded, and there are

11 exceptions to that presumption in those cases that the court

12 outlined.

13     However, I don't think there's any dispute here that this

14 is a noncustodial -- that neither of these cases were custodial

15 interviews.

16     And I don't think that was something that has ever been --

17 that has ever really been contested.

18         THE COURT:  They're not custodial in the traditional

19 sense that the defendants weren't free to leave.  But they also

20 weren't field interviews.  This wasn't something out on the fly

21 where the agent had to question a witness and didn't have time

22 to get the equipment together.  This was a preplanned, staged

23 event.  "Please come to the office for an interview."

24         MR. TATARKA:  Absolutely.  No question, Your Honor.

25         THE COURT:  There's no reason the equipment wasn't

1   available.  None of those kind of justifications would apply.

2       And I understand what you gave me are the presumptions

3   regarding custodial interviews.

4           MR. TATARKA:  Correct.

5           THE COURT:  I asked for the policy regarding

6   recording of the pre-polygraph interviews.  And so you gave me

7   the presumptions.  You gave me the second document, which was

8   -- and verify -- on the presumptions, there's a public safety

9   and national security exception.  And that's New York versus

10  Quarles is the public safety exception.  You've got a person

11  arrested in a crowded supermarket.  He hides a gun in the

12  cantaloupe section of the produce aisle.  "Where is the gun?

13  Somebody could get hurt.  We've got to find this right now."

14  You asked him where it is.  He doesn't get the benefit of

15  recording.  That's perfectly appropriate.

16      The presumption, likewise, does not apply to limited

17  circumstances undertaken to get at national-security-related

18  intelligence.  Doesn't apply here.  Or questioning concerning

19  intelligence, sources, or methods.

20      The public disclosure which would cause damage to national

21  security.  Do any of those apply here?

22          MR. TATARKA:  Well, national security is implicated

23  with respect to the procedure that the polygraph -- and the

24  court addressed that thoroughly in its order.  And again, I

25  want to be clear, though, with respect to:  I understand that

1  the court can disagree with the policy and believe that perhaps
2  it should extend to some noncustodial interviews.  But I want
3  to be clear that the government's position has been throughout
4  that this was a noncustodial interview.  The presumption never
5  applied here.

6          THE COURT:  And I'm sure -- state law differs from
7  federal, I understand that.  I understand what the FBI's
8  obligation is.

9      But the presumption arose in the context of the cases back
10 in 2014 involving Agent Smiedala, where there was concern by
11 judges in this district about the process that happened --
12 similar process that would happen in these two cases.  And in
13 response, we were told by the government, the FBI had changed
14 its policy and would start recording interviews.

15     And so I had none of these cases from 2014 until now.
16 It's a five-year gap.  So, then, when this came up, I was,
17 like, "Oh, what's changed?"  So I asked for the policy if
18 there's a change.  And I was given the presumptions memo.  And
19 I was given Exhibit 2, which was the District of Montana 2019
20 Indian Country Law Enforcement Initiative Operational Plan.
21 Lays out the interplay between the federal law enforcement and
22 the U.S. Attorney's Office and the tribal law enforcement and
23 prosecutors' offices.

24     Then, the third document -- I don't it -- that second
25 document really doesn't relate directly to anything regarding

1  recording or not recording interviews.

2        MR. TATARKA:  I think there is one section in there

3  that reaffirms the nationwide policy with respect to a

4  presumption with respect to custodial interviews and an

5  encouragement to record with respect to the noncustodial

6  interviews.

7        THE COURT:  Right.

8     And part of the reason that I asked for these documents

9  was to determine whether the judges in the district were

10  misled.  That there had been a change in policy.  We were going

11  to record in Indian Country, and it was reported back from the

12  Chief Judge of the district that he had been informed directly

13  by the director of the FBI at a conference that, yes, it had

14  been changed.  And Montana was in large part the impetus for

15  that change.

16     The third document is a declaration from Josefina -- is it

17  Regula?  I'm not sure of the pronunciation on that.

18        MR. TATARKA:  Your guess is as good as mine, Your

19  Honor.

20        THE COURT:  She's the Acting Unit Chief, Polygraph

21  Unit, Security Division, FBI.  And she explains her impressive

22  background and credentials.  And then she refers in

23  paragraph 5:  "Per the FBI's Polygraph Program Policy Guide."

24  And then she quotes from that and discusses that.  But you've

25  never produced that Polygraph Program Policy Guide, which,

1  presumably, is what she's relying upon as support for the

2  notion that this practice was pursuant to FBI policy.

3          MR. TATARKA:  Okay.

4      And I don't have an answer to that question.  If you don't

5  mind if I confer with my --

6          THE COURT:  It's similar, to me, if I ask a lawyer:

7  "Provide me the statute that supports your position of this

8  action," instead of giving me a copy of the statute, you tell

9  me what you think the statute says and why it applies.

10     Where is the policy?

11         MR. TATARKA:  Well --

12         THE COURT:  Please consult, by all means.

13         (A brief off-the-record discussion was had among

14         Mr. Tatarka, Ms. Suek, and Ms. Adams at counsel

15         table.)

16         MR. TATARKA:  Your Honor, my understanding is we have

17 -- I can look -- I can see what I can do about getting that --

18 that -- that statement that is referenced in the affidavit.

19     That said, our -- the United States is asserting to you

20 that we have provided you the relevant policies that we have

21 with this.

22     And the only other thing that I will add is my purpose

23 here today is not to relitigate the court's order.

24         THE COURT:  Let me explain where I'm going, too.  One

25 of the issues here, the government's proposed:  "Well, we won't

 1  play the recording.  The agent will testify as to the content
 2  of the interview."
 3       One of the issues that may come up on cross-examination or
 4  direct is:  "You didn't take notes; did you?"
 5       "Well, no, I didn't."
 6       "And you didn't do X or Y?"
 7       "No.  Because I recorded it," or a portion of it.  You
 8  know, that's the response.
 9       "And why didn't you record the whole thing?"
10       "Well, FBI policy prohibited it."
11       Well, how can defendant cross-examine the witness about
12  any FBI policy if we don't have a copy of the policy?  We had
13  this referenced to the policy by the declaration of the agent,
14  but I don't have the policy itself.  And so, I don't know --
15  you know, if that gives a complete picture of the policy, if
16  there's exceptions, if there are qualifications.  I don't know
17  that.  And I don't see how the defendant could explore that
18  issue without having a copy of this policy that's referenced in
19  the agent's declaration.
20       Do you see where I'm going here?
21            MR. TATARKA:  I do, Your Honor.  And it is my
22  understanding that the -- the -- that there isn't a written
23  policy about this.  I understand there's a reference to that,
24  and I don't know the answer to the question about whether or
25  not that is the policy that we gave you.  I know it's referred

1    to as the 2016 policy, and the date on it is 2014, but it went
2    into effect in 2016.  But --

3           THE COURT:  What I'm worried about is if it comes to
4    that during the trial, we have a cross-examination argument
5    about the policy.  Well, was there really a policy?  Or was it
6    -- was there contemporaneously-enacted policy that prohibited
7    recording.  Or was that the agent's interpretation?  Was that
8    the agent's supervisor's interpretation.  Was that the
9    directive from headquarters?  I don't know.  Where is it?  If
10   there is a the policy --

11          MR. TATARKA:  Well, that can -- to the extent that
12   can be explored with the -- with the witness --

13          THE COURT:  The problem is that the defendants are
14   working with one hand tied behind their back, because the
15   witness will say:  "Well, here's what the policy says," without
16   the ability of the court or the defendant to review what the
17   policy is.

18          MR. TATARKA:  Again, we do have a sworn -- a sworn
19   statement --

20          THE COURT:  I understand that.  You have a
21   statement --

22          MR. TATARKA:  Not just by the agent, but by the
23   director of the unit that that is -- I don't think there
24   necessarily has to be a written policy in order for it to be
25   the policy.  And I do understand there's a citation and that

1  that citation needs to be explored, and we're -- I can't
2  promise that we'll -- that we'll give it, because I'm not sure
3  what it's a reference to.  But I can assure you --
4        THE COURT:  If there's no policy, what's the basis
5  for the statements in the agent's declaration?  For example,
6  paragraph 5:  "Polygraph examiners must advise all individuals
7  undergoing a polygraph examination whether the examination is
8  being monitored."  Why must they?  Because she says so?  Where
9  is the policy?
10        MR. TATARKA:  There's nothing wrong with that, Your
11  Honor.
12        THE COURT:  I know there isn't.
13        MR. TATARKA:  There are plenty of cases where:  "The
14  policy is what I say it is, because I'm in charge.  I'm
15  responsible for that unit."
16     And she's the person responsible for that unit.
17     I don't think -- I don't think it is -- it -- that -- to
18  the extent that this isn't about whether there are references
19  to a written policy, and the question is just:  Is it the
20  policy because the person in that position says it's the
21  policy?  That is perfectly subject to regular
22  cross-examination.  "Are you telling me that this is the policy
23  just because you say it is?"
24        THE COURT:  All right.
25     But there is a reference in here to this document.  Looks

1  like a document, "Program Policy Guide."

2          MR. TATARKA:  And I can -- I can promise that I will

3  get you -- I can get you an answer to the question about

4  whether or not either that we can produce that for you, or I

5  can get you an explanation about why we can't.  I don't know of

6  any reason why we can't.  And I don't know why -- I don't know

7  why there's a reference to a policy guide when we have been

8  told that there is no written policy on this point.

9      And maybe -- it's possible that that is a statement -- you

10  know, sort of about the -- about the policy of making policies,

11  rather than --

12          THE COURT:  I'm quoting here:  "Per the FBI's

13  Polygraph Program Policy Guide, most recently updated November

14  20, 2015," that sounds like a document to me.

15          MR. TATARKA:  No.  No.  I'm not saying that.  But I'm

16  saying it's conceivable to me that that is a policy guide that

17  says these are the times when you can make a policy.  Not a

18  substantive policy on -- on --

19          THE COURT:  Okay.

20      But then it goes on:  "The policy states" -- "states."

21  That, to me, isn't like I, as the director --

22          MR. TATARKA:  No, I agree.

23          THE COURT:  That the polygraph examination is, quote,

24  "a sensitive investigation technique," end quote, and that the

25  quote, "utility of the very sensitive technique is likely to be

1  compromised by unwarranted public disclosure."  End quote.

2          MR. TATARKA:  And you want to know if there's

3  something on one side or the other of that quote.  That is

4  perfectly reasonable.

5          THE COURT:  Yes.  So that when you're quoting like

6  that, it sounds to me like there's a document.  I haven't seen

7  that document.  If it has to be filed under seal, that's fine.

8  I just want the parties to have the ability to fully explore

9  the parameters of this alleged policy.  That would be -- if

10 that would be the justification by the witness for not

11 recording the interview or not doing various things.

12         MR. TATARKA:  Yes, Your Honor.  And I completely

13 understand that.  And I appreciate the court's patience.  I

14 know that you've had sort of a parade of various government

15 attorneys here.  And I hope that the court recognizes that

16 that's because we've taken this -- the court's concern

17 seriously and have had, again, the criminal chief, the

18 appellate folks here to testify -- or here to argue before you.

19 And I understand that that can result in some gaps in what the

20 entire knowledge of the U.S. is.  And the best that I can say

21 is that I can either get that policy for you, or I can get you

22 an explanation about why I can't, if I can't.

23         THE COURT:  All right.

24      Later on in that same paragraph, the agent refers to:  "It

25 has been the best practice of the FBI polygraph unit."

1      Now, that sounds more like:  "Here's how we do it in
2    practice.  This is our unofficial policy," as opposed to a
3    written document that seemed to be referenced earlier in the
4    paragraph.
5          MR. TATARKA:  And again, to -- I don't -- that, it
6    does seem to me -- again, something that if the agent is under
7    -- is under a misunderstanding, that that is subject to
8    something that can be -- could be clarified through cross -- or
9    that could be attacked through cross-examination.
10          THE COURT:  All right.
11    Go ahead.
12          MR. TATARKA:  So, again, I can -- I will work on
13    getting you an answer for this.  I really do -- again, I
14    appreciate your patience for the variety of folks coming up
15    here.  The purpose I wanted to with this one come up this time
16    is because I really do think that we -- we are taking seriously
17    the court's concerns about completeness.  And that while we can
18    -- can disagree about whether or not it's applicable in these
19    particular cases, we certainly recognize that there are times
20    where a partial recording could raise completeness issues.  And
21    we do think that those issues are resolved as proposed in these
22    cases by -- and sort of -- in a similar way to the Virginia --
23    or New Hampshire Supreme Court issue that the court referenced
24    -- or case that the court referenced in its previous order, in
25    saying -- in that case, the court excluded the recorded

1  statements.  In this case, the United States is prepared to
2  forego those recorded statements and have the testimony
3  presented under the regular rules of evidence, which
4  essentially -- and I do think this is in good faith by the
5  government -- essentially, unwinds the issue of the partial
6  recording.  And puts it in the -- at least on -- that deals
7  with that issue of partiality and the issue of completeness.
8           THE COURT:  Okay.
9      So let me just bring this up directly with you, and I will
10 explore it with Mr. Branom when he comes up.
11     So we have a trial and the agent testifies, and he says:
12 "I sat down," lays the scene about where this happened.  "And I
13 started asking Mr. Damon, Mr. Birdrattler.  I conducted
14 interrogation and asked them a number of things.  And during
15 the course of the interrogation, each of them separately
16 confessed to some criminal culpability."  And that happens a
17 lot.  It doesn't happen in Montana state courts anymore, but it
18 happens in federal courts around the country, where the agent
19 simply testifies about an interview, and whether it's custodial
20 or not, we can disagree, without a recording, recording of
21 that.
22          MR. TATARKA:  Uhm-hum.
23          THE COURT:  What happens, then, on cross-examination?
24 What's the scope of cross-examination?
25          MR. TATARKA:  I think the scope of cross-examination

1  is that the defense can get into -- so, I think the guide there

2  is Model Jury Instruction 4.1 when a defendant has a -- right?

3  You've given this a number of times:  You've heard a

4  defendant's statement.  It's up to the jury to determine both

5  whether this statement was made, or how much weight to give it.

6      I do think that the cross-examination can get into the

7  issues of why that, conceivably, should be given less weight,

8  even including the fact that a portion of it was --

9          THE COURT:  Okay.

10     So, cross-examine the agent:  "You don't have any notes of

11  that interview; do you?"

12     "No."

13     "Okay.  And you didn't make a written record of that

14  interview; did you?"

15     "No."

16     All right.

17     And the agent says:  "Well, I didn't have to.  I recorded

18  it."

19     Then we're right back where we started.

20         MR. TATARKA:  Well, and that happens -- there's

21  certainly a number of ways that the defense can raise issues

22  that we would then -- again, this is -- exactly happened in the

23  Deputee case, not with respect to recording, but with respect

24  to basically the defense said:  "Well, why didn't -- you've

25  only told me three things.  Why did it take you two hours to do

1   it?"

2        And the court -- and again, Ms. Suek was part of that
3   case, if you have specific details.  But, essentially, the
4   court, both the district court and the Ninth Circuit, said:
5   "Yes, at that point, it's perfectly appropriate to say:  'This
6   happened in the context of a polygraph interview where a
7   polygraph wasn't conducted.  That's why it took so long.'"

8        And again, if -- there's nothing wrong with the defense
9   getting into the issue of -- it's, essentially -- you know,
10  this court referenced the Ninth Circuit's decision in Wright,
11  and although that was in the context of suppression, what the
12  court said there is:  "Sure.  The fact finder can look at --
13  can take into account the fact that it was unrecorded.  And the
14  court -- and the factfinder can take into account the
15  government gave its reason for why it wasn't recorded."

16       There's no reason why the jury can't make that -- I don't
17  think there's any need for an instruction for the -- beyond
18  Model Rule 4.1, for the jury to be able to -- for the defense
19  to be able to raise that as a reason to distrust the agent's
20  statements, and the jury to consider the government's response
21  to that.

22            THE COURT:  All right.

23       So, I understand -- if the defendant asks the question:
24  "Okay.  You didn't -- you don't have notes of this interview.
25  You didn't make a written record of this interview."  And that

1   wouldn't implicate the recording or not recording.  Or wouldn't

2   raise it directly.  It wouldn't raise the polygraph issue.

3       But -- and I might be willing to say:  Okay.  You know, in

4   lieu of the instruction, I'm going to allow the defendant to

5   cross-examine -- in lieu of the adverse inference instruction,

6   I allow the defendant to cross-examine the agent about the

7   things that aren't there.  We don't have a signed confession.

8   We don't have something written out of that nature.

9           MR. TATARKA:  Yep.

10          THE COURT:  But, I'm trying to figure out what

11  happens when either the agent on cross, or you get up on

12  redirect, and say:  "Well, you didn't take notes, because you

13  recorded it; right?"

14      He says:  "Oh, yeah, I did that."

15          MR. TATARKA:  Well, I recorded.

16          THE COURT:  Recorded a portion.

17          MR. TATARKA:  Recorded a portion of it.

18          THE COURT:  Then we're back with --

19          MR. TATARKA:  But I don't think there's a problem

20  there.  It seems like that's -- that seems like that's fodder

21  for the defense.  The defense can say --

22          THE COURT:  But this is in -- but it's no problem,

23  except it might open the door back to the adverse inference

24  instruction.

25          MR. TATARKA:  No, Your Honor I don't think so.

1            THE COURT:  Why?

2            MR. TATARKA:  Because there's no reason why the --

3            THE COURT:  And how do I explain to the jury we're

4    not playing the recording?

5            MR. TATARKA:  Well, I think -- I think that's --

6    that's absolutely to the defense's benefit.

7            THE COURT:  To not play the recording?

8            MR. TATARKA:  To not play --

9            THE COURT:  I agree.  I agree.

10           MR. TATARKA:  I mean, I think there would be a real

11   problem if the defense says:  "We don't want the recording in."

12   And near as I can tell, the defense -- and this is something

13   different than the issue in Graham, where it was much more

14   complicated.  The defense has never said that it has any

15   interest in eliciting that recording.  It does seem like it

16   would be self-pitch softball for them to say:  "We don't want

17   the recording admitted, but we want to be able to raise,

18   because -- we don't want -- we want to be able to raise

19   something that casts doubt on the interview."  And get both

20   things.  That actually does seem like a case --

21           THE COURT:  How would the defense cross-examine the

22   agent under that theory, where they can't cast doubt on the --

23           MR. TATARKA:  Well, no.  I don't think there's any

24   problem with the defense casting doubt.  I just don't think

25   that -- I don't see any reason why the defendants' casting

1   doubt on the recording procedure necessitates the --

2          THE COURT:  No, not the recording procedure.  I'm

3   talking about --

4          MR. TATARKA:  No.  But what I mean, Your Honor, is to

5   say:  I don't see any reason with the defense saying:  "Did you

6   record this interview?"

7          "Well, I recorded part of it."

8          "Why did you not record the other part?"

9          And raising the allegation that the officer did that --

10  agent did that for nefarious reasons.  But that should not earn

11  him an adverse instruction from you.  He can make that

12  argument; he just doesn't get the court to pile on.

13         THE COURT:  I thought the government proposed a

14  situation where you don't discuss the recording.

15         MR. TATARKA:  We don't intend to.

16         THE COURT:  Right.  So, your motion in limine

17  contemplates a scenario whereby the agent comes in, takes the

18  stand, and explains the -- describes his recollection of the

19  interview with the defendant.

20         MR. TATARKA:  Yes.

21         THE COURT:  All right.

22         MR. TATARKA:  And if the --

23         THE COURT:  So then -- I'm trying to understand the

24  scenario.

25         MR. TATARKA:  I'm sorry, Your Honor.

1   THE COURT:  So, we had that.  Now, we get to
2   cross-examination.  And the defendant -- the balance here is
3   allowing them to cross-examine in a robust way, but without --
4   I mean, I'm talking about not tying both the government's hands
5   behind their back, but trying to -- you know, I'm not a fan of
6   the process.  You understand that?
7   MR. TATARKA:  I absolutely do.
8   THE COURT:  But I'm trying to make sure that this
9   will be fair.  So allowing the defendant to have some ability
10  to cross-examine and challenge the agent, because the agent
11  doesn't have a written record, agent does have notes of the
12  proceeding.  How do you remember exactly what was said?  Things
13  of that nature.  This was a long time ago, without getting into
14  -- without the defendant being able to attack him unfairly,
15  attack the agent unfairly about:  Well, you didn't -- you know,
16  not getting the recording -- I don't want -- I don't want the
17  defense to be able to induce the recording response that might
18  trigger, then, the adverse inference instruction.
19  MR. TATARKA:  No.  I understand where you're coming
20  from.
21  THE COURT:  So I'm trying to wrestle with the
22  procedure where the agent testifies:  "I interviewed the
23  defendant on this date.  It was -- it took place at this
24  building.  We started at, I think, about one o'clock, and my
25  recollection was it went till 1:20," whatever the time was.

 1   "During the course of the interview, I asked him about the
 2   allegations."  I think there were Miranda waivers in both these
 3   cases.
 4            MR. TATARKA:  Yep.  Yep.
 5            THE COURT:  "I read their rights, they signed Miranda
 6   waivers, and then they confessed to some criminal culpability."
 7   And whatever further question you want to ask.
 8        Mr. Branom then gets to cross-examine.  And allow him to
 9   attack the witness's memory; allow him to attack the fact the
10   witness doesn't have notes that were contemporaneous notes of
11   the proceeding; that he doesn't have a written confession,
12   things of that nature.
13        And then both sides have a little bit of jeopardy here.  I
14   mean, I don't want -- the defendant -- the easy thing for
15   Mr. Branom is to just say:  "Well, you don't have a recording?"
16        "Well, yeah, I do."
17        And I'll allow the interview and that triggers the adverse
18   inference instruction.
19        But Mr. Branom, I assume, doesn't want the recording
20   played, because it's in the defendant's own words.  And so, I'm
21   trying to cabin the defendant's cross-examination where it
22   gives him a fair chance to attack the memory of the agent, the
23   credibility of the agent, a few things like that, without
24   opening the door to either the playing of the recording or the
25   adverse inference instruction.  So I'm trying to get the

1    parties to provide some guidance as to -- you know, if we

2    follow your suggestion, we have the agent testify based on

3    memory about what happened.  How do I structure or limit the

4    areas in which the defense can cross-examine without getting

5    into the problem of opening the door?  I'll leave it up to the

6    government, I guess.  Potentially leave it up to the government

7    to decide, you know, when Mr. Branom crosses the line that

8    would allow you to play the recording.  Said:  "Yeah, we have a

9    recording."  And then explain all the reasons for the

10   polygraph, the nonrecording and all that.  But we have a

11   recording of the defendant's own words about his criminal

12   culpability.

13        Do you understand that what I'm --

14             MR. TATARKA:  I do.  I -- my impression, and I -- and

15   I think that the court may be thinking about this at one level

16   more nuanced than I had been.  Because my -- my impression of

17   it was if -- if the -- if the defense wants to cross-examine

18   about the absence of a recording, it would be free to do so

19   with a -- without an inference -- without an adverse inference

20   one way -- without the court directing an inference one way or

21   the other.

22        Now, I understand that the court is, like I say, thinking

23   on another level of nuance, is:  Would there be a way that he

24   could not mention the recording, but put us in a -- put the

25   government in a position where the government would need to

1    mention the recording in order to defend itself?

2         THE COURT:  Right.  In order to restore the

3    credibility of the witness, yeah.

4       And that brings up -- back to the policy again.  You know,

5    okay.  We've opened the door, the defense has crossed some

6    threshold.  You want to be able to restore the witness's

7    credibility:  "I have a recording."

8         "Okay.  Well, the whole interview?"

9         "No.  Just a portion."

10        "Well, why not the whole thing?"

11        "Policy."

12      That's where my concern about the absence of the policy

13   comes up.  I don't doubt that's the practice.  But I want to

14   make sure there was a contemporaneous policy to support the

15   practice if we're going to have Mr. Branom cross-examining

16   about that policy.  And that's what my concern is.  If there is

17   a written policy, I want to get a copy of it, and --

18        MR. TATARKA:  I hear you.

19        THE COURT:  So, if there are qualifiers and

20   presumptions and things of that -- exemptions, we know what

21   those nuances are.

22        MR. TATARKA:  Certainly.

23      And as I said, I will do my best to either get you and the

24   defense that policy, or explain why we don't have it.

25        THE COURT:  So, before you sit down, do you have any

1   suggestions, then, about -- I mean, how do you envision this

2   testimony going?  If it's along the lines you're proposing with

3   my concerns, how does the defense cross-examine here?  What, in

4   the government's view, would be an appropriate scope of that

5   cross-examination?

6              MR. TATARKA:  (No response.)

7              THE COURT:  You know, these were nine months ago, I

8   can't remember when they took place.  One was April, I think.

9   One was --

10             MR. TATARKA:  Well, the good thing is, I think one

11  thing that -- that would allow for a little bit broader scope

12  of the defendant's cross-examination before -- before we have

13  to get into the issue of the recording, is the fact that in

14  both cases, we have two agents that can testify --

15             THE COURT:  And that would be your plan to call Agent

16  Smiedala and Agent Burns, I think in one case.  Who was the

17  other case?

18             MR. TATARKA:  Schneider.  That would be -- I won't be

19  doing the --

20             THE COURT:  You would call the two agents.  They

21  weren't -- were they -- I don't remember offhand if they were

22  both there for the recorded portion.

23             MR. TATARKA:  They are there for the recorded

24  portion.

25             THE COURT:  The problem with that -- I mean -- Agent

1    Smiedala elicited -- allegedly elicited the confession before
2    the recording.  Right?
3             MR. TATARKA:  Yeah.
4             THE COURT:  So, then, the second agent would come in
5    and say:  "Well, I heard Agent Smiedala ask the question.  I
6    heard the defendant make the admissions"?  That's really
7    getting --
8             MR. TATARKA:  No.  I see very little reason to keep
9    the -- sort of the full story from the -- from the jury if it's
10   -- if it's put into play, that we need to explain the context
11   of these statements --
12            THE COURT:  See, but that's -- the reason we don't
13   have the full story is because you didn't record the full
14   interview.  That's the problem I have.  If the government
15   recorded the full interview, we're not here.  There's no issue
16   here.  You didn't do it.  You say you have a good reason.
17   Okay.  But, you know, now, you're kind of wanting to have --
18   let the government provide some corroboration --
19            MR. TATARKA:  I don't know that it's -- I don't know
20   that it's corroboration.  I think it's exactly what -- in my
21   mind, that's exactly what the -- what the defense wants to
22   challenge is the fact that this -- that this was -- that the
23   government was doing a selective recording.
24            THE COURT:  Right.  But that's -- hold up.
25            MR. TATARKA:  If they want to challenge that, they

1   should be able to get the whole thing.  If they don't want to

2   challenge that, we shouldn't force them to.

3        Here's what I think -- I do think it's a big concession by

4   the government to not play the defendants' actual recorded

5   statements.  The other concession is:  I don't think the

6   government should be able to put the defense in a position

7   where it has to choose that line of attack if it doesn't want

8   to.

9        But if it -- if the defense chooses that line of attack --

10           THE COURT:  Which line?  Hold up.

11           MR. TATARKA:  If the defense wants to challenge the

12   fact that this was a partially-recorded interview.

13           THE COURT:  Right.  And again, I'm not going to allow

14   Mr. Branom free rein to cross-examine without opening the

15   possibility of the playing of the recording.

16           MR. TATARKA:  Yeah.

17           THE COURT:  But I'm trying to figure out what would

18   be fair to allow him to ask that wouldn't cross that line as a

19   legal matter, not a strategic matter for you, where am I --

20           MR. TATARKA:  Yeah.  And I think the best guidance is

21   Deputee.  Again, that wasn't, obviously, about the recording.

22   That was about -- about how the court there walked the line

23   about the fact that this was in the context of a polygraph

24   interview.

25        And again, I think -- if the defense wants to take the

1  line of attack that it was partially recorded, then it can do
2  that.  But, it does so without the -- without the adverse
3  instruction.
4      If the --
5          THE COURT:  Well, I guess that's going to depend on
6  how the agent frames it.  You know, I'm not sure I can give
7  everyone a definitive ruling here today.  It's going to depend
8  in part on what happens.  How the testimony evolves at trial.
9  I'm just doing the best we can to try to develop some
10 parameters.
11         MR. TATARKA:  So long as the court recognizes that if
12 we -- if we lack that guidance, that we're not -- we're not
13 committing to not recording -- or not playing the recording.
14         THE COURT:  What I'm going to have to figure out is:
15 Where do I draw the line where Mr. Branom doesn't get to attack
16 you for not recording without -- we're triggering the adverse
17 inference instruction.  I don't think the agent gets to
18 preemptively say:  "Well, I recorded the whole thing."
19         MR. TATARKA:  I agree.
20         THE COURT:  No adverse inference instruction, because
21 Mr. Branom induced me into saying that.
22         MR. TATARKA:  No.  I agree with that, Your Honor.
23         THE COURT:  So that's what I'm trying to figure out
24 is where is his line going to be?  You'll have to work with
25 your agent and plan the testimony about how he responds to

1  those kind of questions.  And I don't know if it's going to

2  take some sidebars at trial or not.  I'll hear from -- anything

3  else you want to add before Mr. Branom gives his view of where

4  those lines can be drawn?

5         MR. TATARKA:  I have one minor point.

6         THE COURT:  Yeah.

7         MR. TATARKA:  Which is with respect to the language

8  of the instruction, and I don't know whether that's something

9  that we need to get into today or not, but I would just note

10 for the court that -- that the "view with distrust" language,

11 which I think the court got from the Montana cases, is not --

12        THE COURT:  We all go back to our roots, Mr. Tatarka.

13        MR. TATARKA:  Amen.

14        THE COURT:  We can't help ourselves.

15        MR. TATARKA:  But that was never language that was

16 crafted for a jury to hear.  If you look at all of those cases

17 that are identified in Deines, all of them say they will be

18 viewed by distrust in a judicial determination of voluntariness

19 or the like.

20     If you look at the instructions that were crafted toward

21 -- with an eye towards the jury, both the Massachusetts Supreme

22 Court case, which the court cited, and Judge Molloy's case in

23 Graham, the language that they use was not the "view with

24 distrust" language.  It was the language of, you know, to view

25 -- review with great care or caution.  And that's the language

1   that's also used by this court, by federal courts, with respect

2   to --

3           THE COURT:  Well, see, that was the instruction I

4   came up with in the context of the order.  As trial approaches,

5   if you want to propose --

6           MR. TATARKA:  And like I said, I knew that was sort

7   of a minor point, I just wanted to -- since it was on my mind,

8   I wanted to frame it for you.

9           THE COURT:  All right.

10      Well, why don't I hear from Mr. Branom now, and I'll give

11  you a chance to rebut.  And be thinking about how we should

12  appropriately draw these lines.

13          MR. TATARKA:  And I'll consult with these folks who

14  are more likely to be in the mix of it.

15          THE COURT:  Thank you, Mr. Tatarka.

16          MR. TATARKA:  Thank you, very much.

17          THE COURT:  Mr. Branom.

18          MR. BRANOM:  Thank you, Your Honor.

19          THE COURT:  You're moving a little spryer,

20  Mr. Branom.

21          MR. BRANOM:  Not really, Your Honor.  I start

22  physical therapy Wednesday.  And spry is a relative term.

23          THE COURT:  Let me just set the table here.

24          MR. BRANOM:  Sure.

25          THE COURT:  So, as you recall my order, I did not

1  suppress those statements.  I don't think the Ninth Circuit law
2  permitted me to do that.  But I did raise some serious concerns
3  about it.
4        And the government's proposed -- in order to address some
5  of those concerns, the government proposed this process by
6  which the agent would testify based on his memory about what
7  happened.  And if that's the case, I want to give you the
8  ability to cross-examine the witness.  Test his memory about
9  when this happened.  You know, point out to the jury how long
10  ago it was.  Ask the agent whether he has contemporaneous notes
11  of what happened, those kind of things, without -- I mean, I
12  guess you have to decide:  Do you want the recording played?
13  Is it better for your clients to play their portion of the
14  recording, and then you get the adverse inference instruction;
15  or would you rather keep that out, because then you don't have
16  the defendant's own words.  The case law expresses great
17  concern about whether the defendant's own words incriminate
18  him.
19        But I don't want to let you control entirely the process
20  by cross-examining so aggressively and on such a range of
21  issues that you would induce the agent to say something:
22  :well, I have to" -- the agent have to defend himself by
23  saying:  "Well, I recorded part of it."
24        Do you understand how I'm addressing this?
25              MR. BRANOM:  I believe so.  Let me -- initially, the

1    motion was to suppress the statements, recorded or otherwise.

2            THE COURT:  Right.

3            MR. BRANOM:  Okay.

4        So, I think, Judge, we're here -- and you are the

5    gatekeeper of what --

6            THE COURT:  I denied the motions -- I mean, I, yeah,

7    denied the motion to suppress.

8            MR. BRANOM:  Right.  But you also indicated you were

9    not happy or comfortable maybe is a better word, with how they

10   got -- how we got here.  That the government -- they proposed,

11   and apparently informed the court that we're going to record

12   stuff.  And then all the sudden, here's this exception.

13       In some ways, I think this is analogous, if you'll

14   remember, I believe it was the first Devereaux case, there was

15   testimony there was a knife.  And the one officer even drew a

16   knife.  But nobody collected the knife.

17       Here, the government -- through the FBI, either -- I don't

18   know how we put the toothpaste back in the tube.  There is the

19   recording.  I mean, that's -- and everything you read, juries

20   think the lawyers are hiding stuff anyway.  So now, it's going

21   the look like either it's them or me, we're hiding something

22   that there's this recording.  As I understand the government's

23   motion in limine, just having the agent testify:  "Oh, this is

24   what he told me," you should still give the cautionary

25   instruction, because we have, on both these cases, this time

1  where it's just Agent Smiedala purposefully not recording what

2  happened.  I mean, that's the -- you know, and we've all these

3  cases you've cited, all the -- these people that come from

4  varying degrees of sophistication and background, basically,

5  tell us he does the same thing.

6      So we've got the perp -- and he doesn't have the other

7  agent in there.  You know, I will -- I can tell the court I

8  can't think of a time I even came close to questioning Agent

9  Burns' veracity.  I think he's straight as string.  But he

10  wasn't in there.  And that's the troubling thing is you've got

11  the one agent -- and the other elephant, that it's a polygraph.

12  I mean, that's -- it's not admissible.  So, purposely --

13          THE COURT:  The results of the polygraph aren't

14  admissible, but no one took a polygraph.

15          MR. BRANOM:  Right.  So, in my mind, then, this whole

16  polygraph exception, how does that even come in?  And I, on one

17  of these, if not both, I remember cross-examining Agent

18  Smiedala:  "Well, why didn't you go ahead and do it anyway?"

19      There are false confessions.  Well, no.  Which either goes

20  to that his purpose is to elicit a confession, not necessarily

21  the truth.  But they purposely -- they record -- you know, you

22  can't do it halfway, I guess, is my -- when it's going our way,

23  we record it.  But this mystery stuff ahead of time, we're not

24  going to preserve.  And I like your one hand behind the back

25  analogy.  I don't know what happens.  And I think it was at the

1   second hearing, I guess that was Mr. Birdrattler, I asked Agent

2   Smiedala:  "Well, if I knew the questions specifically to ask

3   you of what happens, you're going to tell the truth."  And tell

4   you, in your gatekeeper function, what happens.  But I don't

5   know that.

6        Of course, the remedy to that is record it.  Shoot, record

7   it and submit it ex parte in camera, you know, so I don't sell

8   it to Al-Qaeda, or whatever the concern is.

9        But I think the instruction needs to be given, I guess

10  that's the bottom line of my -- to give both these gentlemen a

11  fair trial, when the government controlled the process of what

12  we're going to preserve this evidence.  We're not going to

13  preserve this part of it.  To me, that's the issue.  Is if we

14  have either the whole picture or no picture, Judge.

15            THE COURT:  Well, right.  But the proposed solution

16  by the government is to take the recording out as much as we

17  can.  And now it's an interview between one federal agent and

18  one defendant.  And you can cross-examine about the inequity

19  and power there, about the fear, about whatever defendant might

20  have been feeling, and how -- was the agent bullying the

21  defendant.  I don't know.  And the fact these were, you know,

22  nine months ago, twelve months ago.  "How do you remember all

23  that, word-for-word what happened.  How could you possibly

24  remember the questions you asked and responses.  You didn't

25  have written notes; did you?"

1          "No."

2          "And you didn't get a signed confession; did you?"

3          "No."

4                MR. BRANOM:  Well, shouldn't his answer really be:

5     "Because I listened to the recording last night," I mean, to

6     prepare for trial, I'm going to look at the best thing I have.

7     "Well, I got a tape, so I'm going to listen to that."

8                THE COURT:  Then, when that happens, though, then

9     okay.  Now, we've opened the door to the adverse inference

10    instruction and the playing of the tape, potentially.  If I'm

11    going to -- you want the adverse instruction, even without the

12    playing of the tape?

13                MR. BRANOM:  Absolutely, Your Honor.

14                THE COURT:  Why?

15                MR. BRANOM:  Because the government controlled the

16    process.  The government chose to preserve -- why let the jury

17    only hear part of it, not all of it.  And as the court laid out

18    in the order -- if I hadn't seen the, you know, the banner we

19    get to the email, really, I'm thinking, wow, I pulled this off.

20    And then at the end, you say no, I'm not going to suppress it.

21         But they --

22                THE COURT:  I like to keep you guessing.  That way

23    people read the whole order, Mr. Branom.

24                MR. BRANOM:  Indeed.  Oh, boy.

25         And these two gentlemen, believe me, they've read it, too.

1    They controlled the process.  And the process -- one,

2  apparently, is in contradiction to what Judge Christensen was

3  told by the very head of the FBI of what was going to go on.

4  And so, I think to make it fair, and that's the bottom line

5  here, we want it to be fair, that they purposely -- you know,

6  they tell the court we're going to do it.  And then they, well,

7  this falls under the exception, which it apparently really

8  doesn't.  You know, this isn't national security or the -- you

9  know, the live bomb in the store or whatever.  And before I

10 forget, you know, we argued that it was essentially a custodial

11 interrogation.  And I don't want to concede that.

12    But when they control the process and crafted -- and we

13 need to remember in Mr. Birdrattler's case, there was the first

14 one, and then it was the:  "Oh, shoot.  It didn't work.  Hey,

15 you need to come back again."

16            THE COURT:  Yeah.

17            MR. BRANOM:  Okay.  So, I think that's significant,

18 too.

19    Whether or not it's the recording or the testimony, it got

20 there the same way, which was this period of time where Agent

21 Smiedala doesn't even trust another FBI agent to be in there to

22 hear what's going on.  And I think that calls for the

23 cautionary instruction to the jury.

24            THE COURT:  Which instruction?

25            MR. BRANOM:  Well, you're right.  We haven't -- I

1 think those are due Monday, a week from today.

2         THE COURT:  Well, what's the trial date in these two

3 cases?

4         MR. BRANOM:  January 6th.

5         THE COURT:  For both?

6         MR. BRANOM:  Yes.  Which is what I tried to bring up

7 in chambers last week.  It got brushed aside.  But we've got an

8 issue there.

9         THE COURT:  Where are we on speedy trial here?

10         MR. BRANOM:  I don't know.  Well, actually, quite

11 frankly, once the government filed the instant motion, that

12 stopped the clock.

13         MS. SUEK:  It does, yes.

14         THE COURT:  Did you have a preference for which case

15 would go first?

16         MR. BRANOM:  Well, yeah.  Mr. Damon's in custody.  We

17 want him to go first.  And I've discussed that with

18 Mr. Birdrattler.  I think it's eminently fair that Mr. Damon go

19 first.

20         THE COURT:  So, we get Mr. Birdrattler right after

21 that in January?

22         MR. BRANOM:  Well, we've got Mr. Bird, who I met with

23 this morning, on the 13th.  G41      14

24         THE COURT:  All right.

25      Well, Mr. Birdrattler is not in custody.  If it was the

1   20th or 27th, probably wouldn't be the end of the world.

2   But/for the court -- was it Mr. Birdrattler had the two

3   recordings?

4          MR. BRANOM:  Well, there's only one recording.  And

5   then all the sudden, shoot, it isn't working.

6          THE COURT:  That was Mr. Birdrattler?

7          MR. BRANOM:  Yes.

8          THE COURT:  That would be the second trial?  Okay.

9      So, what's your best case for the idea that you get the

10  adverse instruction regardless of whether the government plays

11  the recording?

12         MR. BRANOM:  I think it's -- quite frankly, it's your

13  ruling on the motion.

14         THE COURT:  Flattery gets you nowhere, Mr. --

15         MR. BRANOM:  Well, no.  Respectfully, Your Honor, all

16  the cases the government cites are somewhat dated, and I think

17  that's important, because they're all before this announced

18  policy to the court that Indian Country cases are going to get

19  recorded.

20     So, I don't have a -- this is new ground.  I suppose I

21  would cite Graham that Judge Molloy was going to give a

22  cautionary instruction.  I think, and I'm willing to stand

23  corrected, that she pled before it was argued.

24         MR. TATARKA:  Pled mid-trial.

25         MR. BRANOM:  Right.  But before, you know, it was

1 actually given to the jury so there isn't quite the imprimatur
2 that it was --

3        THE COURT:  But they also played the recording;
4 didn't they?

5        MR. BRANOM:  Right.

6        THE COURT:  So, you know, I understand -- if the
7 recording comes in, the instruction goes with it.  But there
8 again, keeping in mind that the recording may not come in here.

9        MR. BRANOM:  Yeah.  It's up to the government how to
10 put on their case.  And I'm not going to sandbag.  But I guess
11 it's very troubling to me, move to suppress, okay.  You can't
12 suppress.  And then we're going to hide from the jury that it
13 actually was recorded.  And again, from our perspective, more
14 important, that they only did half of it.  They only did the
15 part they liked.

16        THE COURT:  That will all come out.  But the question
17 is whether you want the playing of the recorded portion for the
18 jury.  If you're willing to concede -- to allow that, then this
19 whole argument/exercise is moot, because then we give the
20 adverse instruction and go to trial.

21        MR. BRANOM:  Well, but like I said, I can't -- I'm
22 not at that table.

23     Certainly, yes, if they play the record.  But I think even
24 -- I guess I don't see the distinction of the recording versus
25 "well, here's what he said," that was adduced from each

1  defendant through this portion where he's alone with Agent

2  Smiedala and nobody tell us.  So, I don't --

3          THE COURT:  I mean, that's part of the jury's

4  evaluation on credibility.  You've got one agent in the room

5  with the defendant.  And you cross-examine Mr. Smiedala --

6  Agent Smiedala.  "Oh, and Agent Burns was down the hall; wasn't

7  he?"

8          "Yes, he was."

9          "And you could have had him in there to serve as a

10  witness; right?  And you didn't do that; right?  Okay."  And --

11          MR. BRANOM:  But as we -- each case, there's evidence

12  that he could have recorded that portion.  He had the

13  technical --

14          THE COURT:  Well, I know that.

15          MR. BRANOM:  -- ability.  So the fact --

16          THE COURT:  I mean, that's -- that's what I

17  understand about the Birdrattler case is why Agent Burns was

18  going to be -- I guess that was the unrecorded portion -- or

19  excuse me, the recorded portion.  They tried to record it,

20  didn't work, brought him back a second time.

21          MR. BRANOM:  And that was Agent Schneider, I believe,

22  that was there with --

23          THE COURT:  There's no scenario where two agents sat

24  and did the -- what they call the pre-polygraph interview.

25          MR. BRANOM:  Right.  It's always just Agent Smiedala

1   by himself.

2          THE COURT:  You'll be free to cross-examine on that

3   question.  "You know, you had an agent down the hall.  You

4   didn't have him in there; did you?"

5      So now you have your word against his word.

6          MR. BRANOM:  But I guess the cross would be slightly

7   more effective with:  "You could have recorded.  And then

8   later, actually you did, when you got to where you wanted."

9      So that's, again, back to the that's where the hands are

10  tied, I would submit, Your Honor.

11         THE COURT:  All right.

12     Anything else, Mr. Branom?

13         MR. BRANOM:  Just --

14         (A brief off-the-record discussion was had among

15         Mr. Branom and the defendants at counsel table.)

16         MR. BRANOM:  Mr. Damon brings up an interesting

17  point, he was interviewed prior to the supposed polygraph

18  interview, and that one was recorded.

19         THE COURT:  It was recorded?

20         MR. BRANOM:  Yeah.  Yes.  So we've got -- I guess

21  that would be an -- obviously, distinguish somewhat the two

22  cases.

23         THE COURT:  So that was Mr. Damon's.

24         MR. BRANOM:  Yes.

25         THE COURT:  Who interviewed him the first time?

1          MR. BRANOM:  I think it was Burns and a tribal

2    officer.  And I think that was right at your house; right?

3       Sorry, guys.

4          THE COURT:  Take your time.

5          (A brief off-the-record discussion was had among

6          Mr. Branom and the defendants at counsel table.)

7          MR. BRANOM:  Actually, in both of them, there were

8    recordings before this one.  So, I guess, if the government --

9    yeah.  It was Josh's --

10         THE COURT:  Then, I guess, you'd be allowed to

11   cross-examine Agent Smiedala and say:  "Well, you're aware that

12   there was an earlier -- earlier interview of Mr. Damon and

13   Mr. Birdrattler."

14      "Yes, I was."

15      And, in fact, I don't know whether he listened to it.  I

16   mean, question him about whether he listened to that earlier

17   recording.  All right.

18      And now -- I don't know, then it's getting difficult, I

19   agree, trying to put the genie back in the bottle.

20         MR. BRANOM:  That would -- and I think we have that

21   scenario.  And then, you know, there's another recording that

22   you don't hear, I think to be fair, we do need the instruction.

23   You're right, I -- bottom line, the government, I think, is

24   trying to put the toothpaste back in the tube when it's the one

25   that squeezed it out.

1          So, thank you for your -- if you don't have anything else,

2     thank you, Your Honor.

3               THE COURT:   Thank you, Mr. Branom.

4          All right.

5          So Mr. Tatarka.

6               MR. TATARKA:   With the curt's indulgence, I think

7     we've sort of fleshed out the legal portion of the interview.

8     I would -- if the court --

9               THE COURT:   Before Ms. Suek comes up.

10              MR. TATARKA:   Sure.

11              THE COURT:   I have a couple questions for you.

12    Mr. Branom has raised this point about we have previous

13    interviews of each of these defendants.  And I can't remember

14    who conducted the interview, but apparently, those interviews

15    were recorded.

16              MR. TATARKA:   Yeah.   The agents.

17              THE COURT:   Okay.

18         Would that be appropriate for cross-examination of Agent

19    Smiedala?  Was he aware of those previous recordings?  Did he

20    review the previous recordings?

21              MR. TATARKA:   Yes, I don't think there's any problem

22    with the cross-examination of those.  I don't know the answer

23    to those questions.

24              THE COURT:   Okay.

25         Well, I don't either.  But -- all right.

1          Let me hear from Ms. Suek, and then I'll have questions

2     for all the lawyers.  I'll ask them when she's finished.

3          Good afternoon, Ms. Suek.

4                MS. SUEK:  Good afternoon.

5          Your Honor, actually, the Deputee case was the first case

6     where we had a recording.  Prior to that, the first decade of

7     my career, we had no recordings.  And so the way it played out

8     was this, as it does in this case.

9          As the court may be aware, or I'll remind the court,

10    Special Agent Smiedala's written reports of both of these

11    interviews were appended to the defendants' suppression motion.

12    So when we say that we're not going to use the recording, we're

13    going to forego from using that piece of evidence, we actually

14    mean that we're going to forego from using it totally.

15    Because, certainly, Mr. Branom can question his memory, he can

16    question that he didn't do simultaneous notes, but there is a

17    report that Special Agent Smiedala can refer to that he can say

18    refreshed his memory, which is what we always did.

19          Interestingly enough, an analogy is the Deputee case, that

20    was not only the first case where we had a recording, but also

21    the first case in my career and what I know about in the

22    district, where we were actually able to bring up the operative

23    fact of polygraph.  We had to stay away from that.  That was

24    something we did by routine, just like we're going to do in

25    this case, staying away from the recording.  Why?  It's not to

1 hide evidence from the jury.  There's all kinds of facts that

2 we never put before the jury, because they might be

3 inadmissible.  They might be more prejudicial than probative.

4 That's just the facts of it.  And polygraph was one of those

5 issues, where even though there was law that allowed us to

6 bring it up, we never did.

7      The Deputee case was extreme.  And that is why the

8 government -- we were allowed to present that fact on rebuttal.

9           THE COURT:  As I understand the Deputee case, the

10 defendant's cross-examination:  "Now, you've told us three

11 things.  And yet, your interview took an hour?"

12           MS. SUEK:  Right.

13           THE COURT:  And the response was:  "Well, yes,

14 because I conducted a polygraph exam."

15           MS. SUEK:  No.  The cross-examination, he could not

16 say there was a polygraph exam.  He was prohibited.  So what

17 was happening throughout is that he would get questioned about

18 his special interrogation techniques, about the special skill

19 that he had over other agents, about the special techniques he

20 may use.

21      And the problem, if the court remembers, is the timing of

22 the Deputee case played into it.  Special Agent Smiedala had

23 just come back from working with the Mossad, and waterboarding

24 was in the news.  And all of that combined to create a

25 situation that was extraordinary.  The cross-examination went

1    beyond the regular cross-examination, where he simply -- it
2    was, basically, in his mind, court-sanctioned lying.  He could
3    not tell the jury what he really did.  He could only just
4    answer the questions.  "No.  I -- you know, this is what I did.
5    This is how long it took."  And leave all of the polygraph
6    information out of it.
7         That's how it operated.
8         So, this is not something new to suggest that we would not
9    -- we would be keeping a fact from the jury that in the court's
10   mind is creating such an evidentiary issue that we need a
11   cautionary instruction.
12        We just keep this away from the jury.
13        The only way that we'll open the door for this, is if
14   there's no other way to answer the question, but even that, in
15   my mind -- I mean, there was -- he was pretty much directly
16   asked over and over again what he did and he never answered:
17   "I'm a polygrapher," until the Deputee case, and that was on
18   rebuttal, not cross-examining.
19        So he can be instructed --
20             THE COURT:  It was a sidebar before --
21             MS. SUEK:  Well, we broke for the day.  And there was
22   -- it was such an extraordinary cross-examination, I asked the
23   court to hold a hearing on the ability on the case law that was
24   in existence to bring this forward as an operative fact.
25        And interestingly enough in that case, Judge Cebull ruled

1  the way that he did, although reluctantly, because there was no
2  polygraph exam.  I understand that the cases that the court has
3  referenced, that there has been no exam, but that's -- even in
4  this case, when Special Agent Smiedala was questioned by
5  Mr. Branom, he did say:  "60 to 80 percent of my cases, I give
6  the test."
7       So, we actually had a situation that made Judge Cebull
8  more comfortable.  There was no ability for the jury to infer
9  what the results would have been, because we didn't have a
10 test.  And the Ninth Circuit actually noted that, as well, that
11 it made it easier to have that just as an operative fact.
12      Be that as it may --
13           THE COURT:  Hold on.  Let me follow-up on that:  So
14 at some point, Agent Smiedala may be permitted to say:  "Well,
15 I was there to give a polygraph exam."  That's what his special
16 training is.  Not initially, I'm talking about, if the
17 questions open the door for that.
18           MS. SUEK:  Right.
19           THE COURT:  All right.
20      And then he would say:  "But I never gave it."  And then,
21 eventually, provided the incriminating statement.
22      But I guess it would also have to be crossed on:  "Well,
23 the defendant signed a consent form.  He was ready and willing
24 to take the test."
25           MS. SUEK:  Absolutely.  And so, how this played out,

1  prior to the recordings, and how it would play out now, because

2  we had reports, like we do here, minus the recording.  Special

3  Agent Smiedala would testify about the circumstances of the

4  interview, and from his reports, never, ever did take

5  simultaneous notes, because you can't build a rapport doing

6  that when you're dealing with a polygraph.  So he never had

7  that, as other agents may in their interviews.

8       So:  "No, I did not make simultaneous notes.  The only

9  thing I have is the biographical sheet that I have and the

10  report that I wrote, the summary report.  And that's what I've

11  used to refresh my memory about the statements."

12            THE COURT:  What do the summary reports contain here?

13  I don't recall.

14            MS. SUEK:  It's, basically, just a summary of the

15  defendants' statements.

16            THE COURT:  Does it talk about the polygraph, though?

17            MS. SUEK:  No.  I mean, it's his statements.  And so

18  -- and it's not something that would go to the jury.  It's your

19  question was -- in answer to -- can I show it to the court?

20  May I approach?

21            THE COURT:  Yeah.  Give it to the clerk, please.

22            MS. SUEK:  In answer to the court's questions as

23  to --

24            THE COURT:  Can I put this on the screen?  Any reason

25  I can't?

1          MS. SUEK:  Sure.

2      As to how he would respond, and then he'd finally have to

3   blurt out:  "Well, I recorded it."

4      Well, that's not true.  Because he could say:  "Well, I

5   reviewed my report."

6          THE COURT:  This is just the polygraph exam report?

7          MS. SUEK:  Right.  But that would not go into

8   evidence.  It's a writing that that allows him to review what

9   occurred.

10          THE COURT:  Okay.

11      So, we can just refer to it more generically as a report.

12          MS. SUEK:  That's exactly right.  Just like they used

13   to question him when he was just a special interrogator or a

14   special interviewer.  Yeah, there's no need to put polygraph

15   in.  Like I said, the only time that ever came into play was

16   the extraordinary circumstance of the Deputee case.  And it was

17   extraordinary.  I mean, we never told the jury he was a

18   polygrapher.  Because the -- even though there was law in the

19   Ninth Circuit in existence that allowed for this to come in as

20   an operative fact, that was just something we were never able

21   to convince the district court to allow us to do.

22      So, it is not that unusual, my point is, to keep a fact

23   away from the jury.  Particularly, in this situation, where

24   it's a recording.

25      The fact -- the reason why -- the policy, the root cause

1    underlying why a cautionary instruction is even talked about

2    with respect to this type of evidence, is how incriminating it

3    can be for a jury to hear the defendant's words.  We

4    respectfully disagree with Mr. Branom on that.  This is -- it's

5    not the same to not -- to have an agent testify about a

6    defendant's words, versus a jury hearing them.  We've never --

7    there's no case that I know of, anywhere, where a cautionary

8    instruction has been given when the government is presenting

9    the defendant's statements only through testimony.

10        And that's because it's the unique aspect of a recording

11   that makes that problematic to the court when there is not one,

12   or a partial recording.

13        And so, the cautionary instruction, in our view, isn't

14   triggered, just as the court's order gave us the evidentiary

15   triggers for it.

16        The scenario we're presenting to the court doesn't raise

17   the same concerns.

18        What it does is allow the jury to consider credibility of

19   witnesses.  And the Model Pattern Instruction tells them to do

20   that.  And that's their job, to consider whether they believe

21   Special Agent Smiedala and Burns, or whether they believe the

22   defendant if the defendant chooses to testify, or present other

23   evidence.

24        They're able to consider whether he made the statement,

25   under what circumstances.  They've been doing it for a lot

1   longer than we've had the issue of recordings.

2        The only other thing I will address, Your Honor, we -- as

3   Mr. Tatarka told you, we will always try and get a copy of the

4   policy.  We're not trying to hide that from the court.  There

5   was a misunderstanding that we got an affidavit believing that

6   there was no written policy.

7        I still believe that's the case.  But if we're wrong, I

8   think what she's referring to is a general policy manual, and

9   with respect to recording, there's no written policy that's

10  practiced.  But I do understand the court's concern.  And it's

11  not anything we're trying to hide.  It's just a

12  misunderstanding in terms of whether it's in writing or not.

13  And we believed it wasn't, and that's why we got an affidavit.

14          THE COURT:  Again, I highlight my concern, it's the

15  quotations in the affidavit about -- from the policy.  So it

16  leads me to believe there's some document on which the agent's

17  relying.

18          MS. SUEK:  Right.

19       And the other thing that I will tell you, Your Honor, is I

20  certainly was not in the meeting was Chief Justice and Director

21  Freeh.  What I will tell you is, I've been here --

22          THE COURT:  You're dating yourself.  It was

23  Director --

24          MS. SUEK:  Well, and I will date myself, since 1995.

25          THE COURT:  It was Director Comey in 2015.

1          MS. SUEK:  Comey.  Okay.

2          So, the only policy that I know of, and I've been doing

3     Indian Country the whole time, is the one we provided the court

4     that was focused on custodial interviews encouraging recording

5     in other places.  Noncustodial, and otherwise, that didn't meet

6     all of the requirements of the policy.

7          And we in Indian Country certainly encourage it.

8          But the polygraph unit, in our view, has always -- it's

9     just always been that exception, whether we agree or not, that

10    has always been an exception.

11         And so, I have -- I have no knowledge of any other policy

12    that was even talked about.

13              THE COURT:  So, I guess, what you're telling me is to

14    be safe when it comes to the U.S. government, get it in

15    writing?

16              MS. SUEK:  Always.

17              THE COURT:  I guess -- well, what concerns me, again,

18    is we didn't have this issue for five years.  And we were told

19    the policy has changed, we didn't have the issue for five

20    years, and suddenly we're back.

21              MS. SUEK:  Well, we didn't have the polygrapher in

22    the district for five years, because Special Agent Smiedala was

23    back in D.C.

24         In the day, we never had a polygrapher in Montana, so the

25    courts were lucky to hear about polygraph evidence once every

1   other year.  And then we had a polygrapher in the district.

2   And we used him as much as we could, but when he left, we

3   didn't have anybody to replace him.  So, it was only by virtue

4   of a different assignment.  We just didn't have polygraph, a

5   polygrapher to use in these cases.

6              THE COURT:  All right.

7       Anything else?

8              MS. SUEK:  No.  Unless you have any other questions

9   for me.

10             THE COURT:  No, thank you.

11      All right.

12      So, I was hoping that we'd be able to rule from the bench.

13  I don't think I can give you enough guidance to make that

14  worthwhile.  I mean, I'm trying to balance, as I said, the

15  government's proposal to have the agent testify, to allow the

16  defense to have a robust cross-examination without inducing the

17  agent into blurting out the recording, or I guess, maybe what I

18  do is not allow the agent on cross-examination to testify to

19  that.  And then have a sidebar before the government redirects

20  to discuss whether the door -- whether fairness would require

21  the court to allow some discussion of that.  I think that's

22  probably the tactic I would take just to avoid an inadvertent

23  disclosure.

24      I think we could get through it without reference to the

25  recording.  But there is that concern I have about --

1   Mr. Branom raised -- about one arm tied behind the back where

2   you get -- talk about -- refer to a report about all this.

3        I think, Mr. Branom, you'll have enough ability to

4   cross-examine without necessarily the adverse instruction

5   coming in.

6        What I would like the parties to do is give me a few

7   instructions, as well, that would be given in different

8   scenarios.  Number one, whether the recording gets played, what

9   that specific language would entail.

10       Number two, you know, I'm not saying I would necessarily

11  give it -- if the recording didn't get played, Mr. Branom, what

12  would be appropriate if you were able to -- "Well, you had the

13  ability to do it, you didn't do it"; right?

14       If there's any kind of a looking with disfavor on or

15  dealing with skepticism, the testimony, when they had the

16  ability to record and did not.

17       So, there's a couple different scenarios.  You get those

18  instructions to me.  What?  The trial's the 6th, so I'm gone

19  next week.  Let me see a calendar here.  How about by the 2nd

20  or 3rd?  Would that be enough time?

21       Again, until I hear all the evidence, I'm not sure I can

22  say exactly what gets said and not said.  But I think to be

23  safe on cross-examination, we'll instruct the agent not to

24  bring up the recording.  And then, Mr. Branom, you'll have to

25  maybe have some discussion between the parties about where each

1   of you think the line would be drawn.  What would be fair game,

2   what wouldn't.  And then we could meet -- why don't we -- I'll

3   set up a hearing on the 2nd or 3rd.  Probably the 3rd.  I'll be

4   back in town on the 3rd.  That's a Friday.

5           MR. BRANOM:  I think I'm going to be gone then, Your

6   Honor.  And also on timing, as I understand it, the government

7   is going to endeavor to find if there's a written policy.  Do

8   we have --

9           THE COURT:  Yeah.  Yeah.  Okay.

10          MR. BRANOM:  -- time on that, too.

11      You know, maybe -- well --

12          THE COURT:  As I understand the speedy trial

13  deadlines here, Mr. Damon's is February 26th.

14  Mr. Birdrattler's February 15th.  Is that with the -- are we

15  stopped now?

16          MR. BRANOM:  Yes.  I believe we are, Your Honor.

17          MS. SUEK:  We are stopped.

18          THE COURT:  I mean, Mr. Damon is in custody.  So, I

19  know that's no fun.

20          MR. BRANOM:  Yes.

21          THE COURT:  So, we do have to check on the policy.

22  When can you give me an answer on the policy?

23          MR. TATARKA:  I think the only concern -- I would

24  confidently say by the end of this week, except for some

25  concerns about the holiday.  And so, maybe to be safe, two

1    weeks.  But we will endeavor to do it as soon as possible.

2          THE COURT:  That gives me concern.  We might have to

3    move this trial on the 6th.

4          Hold old, Mr. Branom.

5          MR. BRANOM:  I'm holding.

6          THE COURT:  I want to say -- before I get ahead of

7    myself, I want to see the policy, because that may have some

8    effect on what happens with regard to the trial instructions.

9    If there is no written policy, or written policy differs from

10   what we've been told, or has more discretion, then we have a

11   different question here.

12         Mr. Branom.

13         MR. BRANOM:  We'd rather have it right than rush,

14   Your Honor.

15         THE COURT:  I understand that.  We're talking about a

16   week or two.  We're not talking about putting this off -- I'll

17   juggle some other trials to make sure it happens in January for

18   Mr. Damon.  It might not be the 6th, it might be the 20th or

19   27th.  But we'll get it in.

20         I understand your hurdle, Mr. Tatarka, but give me that as

21   soon as possible.

22         MR. TATARKA:  Absolutely, Your Honor.  We'll get on

23   the phone this afternoon to start that process.

24         THE COURT:  You'll get that to Mr. Branom, as well?

25         MR. TATARKA:  Again, unless there's some reason

```
 1   why --
 2            THE COURT:  Unless you have to file it under seal.
 3   Then I'll give it an in camera review and make the decision
 4   about whether a portion of it can be redacted.  If there's
 5   something to be redacted, so Mr. Branom has a chance to see it
 6   and use it to prepare his cross-examination.
 7            MR. TATARKA:  Absolutely, Your Honor.
 8       Like I said, we will endeavor as quickly as possible to
 9   get you an answer -- to get you the policy, if possible.  If
10   not, get you an explanation about why we can't.
11            THE COURT:  What the status is.  Here's the policy or
12   it doesn't exist, and here's what these quotes were taken from.
13            MR. TATARKA:  As I said, we will start that process
14   before we even leave Great Falls.
15            THE COURT:  Then, with regard to timing, if you give
16   me the jury instructions, how about, say, by the 10th, the
17   proposals?
18            MR. BRANOM:  No.  No.  If you're going to move it, if
19   you just want to issue a whole new schedule.  I mean, we're set
20   on the 6th, so I guess setting the 10th makes me --
21            THE COURT:  Well, I'm talking about just the
22   instructions related to this issue, not all your instructions.
23   On the adverse -- whatever the content of the adverse inference
24   instruction, or the view with skepticism instruction would be,
25   regarding the failure to record or -- failure to record the
```

 1 | whole interview, or the failure to record it all.
 2 |         MR. BRANOM:  I'm sorry.  By -- when do you want
 3 | those, Your Honor?
 4 |         THE COURT:  Well, assuming I can get a trial set on
 5 | the 20th.
 6 |         MR. BRANOM:  That's been -- that's what --
 7 |         THE COURT:  The 20th --
 8 |         MR. BRANOM:  Sure.
 9 |         THE COURT:  I believe the 20th is a holiday.  The
10 | 21st or 27th, we might be able to squeeze in a trial those
11 | days.
12 |     Counsel, do you have any conflicts in January, Ms. Adams?
13 | Who's going to try the case?
14 |         MS. ADAMS:  I believe Ms. Suek and I are trying it.
15 |         MS. SUEK:  Right now, we're trying it.
16 |     I don't think so, Your Honor.
17 |         THE COURT:  The two of you together are going to try
18 | it?
19 |         MS. SUEK:  Yes.
20 |         THE COURT:  Okay.
21 |     Well, I will check my schedule, and then if necessary,
22 | convene a phone conference to make sure everyone's available,
23 | either the 21st or 27th, I hope.
24 |     But I'm only talking about the instruction, Mr. Branom,
25 | related to the issues raised by these motions.  Not all your

1 | jury instructions, just the --

2 | MR. BRANOM:  So, certainly the 10th, which is what I
3 | understood you to say.

4 | THE COURT:  Does the 10th work as well for the
5 | government?

6 | MR. TATARKA:  Absolutely, Your Honor.

7 | THE COURT:  So, what I would propose doing, then, is
8 | convening a new hearing -- if the trial's the 27th, convening a
9 | hearing the week of the 21st to try to give you as much
10 | guidance as I can.  And I urge you to have some discussions
11 | yourself.

12 | I spoke at the county bar lunch last week and it was
13 | critical of their civil lawyers' failure to communicate without
14 | the court's involvement.  So, I'll put the burden on you two,
15 | Mr. Branom and Ms. Adams, to get together and see if you can
16 | work out some -- you don't have to agree entirely, but just
17 | where those boundaries ought to be, and what some of the issues
18 | of concern are.

19 | Okay?

20 | MR. BRANOM:  Thank you, Your Honor.

21 | THE COURT:  Understood, Mr. Tatarka?

22 | MR. TATARKA:  Understood, Your Honor.

23 | The only place I want to make clear, just so there wasn't
24 | any -- any miscommunication from what we've presented, is that
25 | it's still the United States' position that if -- that if we

1   did not elicit, and as you say, not fairly within the bounds

2   elicit that -- the recording, that even if the defense makes it

3   an issue, we don't think there should be an adverse

4   instruction.  And I think the court understands that and

5   understands that it's reserving that among its considerations.

6   I just want to make that clear, so -- just in case it seemed

7   like we had conceded that point.

8               THE COURT:  All right.

9       I want to make sure I understand before I respond.

10      I know you don't want to concede that point.  But I think

11  if you bring it up -- if you bring the recording up -- if the

12  government brings up the recording, you will get the adverse

13  inference instruction.

14              MR. TATARKA:  We acknowledge that.

15              THE COURT:  Okay.

16      Make sure we're clear on that point.

17              MR. TATARKA:  Yes.  Absolutely.

18      Our intention was never to challenge your initial ruling.

19  Our hopes are that we were within the bounds of that, which I

20  would note that your order does say "if the government raises

21  this."

22              THE COURT:  All right.

23      Anything else?

24              MR. BRANOM:  I look forward to the next hearing, Your

25  Honor.

1      Thank you.

2           THE COURT:  Thank you, all.

3      We're in recess.

4           (The proceedings in this matter were adjourned at

5           3:32 p.m.)

6

7

8

9                 C E R T I F I C A T E

10

11      I certify that the foregoing is a correct transcript from

12  the record of proceedings in the above-entitled matter.

13      /s/ Tina C. Brilz, RPR, FCRR

14      Dated this 26th day of December, 2019.

15

16

17

18

19

20

21

22

23

24

25